IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

FEB 21 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

| | |
|---|---|
| TRI-STATE CONSUMER<br>INSURANCE COMPANY, INC.<br>　　　　　Plaintiff,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS INC.,<br>Formerly Known as ChoicePoint<br>Services Inc., Survivor Entity of its<br>Merger with Insurity LLC a/k/a/<br>"Insurity"<br>　　　　　Defendant, | CIVIL ACTION NO:<br><br>2011CV195485 |

## DEFENDANT'S ANSWER AND DEFENSES AND COUNTERCLAIMS

Defendant LexisNexis Risk Solutions Inc. ("Defendant") hereby files its

Answer and Defenses to the Complaint of Tri-State Consumer Insurance

Company, Inc. ("Plaintiff") and Defendant's Counterclaims.

### ANSWER AND DEFENSES

With respect to the numbered paragraphs in Plaintiff's Complaint,

Defendant answers as follows:

### DEFENDANT'S RESPONSES TO THE NUMBERED ALLEGATIONS OF THE COMPLAINT

1.

The Plaintiff, Tri-State Consumer Insurance Company, Inc., is a New York
State registered corporation with its principal place of business at 575 Jericho
Turnpike, Jericho, New York 11753; it is a New York licensed insurance company.

**RESPONSE:**

Admitted.

2.

The Defendant LexisNexis Risk Solutions, Inc. is a Georgia corporation. It has appointed as its registered agent for service of process CT Corporation Systems, 1201 Peachtree Street, N.E., Atlanta, Fulton County, Georgia 30361.

**RESPONSE:**

Admitted.

2. [SIC][1]

In 2008, Insurity, LLC was a Georgia Limited Liability Company.

**RESPONSE:**

Admitted.

3.

On or about December 31, 2008, Insurity, LLC and ChoicePoint Services, Inc. merged. The surviving entity was ChoicePoint Services, Inc. ChoicePoint Services, Inc. was a Georgia for profit corporation.

**RESPONSE:**

Defendant admits that on or about December 31, 2008, Insurity LLC and

ChoicePoint Services Inc. merged, and ChoicePoint Services Inc was the surviving

---

[1] The Complaint contains two allegations labeled as "2". To avoid confusion, Defendant will follow the Complaint's numbering.

840129.1

2

EXHIBIT C - 2

entity. Defendant admits that ChoicePoint Services Inc. was a Georgia business corporation.

4.

The entity ChoicePoint Services, Inc. amended its Articles of Incorporation changing the name of its corporation to LexisNexis Risk Solutions, Inc. on or about January 1, 2010.

**RESPONSE:**

Defendant admits ChoicePoint Services Inc. amended its Articles of Incorporation and changed its name to LexisNexis Risk Solutions Inc. on or about January 1, 2010.

5.

The Defendant LexisNexis Risk Solutions, Inc. as the surviving entity through a name change is responsible for the obligations of Insurity, LLC.

**RESPONSE:**

Defendant admits that it is responsible for the valid legal obligations of Insurity LLC in so far as they relate to the claims at issue in this dispute; however, Defendant lacks sufficient information to admit or deny the remaining allegations and on that basis denies the allegations in paragraph 5 of the Complaint.

6.

LexisNexis Risk Solutions, Inc. is subject to the jurisdiction of this Court.

**RESPONSE:**

Admitted.

840129.1

3

EXHIBIT C - 3

7.

LexisNexis Risk Solutions, Inc. is subject to the venue of this Court.

**RESPONSE:**

Admitted.

8.

Jurisdiction and venue are properly laid in the Superior Court of Fulton County.

**RESPONSE:**

Admitted.

9.

On or about March 31, 2008, Insurity, LLC, (hereinafter "Defendant" or "Insurity") executed a document entitled "Master Agreement" as did Tri-State Consumer Insurance Company, Inc. (hereinafter "Plaintiff" or "Tri-State").  A true and accurate copy of that "Master Agreement" document (hereinafter "Master Agreement" or "the Agreement") is attached hereto as Exhibit "A."

**RESPONSE:**

Defendant admits that on or about March 31, 2008, Insurity LLC and

Plaintiff executed a contract entitled "Master Agreement."  Although the copy of

the Complaint served on Defendant did not contain the attachment (Exhibit A),

which was incorporated by reference into Plaintiff's Complaint, Defendant admits

that the document attached hereto as Exhibit A is a true and correct copy of the

Master Agreement.

10.

On or about March 31, 2008, Insurity and Tri-State also each executed a document entitled "Schedule – Software & Services."  A true and accurate copy of that "Schedule; Software & Services" (hereinafter "Schedule") document is attached hereto as Exhibit "B."

**RESPONSE:**

Defendant admits that on or about March 31, 2008, Insurity LLC and

Plaintiff also each executed a document entitled "Schedule – Software & Services"

("Schedule").  Although the copy of the Complaint served on Defendant did not

contain the attachment, which was incorporated by reference into Plaintiff's

Complaint, Defendant admits the document attached hereto as Exhibit B is a true

and correct copy of the Schedule.

11.

Pursuant to the Schedule, Insurity purportedly agreed to deliver to Tri-State certain industry specific software described generally as "… the Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions as it exists as of the effective date the Master Agreement, without modification, except as described below" (hereinafter "Base Software") (See Exhibit B, "Schedule" at paragraph 6 Project Scope).

**RESPONSE:**

Defendant admits that the Schedule, which is attached hereto as Exhibit B

and incorporated into the Complaint, contains the quoted language, but states that

the Schedule speaks for itself.  Defendant denies the allegations in paragraph 11 to

EXHIBIT C - 5

the extent that they imply Defendant was not required to modify and make

customizations to the Base Software for Plaintiff's use.

12.

The "Base Software" was represented to support New York insurance issues and support certain of Plaintiff's insurance lines of business including personal auto, homeowner's, and personal umbrella. That "Base Software" was represented to support – for each personal auto, homeowner's, and personal umbrella lines of business – the following:

    (1)   New Business Quote/Issue;
    (2)   Renewal Quote/Issue;
    (3)   Endorsement;
    (4)   Cancel;
    (5)   Reinstatement;
    (6)   View and Reprint Documents;
    (7)   Non-Renewal;
    (8)   Out-of-sequence change endorsement processing; and
    (9)   Rewrites.

**RESPONSE:**

Defendant admits that the Schedule contains the following language:

"(a) The Base Software will support the following state:
    i. New York
(b) The Base Software will support the following lines of business:
    i. Personal Auto
    ii. Homeowners
    iii. Personal Umbrella
(c)   The Base Software will support the following transactions:
    i.   For all line of business:
    •   New Business Quote/Issue
    •   Renewal Quote/Issue
    •   Endorsement
    •   Cancel
    •   Reinstatement
    •   View and Reprint Documents

EXHIBIT C - 6

- • Non-Renewal
- • Out-of-sequence change endorsement processing
- • Rewrites."

*See* Exh. B (Schedule) at §§ 6(a)-(c); however, Defendant states that the Schedule

speaks for itself. Defendant denies the allegations in paragraph 12 of the

Complaint to the extent that they are inconsistent with the Schedule.

13.

The "Base Software" ("BS") was to be implemented as a part of the
Implementation Services and was also to include the following standard
customization items: (1) VIN verification; and (2) Interfaces for ChoicePoint
CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit
Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill, and ChoicePoint NY List
Service.

**RESPONSE:**

Defendant admits that the Schedule contains the following language:

"The Base Software to be implemented as part of the Implementation
Services will include the following standard customization items at no
additional cost to Customer:

  i.  VIN Verification
  ii. Interfaces for ChoicePoint CLUE (Home and Auto),
  ChoicePoint Current Carrier, ChoicePoint Credit Scoring,
  ChoicePoint MVR, ChoicePoint Data Pre-fill, and ChoicePoint
  NY List Service."

*See* Exh. B (Schedule) at § 6(d); however, Defendant states that the Schedule

speaks for itself. Defendant denies the allegations in paragraph 13 of the

Complaint to the extent that they are inconsistent with the Schedule.

14.

That same "Base Software" and Implementation Service was to include a Consumer User Interface and Agent User Interface. The "Base Software" was also to include a batch print administration.

**RESPONSE:**

Defendant admits that the Schedule contains the following language:

> "(e) The Base Software to be implemented as part of the Implementation Services will include a Customer User Interface and Agent User Interface. These will be delivered as part of the base at a time deemed appropriate by the Vendor Project Manager and Customer Project Manager.
> (f) Batch print administration – Policy Decisions will be integrated with Insurity's Batch Print Administrator (BPA) or with a client specific batch printing tool to support batch printing of policy documents."

*See* Exh. B (Schedule) at §§ 6(e)-(f); however, Defendant states that the Schedule

speaks for itself. Defendant denies the allegations in paragraph 14 of the

Complaint to the extent that they are inconsistent with the Schedule.

15.

The license fee for the "Base Software" was One Million, Two Hundred and Fifty Thousand Dollars ($1,250,000.00) to be paid in installments of $250,000 upon signing of the Agreement and then $125,000 monthly thereafter from May 1st through December 1, 2008. To date, Tri-State has paid Defendant One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen Cents ($1,147,726.13).

**RESPONSE:**

Defendant admits that the Schedule § 8(a) contains the following language:

"Base Software License Fee:

EXHIBIT C - 8

> Policy Decisions, Billing Decisions, Reporting Decisions $1,250,000
> Payment of these fees will be due as follows: $250,000 upon
> execution of the Master Agreement
> $125,000 Billable monthly beginning May 1, 2008 and ending on
> December 1, 2008."

*See* Exh. B (Schedule) at § 8(a); however, Defendant states that the Schedule

speaks for itself. Defendant denies the allegations in paragraph 14 of the

Complaint to the extent that they are inconsistent with the Schedule. Defendant

admits that, to date, Tri-State has paid $1,147,726.13. But Defendant denies that

Plaintiff has rendered payment of more than $1,125,000 for the Base Software

license fee.

## 16.

None of the deliverables set forth within the project scope was delivered by
Defendant to Tri-State on schedule or by deadline, to the extent that any schedule
or deadline for submission of deliverables existed or had been set or established by
contract between the parties.

**RESPONSE:**

Denied.

## 17.

Of the elements set forth in the project scope and arguably delivered by
Defendant, none met, constituted or "... contain[ed] all of the features described in,
... performed all of the material functions set forth in, and [/ or] operated in
substantial conformance with, its applicable Specifications and Documentation ..."
as warranted and required in the Master Agreement [See Section 8.
WARRANTIES AND LIMITATION OF LIABILITY at Paragraph 8.1 Software
Warranty].

840129.1
9

EXHIBIT C - 9

**RESPONSE:**

Denied.

18.

The Defendant failed to meet or comply with any delivery schedule or deadline, to the extent that any schedule or deadline for submission of deliverables existed or had been set or established by contract between the parties.

**RESPONSE:**

Denied.

19.

At best, the Defendant only submitted one software element deliverable which was the "auto process."

**RESPONSE:**

Denied.

20.

At no time from the signing of the Agreement or the Schedule on March 31, 2008, have there been set forth and mutually agreed to specific dates for performance by Insurity or the delivery of the promised product to Tri State and, to the extent there may have been, the dates were subject to Defendant's unilateral power to modify or disregard.

**RESPONSE:**

Defendant admits that neither the Master Agreement nor the Schedule

required Insurity LLC to deliver the software by specific dates. Defendant denies

the remaining allegations in paragraph 20 of the Complaint.

840129.1
10

EXHIBIT C - 10

21.

In fact, as late as May 21, 2009, over one year after the signing of the Agreement and Schedule documents, Tri-State's Project Manager communicated to his Insurity counterpart by eMail:

> As far as the option/dates you listed – as you are the project manager for Insurity development – *please provide TSC [Tri State Consumer Insurance Company, Inc.] with schedule that delivers quality product on time in a logical, productive, well communicated way.* I don't have insight into what Insurity can or cannot delivery by what date – only you do. I am not going to pick deliverables of software or associated dates – you tell me what you are delivering and when, and what the ramifications of the delivery and dates are on the overall project schedules.
> (eMail Thursday May 21, 2009 from Peter Kardas to Michelle Piotrowski at 8:57 am – emphasis added)

**RESPONSE:**

Defendant admits that on or about May 21, 2009, Peter Kardas sent a message by email to Michelle Piotrowski containing, in part, the language set forth in paragraph 21 of the Complaint. Defendant denies the remaining allegations in paragraph 21 of the Complaint to the extent they are taken out of context and/or imply that the statements in the message are true.

22.

Essential elements were not defined or agreed to either in the "agreement" or in the "schedule." Nor were there sufficient details agreed to which would permit the determination of a time for delivery of either the "base software" as set forth within the "schedule" or any of the individual elements comprising the "base software" as set forth within the "schedule."

EXHIBIT C - 11

**RESPONSE:**

Defendant denies that "essential elements" or "sufficient details" of the parties' agreements were not defined or agreed to; on that basis, Defendant denies the remaining allegations in paragraph 22 of the Complaint.

23.

Upon information and belief, Defendant and its employees and agents deceived Plaintiff in the furnishing of its software services.

**RESPONSE:**

Denied.

24.

Defendant, by and through its employees and agents traveled to Plaintiff's New York place of business in January 2008, and there "[C]onduct[ed] a "Requirements Assessment project that will document high level functional requirements and create a "Formal Proposal" to develop a solution for policy administration processes" for Plaintiff.

**RESPONSE:**

Defendant admits that certain of its employees and agents have traveled to Plaintiff's New York place of business in January 2008. Defendant also admits that an invoice dated January 3, 2008 from Defendant to Plaintiff contains the above quoted material, which speaks for itself. At this time, Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph 24 of the Complaint.

840129.1
12

EXHIBIT C - 12

25.

Upon information and belief, Defendant thereupon knew that its proprietary Software would not or could not satisfy Plaintiff's known requirements.

**RESPONSE:**

Denied.

26.

By eMail from Tri State's Project Manager to Defendant's Project Manager Michelle Piotrowski dated Monday May 18, 2009 at 7:03 AM, Defendant was rebuked for its pattern of concealment and deception:

> Michelle,
> You said – "We found a significant number of issues with the raters that were provided." But Michelle, it is the 11[th] hour and to date you have told me that Insurity's development and AQ of TSC'S software was going perfectly fine.  You have communicated only positive information on Insurity's development of our software.  To date, you have never hinted of any potential delays or problems.  Additionally, Insurity has been working on our rating software for many months – why on the scheduled day of delivery are you informing us of "significant number of issues"?  These items should have been found long along – can anyone doubt that?  The only thing I can surmise is your dev was late, thus your AQ was late, thus I wasn't being given an accurate information on the status of Insurity's development of TSC software.  What else can I think?  I can only hope the issues are minor and not major.  Do you <u>really</u> know? [emphasis original]

**RESPONSE:**

Defendant admits that on or about May 18, 2009, Peter Kardas sent a

message by email to Michelle Piotrowski containing, in part, the language set forth

840129.1
13

EXHIBIT C - 13

in paragraph 26 of the Complaint. Defendant denies the remaining allegations in

paragraph 26 of the Complaint, including but not limited to any implication that

the statements in the message are true.

27.

Upon information and belief, Defendant Insurity knew its proprietary
Software which was to form the "Base Software" for Plaintiff was not materially as
represented to Plaintiff.

**RESPONSE:**

Denied.

28.

Upon information and belief, Defendant Insurity and its employees and
agents materially misrepresented to Plaintiff and intentionally omitted and
withheld material information from Plaintiff and its employees and agents
regarding the capabilities, functionalities and performance of its propriety Software
as they attempted to modify it for the benefit and use of Plaintiff.

**RESPONSE:**

Denied.

29.

In anticipation of and with the expectation that the Defendant would
develop, deliver, and implement the "software" to Tri-State in a manner which
would be useful in its business, Tri-State made payment to the Defendant of the
following sums:

- $250,000.00 on or about April 18, 2008 representing the base
  software license fee;

- $125,000.00 on or about June 20, 2008 for the May 2008 base
  software license fee;

EXHIBIT C - 14

- $125,000.00 on or about July 24, 2008 for the June 2008 base software license fee;

- $125,000.00 on or about August 8, 2008 for the July 2008 base software license fee;

- $125,000.00 on or about August 29, 2008 for the August 2008 base software license fee;

- $125,000.00 on or about September 19, 2008 for the September 2008 base software license fee;

- $125,000.00 on or about November 7, 2008 for the October 2008 base software license fee;

- $125,000.00 on or about November 13, 2008 for the November 2008 base software license fee;

**RESPONSE:**

Defendant lacks sufficient information to admit or deny what comprised Plaintiff's "expectation" or "anticipation" with respect to the software, and therefore, denies the allegations in paragraph 29 of the Complaint on that basis. Defendant admits that the total Base Software license fee, described in § 8(a) of the Schedule, was $1,250,000. Defendant further admits that Plaintiff made the payments described in paragraph 29 of the Complaint.

30.

In addition to those sums, on or about July 28, 2008, the Defendant invoiced Tri-State for billable travel expense in the sum of $4,801.23 which Tri-State paid on or about August 15, 2008.

**RESPONSE:**

Defendant admits the allegations contained within paragraph 30 of the

Complaint, except that, at this time, Defendant lacks sufficient information to

admit or deny the precise date on which Plaintiff paid the invoice.

31.

On or about September 30, 2008, the Defendant also invoiced the sum of
$3,403.52 for travel expenses allegedly incurred by its staff. Tri-State paid this
invoice on or about October 13, 2008.

**RESPONSE:**

Defendant admits the allegations contained in paragraph 31 of the

Complaint, except that, at this time, Defendant lacks sufficient information to

admit or deny the precise date on which Plaintiff paid the invoice.

32.

Additionally, on or about September 30, 2008, the Defendant invoiced Tri-
State for billable travel expense in the sum of $2,867.61 which was paid on or
about October 13, 2008.

**RESPONSE:**

Defendant admits the allegations contained in paragraph 32 of the

Complaint, except that, at this time, Defendant lacks sufficient information to

admit or deny the precise date on which Plaintiff paid the invoice.

33.

On or about January 3, 2008, the Defendant invoiced Tri-State for the
following: "conduct a 'Requirements Assessment' project that will document high

level functional requirements and create a 'Formal Proposal' to develop a solution for policy administration processes" in the amount of $6,000.00. The Plaintiff paid Defendant the sum on or about January 10, 2008.

**RESPONSE:**

Defendant admits the allegations contained in paragraph 33 of the

Complaint, except that, at this time, Defendant lacks sufficient information to

admit or deny the precise date on which Plaintiff paid the invoice.

34.

None of the elements arguably delivered or as set forth in the project scope performed as represented. The products and services provided by the Defendant to Tri-State have absolutely no value.

**RESPONSE:**

Denied.

## COUNT ONE

## Unjust Enrichment
## Constructive Trust

35.

Plaintiff incorporates by reference paragraphs 1 through 34 of its Complaint as if the same were more fully set forth herein.

**RESPONSE:**

Defendant incorporates by reference, as if fully set forth herein, its responses

to allegations 1 through 34 of the Complaint.

840129.1
17

EXHIBIT C - 17

36.

The payments by Tri-State to the Defendant totaling One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen cents ($1,147,726.13) constitute an unjust enrichment of the Defendant at your Plaintiff's expense.

**RESPONSE:**

Denied.

37.

The Defendant has been conferred a benefit by Tri-State to which the Defendant should have no claim or any right to retain any of those benefits, to wit: One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen cents ($1,147,726.13).

**RESPONSE:**

Denied.

38.

The Court should impose a constructive trust upon monies paid by the Plaintiff to the Defendant, to wit: One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen cents ($1,147,726.13), and order the return of those amounts to the Plaintiff.

**RESPONSE:**

Denied.

## COUNT II

## Deceptive Acts and Practices
## New York State General Business Law §349

840129.1
18

EXHIBIT C - 18

39.

Plaintiff incorporates by reference paragraphs 1 through 38 of its Complaint as if the same were more fully set forth herein.

**RESPONSE:**

Defendant incorporates by reference, as if fully set forth herein, its responses to allegations 1 through 38 of the Complaint.

40.

During the negotiations for, the furnishing of and attempts to resolve conflicts involving Defendant's services in licensing its proprietary Software, its modification of the Software for Plaintiff's use and Defendant's non-delivery of a usable system for which Plaintiff paid Defendant over One Million Dollars, Defendant acting through its employees and agents committed deceptive acts and employed deceptive practices contrary to New York State General Business Law ("NY GBL") §349.

**RESPONSE:**

Denied.

41.

By virtue of Defendant's behavior in violation of NY GBL 349, Plaintiff has been harmed and has suffered the loss of actual damages, to wit: the monies paid to Defendant plus other expenses incurred plus reasonable attorney fees as allowed under NY GBL §349(h).

**RESPONSE:**

Denied.

## COUNT III

### Breach of Warranty

840129.1
19

EXHIBIT C - 19

42.

Plaintiff incorporates by reference paragraph 1 through 41 of its Complaint as if the same were more fully set forth herein.

**RESPONSE:**

Defendant incorporates by reference, as if fully set forth herein, its responses

to allegations 1 through 41 of the Complaint.

43.

In the alternative, should it be determined that a valid, *de facto* common law contract was created between Plaintiff and Defendant, the Plaintiff shows that the Defendant breached its obligations pursuant to any such agreement in that it did not timely delivery the "base software" as understood and agreed or any of the individual elements set forth in the project scope with features as described, or which performed the material functions set forth within the intended project scope, or which operated in substantial conformance with all of the applicable specifications and documentation.

**RESPONSE:**

Denied.

44.

Any contract for licensure of the Base Software and associated services contained an implied warranty that the software and services would be of value to Tri-State and provide it with a useful, functioning, quality system.

**RESPONSE:**

Denied.

45.

The software and services did not provide Plaintiff with a useful, functioning, quality system.

**RESPONSE:**

Denied.

46.

The software and services provided by the Defendant to your Plaintiff had a value of zero dollars. Had the software and services been of the value represented by the Defendant, the value would have been slightly in excess of One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen cents ($1,147,716.13).

**RESPONSE:**

Denied.

## COUNT IV

## Breach of Warranty

47.

Plaintiff incorporates by reference paragraphs 1 through 46 of its Complaint as if the same were more fully set forth herein.

**RESPONSE:**

Defendant incorporates by reference, as if fully set forth herein, its responses to allegations 1 through 46 of the Complaint.

840129.1
21

EXHIBIT C - 21

48.

At all times material hereto the Defendant was in the business of licensing and selling computer software and ancillary services including, but not limited to implementation, integration, customization and maintenance.

**RESPONSE:**

Admitted.

49.

In 2008, the Defendant invoiced and Plaintiff paid for software licensure and services in the sum of One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen Cents ($1,147,726.13).

**RESPONSE:**

Defendant admits that Plaintiff has paid Defendant $1,147,726.13.

Defendant denies the allegations in paragraph 49 of the Complaint, and elsewhere,

to the extent that they suggest or imply that Plaintiff has remitted all amounts due

and payable to Defendant.

50.

Defendant knew or had reason to know the Plaintiff needed the Defendant's products for the proper operation of its insurance business.

**RESPONSE:**

Denied.

51.

Plaintiff relied on the Defendant's represented industry specific skill and represented industry specific expertise in the technology needed for this segment of

the insurance industry and Defendant's industry specific software product in selecting the software and services for Plaintiff's utilization.

**RESPONSE:**

Defendant lacks sufficient information to admit or deny what subjectively motivated Plaintiff's purchasing decisions, but otherwise denies the allegations in paragraph 51 of the Complaint.

52.

The goods and services were not fit for the intended and known utilization by the Plaintiff.

**RESPONSE:**

Denied.

53.

The software and services provided by the Defendant to your Plaintiff had a value of zero dollars. Had the software and services been of the value represented by the Defendant, the value would have been slightly in excess of One Million One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen cents ($1,147,726.13).

**RESPONSE:**

Denied.

## COUNT V

### Breach of Contract

54.

Plaintiff incorporates by reference paragraphs 1 through 53 of its Complaint as if the same were more fully set forth herein.

840129.1
23

EXHIBIT C - 23

**RESPONSE:**

Defendant incorporates by reference, as if fully set forth herein, its responses

to allegations 1 through 53 of the Complaint.

55.

In the alternative, should it be determined that the March 31, 2008 Master
Agreement and the March 31, 2008 Schedule; Software & Services constitutes a
valid and enforceable contract, the Plaintiff shows that the Defendant breached its
obligations pursuant to said contract in that it did not timely delivery the "base
software" as understood and agreed or any of the individual elements set forth in
the project scope with features as described, or which performed the material
functions set forth within the intended project scope, or which operated in
substantial conformance with all of the applicable specifications and
documentation.

**RESPONSE:**

Denied.

56.

As a direct result of the Defendant's failure to perform or other meet its
contractual obligations the Plaintiff was harmed.

**RESPONSE:**

Denied.

57.

Plaintiff paid Defendant pursuant to the Agreement One Million One
Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and Thirteen
cents ($1,147,726.13) and received no value in exchange due to Defendant's
failure to perform or deliver as promised.

**RESPONSE:**

Defendant admits that Plaintiff paid Defendant $1,147,726.13, but otherwise

denies the allegations in paragraph 57 of the Complaint.

58.

Pursuant to the terms of the Agreement, Plaintiff is limited in its recovery to
the amount of money actually paid to Defendant.

**RESPONSE:**

Defendant admits that the parties' agreements limit Plaintiff's damages to

the amount of fees Plaintiff actually paid to Defendant; however, Defendant denies

that Plaintiff is entitled to any recovery from Defendant whatsoever.

59.

Plaintiff is entitled to recover damages from Defendant as a result of
Defendant's breach of contract and failure to perform in the sum of One Million
One Hundred Forty Seven Thousand Seven Hundred Twenty Six Dollars and
Thirteen cents ($1,147,726.13).

**RESPONSE:**

Denied.

60.

Any allegation not specifically admitted herein is denied.

61.

**WHEREFORE,** Defendant denies that Plaintiff is entitled to any relief

whatsoever on its claims, including but not limited to, any of the relief claimed in

840129.1
25

EXHIBIT C - 25

the Complaint's Prayer for Relief. Defendant respectfully requests that the Court

enter judgment against Plaintiff, award costs to Defendant, and grant such other

relief as may be just.

## DEFENDANT'S AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim on which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims are barred by a contractual limitation period agreed to by

the parties in the Master Agreement and Schedule (collectively "the Agreements").

### THIRD DEFENSE

Plaintiff's claims are barred by the voluntary payment doctrine.

### FOURTH DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

### FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by a contractual disclaimer

of implied warranties.

### SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because it is ineligible for,

or has failed to satisfy the conditions for, the warranty contained in the

Agreements.

840129.1
26

EXHIBIT C - 26

## SEVENTH DEFENSE

Plaintiff's claims are barred, in part, because a Georgia choice of law clause in the parties' Agreements bars its claim under New York law.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because it has affirmed and ratified the Agreements and/or any contract at issue between the parties.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because it has failed to satisfy condition(s) precedent to its recovery under the Agreements and/or any contract between the parties.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the affirmative defense of estoppel.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because it failed to rescind the Agreements and/or any of the contracts between the parties.

## TWELFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because it failed to restore the parties to their pre-contractual position and by Plaintiff's failure to tender back the benefits of the bargain it received.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by offsetting damages Plaintiff owes Defendant.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the statute of frauds.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the Agreements' merger and non-reliance clauses. *See* Exh. A (Master Agreement) at §§ 2.1, 8.2.

## SIXTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the affirmative defense of waiver.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the Agreements.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation for, *inter alia*, the New York Gen. Bus. Law § 349 claim.

## NINETEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the defense of laches.

## TWENTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the language of the Master Agreements and Schedule, including but not limited to, language limiting Plaintiff's remedies, a liability waiver for certain delays, and all other applicable provisions.

## DEFENDANT'S COUNTERCLAIMS

Without waiver of the above affirmative defenses or any grounds or arguments supporting or set forth in Defendant's Motion to Dismiss, Defendant hereby asserts the following counterclaims. In short, Defendant/Counterclaimant LexisNexis Risk Solutions Inc. ("Counterclaimant") seeks monetary damages and injunctive relief arising out of Plaintiff/Counterclaim-Defendant Tri-State Consumer Insurance Company, Inc. ("Counterclaim-Defendant" or "Tri-State)'s (1) anticipatory repudiation and breach of the contracts between the parties; (2) breach of contracts; (3) breach of the implied covenant of good faith and fair dealing; (4) improper retention of Counterclaimant's property, including proprietary information; and (5) stubborn litigiousness and bad faith.

### The Parties

1.

Counterclaimant LexisNexis Risk Solutions Inc. is a Georgia corporation.

EXHIBIT C - 29

2.

Counterclaim-Defendant Tri-State Consumer Insurance Company, Inc. is a New York State registered corporation, with its principal place of business at 575 Jericho Turnpike, Jericho, New York 11753. It is a New York-licensed insurance company.

3.

Counterclaimant LexisNexis Risk Solutions Inc., a Georgia corporation, is the current name of ChoicePoint Services Inc., with which Insurity LLC, a Georgia limited liability company, merged. Counterclaimant is the proper party to this suit.

4.

On January 21, 2011, Tri-State initiated this action against Counterclaimant in the Superior Court of Fulton County.

5.

Therefore, the parties are subject to the jurisdiction of this Court, and venue is proper in the Superior Court of Fulton County.

**The Agreements**

6.

On March 31, 2008, Insurity and Tri-State executed two contracts for the development, sale, and provision of software to Tri-State. *See* Master Agreement ("Master Agreement"), a true and correct copy of which is attached hereto as

Exhibit A, and Schedule: Software & Services ("Schedule), a true and correct copy of which is attached hereto as Exhibit B.

7.

The Master Agreement and Schedule (collectively "the Agreements") created a framework by which, *inter alia*, the parties would work cooperatively to create customized software for Tri-State's use in its insurance business.

8.

The Master Agreement created a series of terms and conditions that the parties incorporated into the more specific Schedule.

9.

The Master Agreement and the Schedule together constituted the relevant "Agreements" between the parties. *See* Exh. A (Master Agreement) at 1 ("[E]ach Schedule shall constitute a separate and independent agreement with the terms of this Master Agreement applying to each Schedule individually."); Exh. B (Schedule) at 1 ("Vendor and Customer are Parties to a certain Master Agreement, dated March 15, 2008, pursuant to which certain terms and conditions have been established."); *id.* ("[T]ogether with the Master Agreement, the Parties agree as follows: . . ."); *id.* at § 1 ("The [Schedule] is hereby incorporated into the Master Agreement and, as set forth herein, is subject to its terms and conditions.").

10.

The Schedule identified the software and services to be provided.

11.

The Agreements did not require Counterclaimant to complete performance by a specific date.

12.

Rather, the Agreements required (1) the parties' cooperation and active involvement and (2) imposed certain obligations necessary for the development and implementation of the software.

13.

The Agreements reflected the fact that without both parties' active cooperation, Counterclaimant would not be able to design and produce software that would meet Tri-State's needs.

14.

For example, the Master Agreement specified that Counterclaimant "shall have **no liability** for delays in the provision of the Project implementation services caused by [Plaintiff's] failure to complete its tasks or provide information or resources in a timely manner." Exh. A (Master Agreement) at § 11.5 (emphasis added).

EXHIBIT C - 32

15.

The Schedule also required Tri-State to do certain things including: (1) "[a]ssign competent project, insurance/business and technical staff to review and sign-off on the final [project], Exh. B (Schedule) at § 10(a)(ii); (2) "provide adequate resources to ensure that the [Client Requirement's Book] is completed within" 75 days of the Schedule's execution, *id.* at § 10(a)(iii); and (3) participate in Executive Governance Committee meetings (as required by the Master Agreement § 7.1), *id.* at § 10(a)(xi).

16.

The Master Agreement required ongoing cooperation in the form of: (1) testing after delivery of software and (2) the designation of certain coordinators to identify problems.  *See* Exh. A (Master Agreement) at §§ 3, 5, 6, and 7.

17.

The parties mutually understood that the development, customization, and implementation of the software was a complex undertaking that was subject to delays both in the creation and in the implementation stage (referred to hereafter as "the project").

## The Software at Issue in this Dispute

18.

The Schedule required Counterclaimant to deliver, *inter alia*, Base Software

with a number of customizations that would support the following lines of Tri-

State's business: (1) personal auto, (2) homeowners, and (3) personal umbrella.

19.

As noted in the Schedule, the Base Software had, *inter alia*, three

components: (1) policy decisions, (2) billing decisions, and (3) reporting decisions.

## Payments and Costs of the Project

20.

The Schedule required Tri-State to make a number of payments to

Counterclaimant for a "Base Software License Fee" which were "due as follows:

$250,000 upon execution of the Master Agreement [and] $125,000 Billable

monthly beginning May 1, 2008 and ending on December 1, 2008." *See* Exh. B

(Schedule) at § 8(a).

21.

The parties also agreed, pursuant to the Schedule, that Counterclaimant

would create certain customized add-ons for a flat-fee of $245,000, *id.* at

EXHIBIT C - 34

§ 8(b), and a number of other "customizations" to be paid on a T&M [time and materials] [] basis, *id.* at § 8(c); *see also id.* at § 8(e) (requiring **annual** maintenance fee of $252,000).

## Counterclaimant's Performance

22.

Counterclaimant developed and delivered a number of the software components to Tri-State, including a number of customizations.

23.

Counterclaimant completed the "policy decisions" batch of software and delivered it to Tri-State.

24.

Throughout the process, Tri-State submitted a number of "Change Requests."

25.

These Change Requests delayed Counterclaimant's ability to complete the development and implementation of the entire software package for Tri-State.

26.

Counterclaimant's efforts to provide the software also suffered from delay related to, *inter alia*, Tri-State's failure to timely provide key information to Counterclaimant.

27.

Moreover, Tri-State failed to devote enough resources to the project to ensure that the project could be timely completed.

28.

Despite delays, by April 2009, the project was "re-baselined" (*i.e.,* the parties generated new target dates for completion, which took into account past delays).

29.

Starting in April 2009, Counterclaimant generated "Weekly Status Reports," which kept Tri-State apprised of progress on the software development.

30.

On July 1, 2009, Penny Hart, President of Tri-State, stated that she was putting the software project with Counterclaimant on indefinite hold, reassigning Tri-State's internal resources away from the project, terminated Tri-State's Project Manager, and told Counterclaimant she was leaving the country on extended vacation.

31.

Ms. Hart's above-described actions as an officer and agent of Tri-State repudiated the Agreements and necessarily prevented Counterclaimant from completing the remainder of the project.

EXHIBIT C - 36

32.

In July 2009, Tri-State was notified that without its involvement, the software project could not go forward.

**Plaintiff's Breaches and Repudiation of the Agreements**

33.

From the Agreements' effective date through Tri-State's repudiation of and withdrawal from the project, Counterclaimant worked diligently to create customized software for Tri-State's use in its insurance business.

34.

At all times, Counterclaimant was and is ready, willing, and able to perform under the Agreements.

35.

Even though Tri-State had previously suspended all work on the project and knew that Counterclaimant would be unable to complete key tasks on the project without Tri-State's cooperation, after seven months of inactivity, on January 22, 2010, Tri-State sent Counterclaimant a letter, purportedly pursuant to § 10.3 of the Master Agreement, alleging that Counterclaimant had materially breached the Agreements by failing to deliver the software in time.

36.

Master Agreement Clause § 10.3 states that Tri-State may terminate the

Agreements if Counterclaimant "breaches any material term of this Agreement and

fails to initiate a remedy for such breach within thirty (30) calendar days after

receiving notice thereof from [Tri-State]." Exh. A (Master Agreement) at § 10.3.

37.

Even though Tri-State was already in breach of the Agreements,

Counterclaimant responded to Tri-State's letter three days later on January 25,

2010 in an attempt to resolve the parties' dispute, by proposing that members of

the project's executive team meet to identify the problems, "understand the

specific allegations which you believe give rise to the allegation of breach, outline

the respective interests of the parties, identify areas of alignment and disagreement

and determine a mutually acceptable arrangement to address the areas of concern

of each party."

38.

On February 5, 2010, Tri-State responded that the "executive team [was] not

presently available" and demanded that Counterclaimant deliver "the completed

project" within 30 days.

39.

Tri-State's January and February 2010 letters were sent in bad faith. At that point, Tri-State had suspended all work on the project. Tri-State knew that Plaintiff could not deliver the completed product without Tri-State's participation and cooperation.

40.

On February 16, 2010, Counterclaimant submitted a letter to Tri-State noting, *inter alia*, that "[Tri-State's] cooperation has always been a material condition of performance," but that Counterclaimant, nonetheless, "[was] still willing to re-engage with [Tri-State] on the project."

41.

On February 24, 2010, Tri-State purported to terminate the Agreements pursuant to § 10.4 of the Master Agreement.

42.

Although the Schedule required Tri-State to pay $1,250,000 for a Base Software licensing fee, Tri-State never made the final payment (*i.e.*, it failed to pay $125,000).

43.

Moreover, Tri-State failed to make a number of other payments required by the Agreements.

44.

On March 26, 2010, Counterclaimant notified Tri-State and demanded payment of outstanding invoices in the amount of $383,178.62.

45.

Tri-State has yet to remit the $383,178.62, which it currently owes, as well as a number of other substantial payments.

46.

After purporting to terminate the Agreements, Tri-State failed to return any of Counterclaimant's proprietary materials; it also failed to verify to Counterclaimant that it had purged any such information or software as required by Master Agreement § 10.5.

## COUNT ONE

### (Anticipatory Repudiation of the Agreements)

47.

Counterclaimant restates and reincorporates paragraphs 1-46 of this Counterclaim as if set forth fully herein.

48.

Plaintiff and Insurity entered into the Master Agreement and the Schedule (collectively "the Agreements") in March of 2008.

49.

The Agreements were valid and binding contracts between the parties.

50.

The Agreements required TriState to take a number of actions to ensure that

Counterclaimant could perform, including but not limited to: (1) provide

Counterclaimant with key information about TriState's software needs to ensure

proper customization, (2) sign off on various software requirements, (3) timely pay

all licensing fees (4) participate in meetings about the scope of the project, and (5)

actively cooperate with Counterclaimant to ensure that the software was properly

customized and implemented.

51.

Tri-State anticipatorily repudiated the contract by unqualifiedly and

unequivocally refusing to perform as required by the Agreements.

52.

On July 1, 2009, Penny Hart, President of Tri-State, stated that she was

putting the software project with Counterclaimant on indefinite hold, reassigning

Tri-State's internal resources away from the project, terminated Tri-State's Project

Manager, and told Counterclaimant she was leaving the country on extended

vacation.

53.

At all times, Counterclaimant was and is ready, able and willing to perform under the Agreements.

54.

Counterclaimant was proximately harmed by Plaintiff's anticipatory repudiation of the Agreements in an amount to be proven at trial.

## COUNT TWO

### (Breach of Contract)

55.

Counterclaimant restates and reincorporates paragraphs 1-54 of this Counterclaim as if set forth fully herein.

56.

Tri-State and Insurity entered into the Master Agreement and the Schedule (collectively "the Agreements") in March of 2008.

57.

The Agreements were valid and binding contracts between the parties.

58.

Tri-State breached the Agreements by, *inter alia*, (1) failing to complete the Client Requirements Book ("CRB") within 75 days of the Effective Date as required by the Software Schedule; (2) failing to assign competent project,

840129.1
42

EXHIBIT C - 42

insurance, business, and technical staff to review and sign off on the CRB components, (3) failing to sign-off on development artifacts within 15 business days of receipt of Counterclaimant's request, (4) failing to return and/or purge all software, documents, or proprietary information, (5) failing to devote adequate resources to the software project, (6) failing to engage in required meetings, (7) suspending all work on the project; (8) ceasing all cooperation and work with Counterclaimant on the project, and (9) failing to make substantial payments required by the Agreements, including but not limited to (a) licensing fee payments, (b) payments for services rendered on a time and material basis, (c) annual maintenance fees (which accrued at an annual rate of $252,000), (d) interest and late-fee payments, and (f) any other payments required by the Agreements.

59.

Counterclaimant was proximately harmed by Tri-State's breaches in an amount to be proven at trial.

## COUNT THREE

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

60.

Counterclaimant restates and reincorporates paragraphs 1-59 of this Counterclaim as if set forth fully herein.

EXHIBIT C - 43

61.

Tri-State and Insurity entered into the Master Agreement and the Schedule (collectively "the Agreements") in March of 2008.

62.

The Agreements were valid and binding contracts between the parties.

63.

At all times, Tri-State was bound by a duty to discharge its contractual obligations under the Agreements in good faith.

64.

Tri-State breached the implied covenant of good faith and fair dealing by suspending all work and cooperation under the Agreements in bad faith. Tri-State knew that Counterclaimant could not deliver the final product without Tri-State's cooperation.

65.

Tri-State breached the implied covenant of good faith and fair dealing by purporting to terminate the Agreements in bad faith.

66.

Counterclaimant was proximately harmed by Tri-State's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

## COUNT FOUR

### (Specific Performance and Injunction for Return of Confidential Information and Other Property)

67.

Counterclaimant restates and reincorporates paragraphs 1-67 of this Counterclaim as if set forth fully herein.

68.

Pursuant to the Master Agreement and Schedule, Counterclaimant has a property interest in the Software, Documentation, proprietary information, and Confidential Information that it transmitted, delivered, and/or made available to Tri-State. *See* Exh. A (Master Agreement) at § 10.5 (requiring Tri-State to: (1) discontinue all use of Software and Documentation upon termination; (2) purge and delete the information; (3) **"return to [Counterclaimant] or destroy all Confidential Information and all related materials, and copies thereof"; (4) "represent and warrant** to [Counterclaimant] in writing within ten (10) calendar days after such expiration or termination that [Tri-State] has complied with the provisions of this Section").

69.

To date, Plaintiff has not represented and warranted to Counterclaimant that it has purged, deleted, destroyed, and/or returned all of Counterclaimant's

Property, including relevant software, materials, and other such proprietary information, as the Master Agreement requires.

70.

On information and belief, Tri-State has failed to make such representation and warranty because it is in possession of Counterclaimant's software, materials, and/or proprietary information in violation of the Master Agreement.

71.

Pursuant to Master Agreement § 9.4, "[Tri-State] acknowledge[d] that the Confidential Information is commercially valuable, proprietary information of [Counterclaimant]." Therefore, Tri-State agreed that Counterclaimant is contractually "entitled to seek specific performance and [Tri-State] hereby consents to seek the entry of an immediate injunction without the need for posting any bond." Exh. A (Master Agreement) at § 9.4.

72.

Pursuant to Master Agreement § 2.2, Counterclaimant has a property interest in any and all software that Tri-State currently uses or possesses to the extent that such software is "based on" Counterclaimant's software or its services. In other words, to the extent Tri-State's software is based on any aspect of Counterclaimant's software, it is a "derivative work," and Counterclaimant is entitled to exercise exclusive control over such derivative works.

73.

Tri-State has admitted to retaining the services of another vendor for the purpose of meeting its software needs. It has not disclosed whether its new software contains components that were based on, developed, inspired by, or derived from Counterclaimant's work.

74.

Therefore, pursuant to the parties' Agreements, Counterclaimant respectfully asks that this Court enter an injunction ordering Tri-State to return to Counterclaimant any of Counterclaimant's Software, proprietary information, Confidential Information, or derivative works (to the extent that Tri-State possesses any such materials).

## COUNT FIVE

### Bad Faith Litigation and Stubborn Litigiousness

75.

Counterclaimant restates and reincorporates paragraphs 1-74 of this Counterclaim as if set forth fully herein.

76.

Pursuant to O.C.G.A. § 13-6-11, Tri-State has been stubbornly litigious, engaged in bad faith, and has caused the Counterclaimant unnecessary trouble and expense.

77.

Tri-State's conduct includes, but is not limited to, purporting to terminate the Agreements in bad faith and filing suit against Counterclaimant without engaging in good faith efforts to resolve the dispute.

78.

Tri-State's conduct has damaged Counterclaimant in an amount to be proven at trial.

### Prayer For Relief

WHEREFORE, Counterclaimant prays for the following relief:

(a)  Trial by jury on all issues so triable;

(b)  Judgment be entered in favor of Counterclaimant and against Tri-State in an amount to be determined by the jury at trial;

(c)  Counterclaimant be awarded its expenses of litigation, including reasonable attorneys' fees and costs;

(d)  Counterclaimant be granted an injunction requiring Tri-State to return and/or destroy all of Counterclaimant's Software, proprietary material, and derivative works that may be in Tri-State's possession; and

(f)  The Court award such other and further relief as the Court deems just and appropriate under the facts and circumstances.

Respectfully submitted, this 21st day of February, 2011.

Jill A. Pryor
Georgia State Bar No. 589140
Randi E. Schnell
Georgia State Bar No. 248592
Kamal Ghali
Georgia State Bar No. 805055

BONDURANT, MIXSON & ELMORE
1201 W. Peachtree Street
Suite 3900
Atlanta, Georgia 30309
(404) 881-4100 – Phone
(404) 881-4111 – Fax

Attorneys for Defendant and Counterclaimant

EXHIBIT C - 49

# Exhibit A

EXHIBIT C - 50

# MASTER AGREEMENT

THIS MASTER AGREEMENT ("Master Agreement"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and, together with Vendor, referred to collectively as, the "Parties".

## WITNESSETH

**WHEREAS,** Vendor offers proprietary software and services for use in the Insurance industry. Customer desires to obtain those services, and a limited, nonexclusive and nontransferable license to that proprietary software, as more fully described herein.

**WHEREAS,** the Parties contemplate that a number of separate services and/or software programs may be provided by Vendor to Customer. Accordingly, this Master Agreement is a master of terms and conditions, which will be incorporated by reference into separate mutually agreed upon written agreements, each referred to as a "Schedule" (as more fully defined below), and each relating to specific software programs and/or services as expressly set forth therein.

**WHEREAS,** each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively. This Master Agreement, however, does not, in and of itself, grant any license rights to Customer nor does it give rise to any other rights or obligations unless and until it is incorporated by reference into one or more Schedule(s).

**NOW THEREFORE,** for and in consideration of the promises, agreements, covenants and conditions contained herein and in the Schedules, and other good and valuable consideration, the receipt and adequacy being hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1  DEFINITIONS

For purposes of this Master Agreement and each Schedule, the following terms shall be defined as follows:

1.1     Affiliates.  The term "Affiliates" means these entities: Tri-State Consumer, Inc.; Driver's Insurance Company; (Bender); (Sterling); (Spirit/Lighthouse); and other affiliated agency and/or broker entities which TSCIC presently does business with, or may do business with in the future. This definition of "Affiliates" shall apply to, and be incorporated into other documents referencing this Master Agreement.

1.2     Agreement.  The term "Agreement" means, with respect to each individual Schedule, this Master Agreement together with such Schedule, and any and all exhibits hereto and thereto.

1.3     Authorized User The term "Authorized User" means any Affiliates, employee, contract employee or independent agent who accesses or uses the Software or Services and (a) is under the control and responsibility of Customer; (b) is authorized under Customer's license; (c) has verified they are not competing with Vendor in this or other market; in addition, the New York State Insurance Department, or some similar entity, shall be granted access to the Software or Services for the sole purpose of performing an audit, review, survey, investigation, analysis or study of Customer and/or Customer's Affiliates,.

1.4     Bureau; Bureau Materials. The term "Bureau" means any and all insurance regulatory bodies, including but not limited to ISO, NCCI and state regulatory authorities, which provides license rating and/or other information to Customer and/or to Vendor on Customer's behalf. "Bureau Materials" means any and all materials provided by any Bureau to Vendor for Customer.

1.5     CRB. The term "CRB" shall mean the "Client Requirements Book", created by Vendor and Customer, containing Customer's business needs and Vendor's resolution of those needs. The CRB shall contain the project Specifications, as further defined herein.

1.6     Customer Created Error. The term "Customer Created Error" means any improper use of the Software or any Service including, but not limited to: a) incorrect or incomplete data or input being provided for use in connection with the Software or any Service; b) any modifications to the Software made or permitted by, or at the direction of Customer; c) any use by Customer of devices or third party software which causes the Software or any Service to fail to conform to its Specifications or to perform as intended, as applicable; d) Customer's failure to promptly implement or use any Update or Mandatory Upgrade; or e) any other failure of the Software or any Service that is beyond Vendor's control.

1.7     Customer Request. The term "Customer Request" means a written request for Software or Services, which shall be submitted by Customer in the form of an Exhibit (in a form agreed upon by the Parties and attached hereto) and by this reference made a part hereof, and shall be subject to acceptance or rejection by Vendor and shall contain the fees to be paid in connection therewith.

1.8     Deliverable.   The term "Deliverable" means each specifically defined work product, identified in any individual schedule or related document, to be provided by Vendor to Customer as of a specific date.

1.9     Documentation.   The term "Documentation" means the documentation outlining the performance, use and training required by Customer and its Authorized Users to utilize the software and related systems.

1.10    Enhancement. The term "Enhancement" means any change to the Software or any Service, which is not an Update, Mandatory Upgrade or Optional Upgrade, requested on a Customer Request.   The fees for each Enhancement shall be set by Vendor as stated on the Customer Request.

1.11    Mandatory Upgrade. The term "Mandatory Upgrade" means those changes to the Software made by Vendor from time to time, which Customer is required to implement. Mandatory Upgrades will be made available to Customer when they are made available to other

**EXHIBIT A - 2**

2

EXHIBIT C - 52

Vendor customers. Failure to implement these Mandatory Upgrades may invalidate any Warranty coverage.

1.12   Optional Upgrade. The term "Optional Upgrade" means those changes to the Software made by Vendor from time to time, and which Customer is not required to implement. Optional Upgrades will be made available to Customer when made available to other Vendor customers.

1.13   Schedule. The term "Schedule" means the written agreements that specify the services and/or software to be provided to Customer in connection with such Schedule. Each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively, and shall be in the form (but not substance) attached hereto.

1.14   Services. The term "Services" means both the services offered, delivered, or performed by Vendor on any CRB, Schedule, Customer Request, or similar document, and the services accessed, derived or received by Customer through or as a result of the use of the Software or any Service.

1.15   Software. The term "Software" means the specific applications described in the Schedule, along with any and all: (i) Enhancements, Mandatory Upgrades, Optional Upgrades, if any, and Updates, and any other modifications whatsoever, in each case if and to the extent provided to the Customer pursuant hereto, and (ii) derivative works based on the foregoing if and to the extent provided to the Customer pursuant hereto.

1.16   Specifications. The term "Specifications" shall mean the requirements set forth in the relevant CRB, Customer Request or other similar document.

1.17   Update. The term "Update" means those changes to the Software, which must be made as a result of applicable one or more statutory or Bureau changes, such as those published by ISO, NCCI, or other insurance regulatory authorities having appropriate jurisdiction in those state(s) supported as identified in the Schedule.

## SECTION 2  LICENSE

2.1   Grant of License. Upon execution of the Schedule, Vendor grants to Customer a non-exclusive, perpetual, non-transferable, limited license to allow Authorized Users to use the Software or Service in the United States at Customer's or its Authorized User's place(s) of business only, in object code format only, provided that Customer and its Authorized Users comply with all of the terms and conditions of this Agreement, and do so in strict accordance with the following conditions: (i) the Software and all Services shall be used solely for Customer's own internal business purposes, and not for providing service bureau, timesharing, data processing or other similar services to third parties; (ii) Customer and its Authorized Users shall not use the Software or any Service to evaluate or scan data of or for anyone other than Customer, and such evaluation and/or scanning is expressly prohibited; (iii) Customer and its Authorized Users shall not reveal any links, user accounts, or passwords for the Software to anyone other than Customer's Authorized Users who have a need to know such information; (iv)

**EXHIBIT A - 3**

EXHIBIT C - 53

3

Customer shall ensure that all Authorized Users having access to the Software or any Services shall maintain the confidentiality of the Software and the Services, and shall abide by the terms of this Agreement; (v) Customer and its Authorized Users shall not use the Software or any Service to create a product or service that would compete with Vendor in the provision of the such Software or Service to third parties; and (vi) Customer and its Authorized Users shall use the Software and all Services, and all information accessed in connection therewith, in accordance with the requirements of all applicable laws, regulations and rules.

      2.2     Restrictions on Use. The license granted under this Agreement permits the Authorized Users to use the Software only on the equipment agreed upon by the Parties. Except as permitted by this Agreement, Authorized Users shall not, nor permit others to: (i) store, run, display, load, use, produce, copy (except for archival purposes, with notice to Vendor), market, license, sell, rent, assign, transfer, or adapt the Software, any Service or any Documentation; (ii) merge or combine the Software or any Service with any other program/application; (iii) translate, disassemble, decompile, reverse engineer or otherwise attempt to discover or obtain possession of the source code of the Software; (iv) create derivative works based on the Software or any Service, or any portions thereof (except for the sole purpose of allowing Software to interface with Customer's internal business processes). Irrespective of the above, in the event that a derivative work is created, it shall be deemed a "work made for hire", or if inapplicable, Customer and Authorized Users shall (a) assign to Vendor all right, title and interest in, and to, such derivative works, and b) at Vendor's expense, provide Vendor with assistance to execute any additional instruments as may be reasonable and necessary to perfect any of Vendor's rights thereto.

      2.3     Title to the Software. Vendor reserves and retains all right (other than the limited license to use granted to Customer herein), title and interest in and to the Software, the Services and all Documentation, and expressly disclaims any other grant of express or implied license, moral rights, or other right of any kind whatsoever to Customer regarding the Software, the Services or Documentation. Customer hereby acknowledges and agrees that it has and shall have no claim of ownership or interest in or to the Software, Services or Documentation and, accordingly, that it shall not challenge, dispute, lay claim to, or otherwise jeopardize Vendor's rights, title and interest in and to the Software, Services or Documentation, or create any derivative work based thereon, or any portion of the foregoing, except as set forth in Sec. 2.2. Customer acknowledges that the Software, Services and Documentation are commercially valuable, proprietary property of Vendor, the design and development of which reflects the expenditure of considerable time, effort and expense. As such, Customer acknowledges and agrees that for any breach of this Sec. 2, Vendor will not have an adequate remedy at law; and consequently, Vendor, in addition to and not in lieu of any other remedy to which it may be entitled at law or in equity, shall be entitled to specific performance and Customer hereby consents to (without limiting the right of Vendor to seek any other remedy at law or in equity) to the entry of an immediate injunction without the need for posting any bond.

      2.4     Updates to Software. To the extent specified in the Schedule, scheduled Updates will be provided to Customer for no additional charge throughout the Term, provided that all license and other fees due hereunder are current; provided, however, Customer acknowledges that there may be an additional charge for extraordinary Updates, which are typically an unusual Bureau change requiring longer than sixty (60) calendar days to implement.

**EXHIBIT A - 4**

EXHIBIT C - 54

4

## SECTION 3  DELIVERY AND ACCEPTANCE

3.1     Delivery Schedule.  Vendor shall deliver the Software, any Updates, and the Services to Customer substantially as set forth in the Schedule. Each Deliverable shall be presumed to require testing, unless (a) otherwise stated in the Schedule or (b) the Deliverable has previously been accepted by Customer.

3.2     Delivery, Testing and Acceptance of Initial Development Deliverables.  Vendor will deliver and Customer will accept the Deliverables in accordance with the following procedure:

(a) During the seventy-five (75) calendar days immediately following delivery of a Deliverable (the "Acceptance Test Period"), Customer shall test such Deliverable for functionality and accuracy, and shall notify Vendor in writing of any components or functions that are missing or not operating in accordance with the applicable agreed-upon specifications set forth in the Client Requirement Book ("CRB") or Customer Request (collectively, the "Specifications"). Such notification shall toll the Acceptance Test Period.

(b) Within a reasonable period of time after having received written notification, Vendor shall bring all critical components and functions of the Deliverable into compliance with the Specifications.

(c)     As soon as a Deliverable meets the Specifications, Customer will notify Vendor in writing that the Deliverable is accepted; provided, however, that if Customer does not notify Vendor in writing of any failure to meet the Specifications by the end of the Acceptance Test Period (tolled by any notices of non-compliance) or if the Deliverable is used by Customer in a production environment other than for testing or training purposes, such action or inaction shall be deemed to constitute acceptance of the Deliverable.

### SECTION 4  FEES

4.1     Fees.   Fees are ordinarily designated as Development/Enhancement, License, or Maintenance/Service fees. Fees, and the corresponding payment schedule, are as set forth in the applicable Schedule or document. Changes to the fees or the payment schedule must be agreed upon, in writing.

All fees shall be due and payable thirty (30) calendar days after the date set forth in the applicable Schedule or document and shall be considered past due the next business day thereafter.

4.2     Expenses.  Customer shall be responsible for reasonable expenses and costs incurred by Vendor, including reasonable travel and living expenses for its personnel. These expenses may be invoiced at any time up to six (6) months after they are incurred and shall be due and payable thirty (30) calendar days after the invoice date.

**EXHIBIT A - 5**
EXHIBIT C - 55

4.3     Interest        Interest shall accrue on past due amounts for fees and expenses from the stated due date at the lesser rate of (a) one and one-half percent (1.5%) per month, or (b) the maximum interest permitted by law.

4.4     Taxes. Customer shall be responsible for the payment of any and all federal, state and local taxes related to the Services, Software and Deliverables provided under this Agreement (except those taxes based on Vendor's net income), and shall defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with such taxes.

## SECTION 5  OBLIGATIONS AND RESPONSIBILITIES OF VENDOR

5.1     Documentation and Training. Vendor shall provide Customer with (i) copies of the appropriate Software documentation (the "Documentation") in the quantities set forth in the Schedule or make such Documentation available online, and (ii) training in the use of the Software as set forth in the Schedule. Customer agrees to maintain the Documentation on a confidential basis. Customer agrees not to make additional, unauthorized copies, or to provide or otherwise make available the Documentation, or any portion thereof, to any third party not licensed hereunder.

5.2     Mandatory and Optional Upgrades. Vendor shall make available to Customer, at no additional charge, all Mandatory Upgrades that are made generally available by Vendor to other Customers using the same Software product. Vendor shall make available to Customer, at a fee to be determined in Vendor's sole discretion, all Optional Upgrades that are made generally available by Vendor to other Customers using the same Software product.

5.3     Other Services. Vendor shall make available to Customer such other services as are specifically specified in the Schedule at the prices indicated therein, or if other services are not specified or if specified without a corresponding price, at Vendor's then current prices in effect at the time such services are provided.

5.4     Customer Options. Vendor shall make available to Customer at the prices stated in the Schedule such software and/or services as are identified in the Schedule as "Customer Options." Customer shall exercise its option to receive such software and/or services at the times and in the manner stated in the Schedule by completing a Customer Request.

5.5     Indemnification.      Vendor agrees to defend, indemnify and hold harmless Customer from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with any United States' patent or copyright infringement asserted against Customer by virtue of Customer's use as permitted hereunder of the Software during the Term, provided that such claim of infringement is not attributable to the use of the Software in combination with any other software programs/applications, or due to a Customer Created Error ("Infringement"), and provided further that the following conditions are met:

**EXHIBIT A - 6**                                    6
EXHIBIT C - 56

(a)  Customer shall give Vendor prompt written notice of any such claim; and

(b)  Customer shall give Vendor full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Vendor in connection with the foregoing.

In the event that such claim of Infringement occurs or in Vendor's opinion is likely to occur, Vendor may, at its option, procure for Customer the right to continued use of the Software or render its use hereunder noninfringing, or if neither of the foregoing options is available on terms that are reasonable in Vendor's judgment, then Vendor may terminate this Agreement and refund all amounts paid by Customer for the Software, whereupon the Vendor shall have no further obligations under this Agreement except in connection with those provisions which survive pursuant to the terms of Sec. 10.6 hereof.

## SECTION 6   OBLIGATIONS AND RESPONSIBILITIES OF CUSTOMER

6.1   Legends and Markings.  Customer agrees to retain and not remove, modify or destroy Vendor's trademarks, trade names, markings, logos, trade colors, or any proprietary or confidentiality notices, legends and/or markings (the "Proprietary Marks") as and where they are originally affixed to or contained within the Software, Documentation, Confidential Information or related documentation. Use of any Proprietary Mark or any other mark or legend confusingly similar to the Proprietary Marks by Customer is strictly prohibited, and Customer agrees not to challenge, dispute, lay claim to or otherwise jeopardize Vendor's right, title and interest in and to the Proprietary Marks.

6.2   Designation of Coordinator.  Customer shall designate one system coordinator and one back-up coordinator, who shall act on behalf of the Customer and through whom all communication with Vendor pursuant to this Agreement shall occur. Customer shall ensure that such coordinators are fully familiar with and trained in the use of the Software, and that their identity (which may be changed from time to time) is at all times made known to Vendor by written notice five (5) business days prior to their contacting Vendor. All questions and problems regarding the use, operation, development, support or maintenance of, or otherwise concerning the Software shall be directed to Vendor through such designated coordinators, and Vendor shall direct all Deliverables, Updates, Mandatory Upgrades, Optional Upgrades, Enhancements and other issues related to the Software through such designated coordinators.

6.3   Training.  Customer agrees that it is solely responsible for the training of its personnel and acknowledges that the training described in the Schedule, if any, is provided by Vendor without any guaranty that it will enable Customer's personnel to effectively use the Software or to use the Software in the manner intended by Customer.

6.4   Indemnification.  Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities, fees, assessments and expenses (including reasonable attorneys' fees) arising out of or in connection with the procurement of Bureau Materials, the incorporation of Bureau materials into the Software or the use of the Bureau materials by Vendor on Customer's behalf. Moreover, Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with

**EXHIBIT A - 7**   7

EXHIBIT C - 57

Customer's use of the Software or any Service, except for claims alleging Infringement (as defined in Sec. 5.5 hereof), and provided further that the following conditions are met:

    (a) Vendor shall give Customer prompt written notice of any such claim; and

    (b) Vendor shall give Customer full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Customer in connection with the foregoing.

    6.5    Action to Ensure Compliance. Customer shall take all appropriate action to ensure full compliance with Customer's obligations under this Agreement by any and all persons and entities permitted access to or use of the Software or any Service pursuant to the terms of this Agreement. Customer acknowledges that it shall be responsible and liable for any and all acts and omissions of each such person or entity as if they were the acts and omissions of Customer.

    6.6    Inspection. Subject to reasonable advance notice and execution of appropriate confidentiality agreements, Customer agrees to permit Vendor to enter upon its premises in order to inspect such records, reports and the use of the Software and Services necessary to verify compliance with the terms of this Agreement. Such inspection shall occur during Customer's normal business hours no more than once per calendar quarter. Vendor shall use reasonable efforts not to disrupt or interrupt either the normal business operations of Customer or Customer's permitted use of the Software or, if inevitable, to take reasonable steps to minimize such disruption or interruption. If Vendor determines Customer is in violation of the terms of this Agreement, Customer shall reimburse Vendor for all costs incurred in connection with the inspection. Furthermore, if Vendor determines that Customer has exceeded the scope of its authorized use under this Agreement, Customer shall be invoiced two times the fees that would have been due and payable for any ordinary third party customer to purchase rights for the scope of use actually made by Customer, and Customer agrees to pay such invoices immediately upon receipt. Notwithstanding the foregoing, Vendor shall (i) retain all other remedies available to it under this Agreement, or at law or in equity, and (ii) be permitted at anytime to review by remote access Customer's accounts, links and passwords to verify compliance with the terms of this Agreement.

    6.7    Bureau Materials. Customer shall be responsible for the legal procurement, on its own behalf of the right to receive and to use directly from the applicable Bureaus any and all Bureau materials to be incorporated or integrated into, or used in connection with the Software, in all forms licensed by the appropriate Bureau, including but not limited to diskette and online form. Should such rights to receive and use the Bureau materials expire or terminate, Customer will provide prompt written notice to Vendor of such expiration or termination.

    In the event that Vendor is required to obtain these Bureau Materials, Customer shall (a) reimburse Vendor for any fees or assessments charged by any Bureau and assessed to Vendor associated with procuring Bureau materials hereunder (subject to receipt of appropriate documentation to substantiate such fees or assessments), and (b) indemnify Vendor as set forth in Sec. 6.4.

## SECTION 7 JOINT OBLIGATIONS AND RESPONSIBILITIES

**EXHIBIT A - 8**

EXHIBIT C - 58

8

7.1     Executive Governance Committee. An Executive Governance Committee ("EGC") shall be established within 45 business days of the time of execution of this Agreement, with representation from both Parties. The EGC will act as the champion of the project and ongoing relationship of the Parties. Duties of the EGC include but are not limited to responsibility for ensuring the project and ongoing Services retains appropriate priority within both organizations, understanding the overall business objectives, removal of organizational barriers to project and ongoing relationship's success, and serve as escalation point for change management. Both Parties agree to actively participate in ongoing EGC meetings whose schedule will be mutually agreed upon at the time of creation of the EGC.

7.2     Notice of Certain Events. Both Parties agree to give the other Party prompt notice: (i) if a Party ceases to do business for any reason and proceeds with the winding-up of its affairs; or (ii) if a Party or any third party owning an equity interest of more than fifty percent (50%) of that Party files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy (other than for reorganization).

7.3     Privacy. With respect to personally identifiable information regarding consumers, the parties further agree as follows:  (i) Vendor has adopted the "ChoicePoint Privacy Principles" ("Principles") recognizing the importance of appropriate privacy protections for consumer data and (ii) Customer agrees that Customer (including its directors, officers, employees or agents) will comply with the Principles or Customer's own comparable privacy principles, policies, or practices, including Customer's standard contractual privacy policies.  ChoicePoint's Privacy Principles are available at www.privacyatchoicepoint.com

## SECTION 8  WARRANTIES AND LIMITATION OF LIABILITY

8.1     Limited Warranty  During the Term, and provided Customer is current on the payment of all fees due and payable hereunder, Vendor offers the following limited Warranties.

(a)     Software Warranty.   Vendor warrants that each such portion of the Software, as delivered by Vendor, if properly installed and operated on recommended hardware and in accordance with Vendor's Documentation: (i) contains all of the features described in, shall perform all of the material functions set forth in, and shall operate in substantial conformance with, its applicable Specifications and Documentation, provided, however, Customer acknowledges and agrees that (A) the Software is not error or "bug" free;  (B) Authorized Users must have adequate skills to use the Software; (C) Customer is responsible for backing-up its data; (D) Vendor shall not be responsible for the suitability of any Customer-configuration of the Software. This warranty shall not apply to the extent that any defect in the Software would be corrected by an Update or Mandatory Upgrade which Customer has failed to implement.

(b)     Services Warranty.  Vendor warrants that it has all required rights, permits and licenses to perform the Services, that the Services will be performed by appropriately trained, experienced and competent personnel in a manner at least consistent with commercially reasonable standards of quality and care, and that the Services will conform to the Specifications and Documentation applicable thereto.

**EXHIBIT A - 9**                          9
EXHIBIT C - 59

8.2     Disclaimer of Warranties.  EXCEPT AS EXPRESSLY PROVIDED FOR IN SECTION 8.1 HEREOF AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VENDOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CORRECTNESS, COMPLETENESS OR CURRENTNESS OF ANY DATA OR RESULTS, ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, VENDOR MAKES NO WARRANTY WITH RESPECT TO ANY OPERATING SYSTEM OR OTHER SOFTWARE APPLICATION NOT OWNED BY VENDOR WHICH MAY BE LINKED TO OR USED IN CONNECTION WITH THE SOFTWARE, AND MAKES NO WARRANTY WITH RESPECT TO THE USE OF THE SOFTWARE IN CONNECTION WITH ANY OTHER SOFTWARE APPLICATION NOT DEVELOPED BY VENDOR.  USE OF THE SOFTWARE CONSTITUTES CUSTOMER'S CONSENT TO ASSUME THE ENTIRE RISK ARISING OUT OF THE USE OF THE SOFTWARE.  EMPLOYEES OR AGENTS OF VENDOR OR ANY THIRD PARTY HAVE NO AUTHORITY TO MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE SOFTWARE AND CONSEQUENTLY, SHOULD NOT AND MAY NOT BE RELIED UPON BY CUSTOMER.

8.3     Exclusive Remedy.  The sole and exclusive liability of Vendor, and the sole and exclusive remedy of Customer, in the event of any breach of or claim under the above warranty shall be, at Vendor's option, (i) correction or replacement of the nonconforming portion of the Software within a reasonable period of time after receiving written notice from Customer, or (ii) a refund, after receiving written notice from Customer, of all amounts paid by Customer to Vendor which are attributable to that portion of the Software that does not conform to the warranty, (as determined by the EGC and Executive Management, based upon the material impact on the Software); provided, however, that Customer shall not receive such refund unless and until it ceases all use, and destroys, returns, removes and/or purges all copies, of that portion of the Software that does not conform to the warranty.

8.4     Limitation of Liability.  CUSTOMER AGREES THAT VENDOR'S AGGREGATE LIABILITY TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR DAMAGES WHATSOEVER AND HOWEVER CAUSED, SHALL BE LIMITED TO, AND IN NO EVENT EXCEED, THE FEES ACTUALLY PAID BY CUSTOMER. .

NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT TO THE CONTRARY AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL VENDOR BE LIABLE TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER AND HOWEVER CAUSED, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, LOST OR DAMAGED DATA OR BUSINESS INFORMATION, BUSINESS INTERRUPTION OR OTHER ECONOMIC LOSS, EVEN IF VENDOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CUSTOMER ACKNOWLEDGES THAT EVERY BUSINESS DECISION INVOLVES

ASSUMPTION OF RISK, AND THAT VENDOR DOES NOT UNDERWRITE THAT RISK IN ANY MANNER WHATSOEVER.

8.5     Limitation on Time for Bringing Actions.  No action, regardless of form or substance, arising out of this Agreement or the performance or nonperformance of any of the Parties' obligations hereunder may be brought more than one (1) year after a party knew or should have known of the occurrence of the event giving rise to such cause of action.

## SECTION 9  CONFIDENTIALITY

9.1     Confidential Information.  "Confidential Information" under this Agreement shall include all confidential and proprietary information disclosed by either Party ("Disclosing Party) to the other Party ("Receiving Party"), including, without limitation, (i) the Software, Documentation, Services, CRB, this Agreement, all Schedules and Customer Requests, all customer contact information, and any and all portions thereof, and (ii) any and all information related to the Disclosing Party's trade secrets, technology, software, know-how, products, potential products, services, financial information, potential services, markets and/or business information, which is in writing and marked as "Confidential" or "Proprietary" (collectively, "Confidential Information").

9.2     Nondisclosure of Confidential Information.  The Receiving Party agrees to use the Confidential Information of the Disclosing Party only in connection with this Agreement. Each Party agrees to hold the other Party's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties.  Notwithstanding the foregoing, each Party may disclose the other Party's Confidential Information to those employees, agents or consultants who have a need to know such information in connection with this Agreement; provided, however, that each such employee, agent and consultant is informed of the foregoing obligations and has executed a nondisclosure agreement which binds such employee, agent or consultant to confidentiality terms no less favorable than those set forth herein.  Each Party agrees that it will take all measures necessary to protect the confidentiality of and avoid disclosure or use of the other Party's Confidential Information in order to prevent it from falling into the public domain, or into the possession of persons other than those persons expressly permitted hereunder to have any such information, which measures shall include protection of the other Party's Confidential Information with the same degree of care that it utilizes to protect its own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The obligations of confidentiality and limitations on use set forth herein shall survive the expiration or termination of this Agreement for any reason for a period of five (5) years except with respect to Confidential Information that embodies trade secrets, the confidentiality and limitation on use of which shall be maintained for so long as such Confidential Information embodies trade secrets.

9.3     Exceptions.  The obligations and limitations set forth above shall not apply to any information which: (i) was lawfully known to the Receiving Party prior to being disclosed by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is company specific information filed with any Bureau; (iv) is approved for release by written authorization of the Disclosing Party; (v) is rightfully received from a third party who provided such information without breaching any separate confidentiality obligation, or without

**EXHIBIT A - 11**
EXHIBIT C - 61

restriction of subsequent disclosure; or (vi) is independently developed without reference to the Disclosing Party's Confidential Information. In addition, Confidential Information may be disclosed to the extent required by court order or as otherwise required by law, provided that the Receiving Party notifies the Disclosing Party promptly in writing upon learning of the possibility of any such requirement and has given the Disclosing Party a reasonable opportunity to contest or limit the scope of such required disclosure; provided, further, that such disclosed Confidential Information shall otherwise remain subject to the terms of this Sec. 9.

9.4    Non-Exclusive Remedies. Receiving Party acknowledges that the Confidential Information is commercially valuable, proprietary information of the Disclosing Party, which reflects the expenditure of considerable time, effort and expense. As such, Receiving Party acknowledges and agrees that for any breach of this Section 9, Disclosing Party will not have an adequate remedy at law; and consequently, Disclosing Party, in addition to and not in lieu of any other remedy to which it may be entitled to at law or in equity, shall be entitled to seek specific performance and Receiving Party hereby consents (without limiting the right of Disclosing Party to seek any other remedy at law or in equity) to seek the entry of an immediate injunction without the need for posting any bond.

## SECTION 10 TERM AND TERMINATION

10.1    Term. The Term of this Agreement shall be defined in the Schedule.

10.2    Termination at Vendor's Option. This Agreement may be terminated immediately by Vendor at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a)  Customer fails to pay any amount past due under this Agreement within fifteen (15) calendar days after receiving written notice that such amount is past due from Vendor;

(b)  Customer breaches any material term of this Agreement (other than payment and Confidential Information obligations hereunder) and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Vendor;

(c)  Customer uses or distributes any Confidential Information in a manner inconsistent with the terms of this Agreement;

(d)  Customer or any third party owning an equity interest of more than fifty percent (50%) of Customer becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy, or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(e)  Customer ceases to do business for any reason; provided, however, that Customer shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Customer's obligations under this Agreement.

**EXHIBIT A - 12**
EXHIBIT C - 62

12

10.3   Termination at Customer's Option.   This Agreement may be terminated immediately by Customer at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a)  Vendor breaches any material term of this Agreement and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Customer;

(b)  Vendor or any third party owning an equity interest of more than fifty percent (50%) of Vendor becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(c)  Vendor ceases to do business for any reason; provided, however, that Vendor shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Vendor's obligations under this Agreement.

10.4   Notice of Termination.   In the event either Party elects to terminate this Agreement pursuant to this Section, it shall send written notice of such election to the other Party within thirty (30) calendar days of the occurrence of the Event of Default giving rise to its right to terminate.

10.5   Customer's Obligations upon Termination.   Immediately upon expiration or termination of this Agreement, Customer shall: (i) discontinue all use of the Software and Documentation; (ii) remove all portions of the Software including without limitation, Software in or from modified or derived programs; (iii) purge the Software and all Documentation, or cause it to be purged from all human and machine-readable media (or other memory devices); (iv) return to Vendor or destroy all Confidential Information and all related materials, and copies thereof; and (v) represent and warrant to Vendor in writing within ten (10) calendar days after such expiration or termination that Customer has complied with the provisions of this Section. In addition to the foregoing, Customer agrees that it shall not, both during the Term and following expiration or termination of this Agreement, act in any manner to damage the reputation or goodwill of Vendor, or any of its products or services.

10.6   Survival of Certain Terms.   The provisions of Sections 2, 4, 6.1, 6.4, 6.6, 7, 8, 9 and 12 hereof shall survive the expiration of this Agreement; the provisions of Section 4, 6.1, 6.7, 7, 8, 9 and 12 hereof shall survive the termination of this Agreement.

10.7   Termination Not Exclusive Remedy.   Either Party's option to terminate this Agreement pursuant to the terms of this Section shall not be exclusive of any other remedy available to it whether under this Agreement or otherwise at law or in equity.

10.8   Acceleration of Payments.  Any expiration or termination of this Agreement shall not release Customer from its duty to pay any amount which may be then or with the passage of time will become owing to Vendor. Furthermore, immediately upon any termination of this Agreement, Customer shall pay to Vendor any and all amounts that are or with the passage of time will become due and payable, as determined by the EGC and Senior Management. Interest, at a rate of one and one-half percent per month or the maximum interest permitted by law, shall

**EXHIBIT A - 13**                    13

EXHIBIT C - 63

begin to accrue as of the effective date of termination and continue until payment of all such amounts, plus interest, are paid in full.

## SECTION 11 CHANGE CONTROL

11.1    If either Party determines that a material change to agreed upon Software or Services as defined in a Schedule attached to this Master Agreement (such Software or Services are referred to as "Projects"), which would include, without limitation, any change that would change the fees for that Project beyond the stated fees or beyond the stated estimate for that project or delay the scheduled completion date for such Project, then that Party's Contract Coordinator shall promptly inform the other Party's Contract Coordinator, in writing, of the facts and circumstances leading to such determination ("Request for Change").

11.2 If a Request for Change is initiated by Vendor, Vendor shall provide Customer, (a) an estimate of the additional time and cost, if any, and (b) an estimate of the impact to the scheduled completion dates, which would result from such change.

11.3 If a Request for Change is initiated by Customer, Customer acknowledges that Vendor may be required to investigate and analyze the business impact, including fees, delivery dates and deliverables, on a project. Vendor shall notify Customer's Contract Coordinator within five (5) business days of receipt if Vendor determines that that Request for Change requires additional investigation and analysis. If Customer's Contract Coordinator approves, Customer shall pay Vendor for such research and analytical services relating to such Request for Change initiated by Customer.

11.4 If the Parties approve a Request for Change, the respective Contract Coordinators shall draft and execute a Customer Change Request, which describes the relevant changes to the Software and/or Services, if applicable, any changes to the scheduled completion dates, additional responsibilities of Customer, and any change to the stated fee or estimated fee (a "Change Order"). Until a Change Order is fully executed, (a) Vendor is not obligated to perform a change and (b) Customer is not obligated for any additional fees.

11.5    Vendor shall have no liability for delays in the provision of the Project implementation services caused by Customer's failure to complete its tasks or provide information or resources in a timely manner, provided that Customer's Project Manager was notified of such requests. For changes to a Project caused by: (i) Customer's resources not completing tasks assigned to them accurately or in a timely fashion; or (ii) events outside the control of Vendor, Vendor shall initiate a Request for Change and the parties shall negotiate in good faith the appropriate Change Order.

## SECTION 12 GENERAL

12.1    Entire Agreement.    This Agreement (including any exhibits attached hereto) constitutes the entire agreement between the Parties related to the subject matter hereof, and

**EXHIBIT A - 14**

EXHIBIT C - 64

14

supersedes any and all prior and contemporaneous proposals, communications, agreements and understandings, whether oral or written, concerning the subject matter hereof.

12.2    Construction of this Agreement; Construction with Other Agreements.  In the event and to the extent of any conflict between a term of this Master Agreement and that of the Schedule, the term of the Schedule, to the extent necessary to resolve the conflict, shall control. In the event of any conflict between the terms of this Agreement and any printed form, this Agreement shall control. The terms of this Agreement shall not be altered by the terms of any purchase order, acknowledgment or the like, even if signed by Vendor, unless such purchase order, acknowledgment or the like specifically and conspicuously states that it amends this Agreement and is signed by Vendor's Senior Vice President.

12.3    Assignment.  Neither Party shall assign this Agreement, or the rights or duties contained herein, without the prior written consent of the other.  Any attempt at assignment without such consent shall be null and void, and shall constitute an "Event of Default" under this Agreement by the Party attempting such assignment.

Notwithstanding the foregoing, Vendor may assign this Agreement and its rights and duties contained herein without such prior written consent, but with 30 days prior notice, in connection with the transfer of substantially all of the assets and business of Vendor to an entity that is subject to and assumes Vendor's obligations hereunder.

12.4    Waiver.  No waiver of any right, power, or remedy under this Agreement shall be effective unless in writing and signed by the Party against whom enforcement is sought.  No failure or delay in exercising any right, power, or remedy with respect to any of the provisions of this Agreement shall operate as a present or future waiver thereof.

12.5    Amendments and Modifications.   This Agreement shall not be amended or modified in any respect except by a writing signed by both Parties.

12.6    Notice.  Any and all notices or other communications required or permitted under this Agreement shall be in writing and shall be deemed sufficient in all respects when delivered personally, delivered by an overnight courier service, sent by facsimile, or placed in the United States mail, return receipt requested, postage prepaid, and addressed as follows:

If to Vendor:                                    If to Customer:

    Insurity LLC.

    170 Huyshope Avenue

    Hartford, Connecticut 06106

    Attn:   Tony Reisz                             Attn:

        Group VP, General Manager

With a copy to:

**EXHIBIT A - 15**
EXHIBIT C - 65

Insurity LLC.
c/o ChoicePoint Inc.
1000 Alderman Drive
Alpharetta, Georgia 30005
Attn: Legal Department

Notices sent according to the provisions of this Section shall be deemed received five (5) calendar days after being deposited in the U.S. mail or on the actual date of receipt, whichever is earlier.

12.7    Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties' respective successors, legal representatives and permitted assigns.

12.8    Governing Law. The validity, construction, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without regard to its choice of law provisions.

12.9    Source Code Escrow. Source Code Escrow, if desired, is available under a separate Agreement.

12.10   Relationship of the Parties. Personnel supplied by each Party to perform services or other obligations hereunder shall not be considered employees or agents of the other Party. During the Term of this Agreement and for a period of two (2) years thereafter, Customer shall not solicit, hire or engage any person employed by Vendor who was involved in the performance of any obligations related to this Agreement without Vendor's prior express written consent.

12.11   Use of Names and Trademarks. Neither Party shall use the name or trademark of the other for any purpose, including without limitation advertisement or public relations announcements, without the prior written consent of the other Party.

12.12   Force Majeure. Neither Party shall be responsible for any delay or failure of performance under this Agreement (other than Customer's payment obligations) by reason of any acts, events, or circumstances beyond its control. Such acts, events, or circumstances shall include, but shall not be limited to: acts of God, act of war, act of terrorism, riot, epidemic, fire, flood or other disaster, act of government, power failure, or labor walkout or strike. Nothing herein shall be construed to preclude termination of this Agreement pursuant to Sec. 10 hereof in the event any such delay or failure of performance is material and persists or is likely to persist for more than one hundred eighty (180) calendar days.

12.13   Severability. If any provision of this Agreement or portion thereof is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or portions thereof shall not be affected.

12.14   Headings. The headings in this Agreement are inserted for reference and convenience only, and shall not be considered as substantive parts hereof.

     viii.  Move new Mandatory Updates into a test environment within thirty (30) days of receipt and move them into production no later than seventy-five (75) days following receipt. Vendor will not support mandatory system releases later than ninety (90) days following the date a replacement release is made available to Customer;

     ix.  Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

11.    <u>Conflicting Terms</u>. In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail. In the event there are any conflicts among the terms of the specifications set forth in the CRB and those in this Software Schedule, the terms of the CRB shall prevail.

In witness of the foregoing, each of the Parties hereto has duly executed this <u>Software Schedule</u> as of the day and year first above written.

**INSURITY LLC**

Signature: _Anthony J Reise_

Name: _ANTHONY REISE_

Title: _PRESIDENT_

Date: _3/31/08_

**TRI-STATE CONSUMER INSURANCE**

Signature: _____

Name: _PENNY FERN HART_

Title: _President_

Date: _3-31-08_

# EXHIBIT A
## CUSTOMER REQUEST TEMPLATE

Customer:_____         Prepared By:_____

Request Number:_____             Request Date:_____

    This Customer Request is being submitted pursuant to the terms of that certain Master Agreement (the "Master Agreement") effective [MASTER AGREEMENT DATE], by and between Insurity LLC ("Vendor") and Customer and is subject to all of the terms and conditions of the Master Agreement and the applicable Schedule executed in connection therewith.

## DESCRIPTION OF BUSINESS NEED:

## PRICING METHOD AND CHARGES:

    [ ] Time & Materials for entire request

    [ ] Fixed Price for entire request

|  | DEVELOPMENT CHARGE | ANNUAL OTHER FEES |
|---|---|---|
| Non-Forms Development: | $_____ | $_____ |
| Forms Development: | $_____ | N/A (see note below) |
| TOTAL CHARGES: | $_____ | $_____ |

## PAYMENT METHOD:

Upon authorization for development, Vendor will invoice Customer for:  $_____.

Upon delivery, Vendor will invoice Customer for:                      $_____.

**EXHIBIT A - 18**

(The maintenance fee for the current contract year will be calculated on a pro-rated basis and billed from the period of delivery until the next anniversary of the Master Agreement.)

**NOTES:**

1) If this Customer Request is not approved by Vendor by _____ [Insert Date], it will be considered rejected and closed. If approved by such date, the enhancement will be delivered in/on _____ and will be compatible with the _____ release environment.

2) The above pricing and delivery date are based on the information available at this time. Should the scope of the request change, Vendor reserves the right to modify this Customer Request. Any changes to this Customer Request must be initialed by both Parties.

3) The pricing for this Customer Request is considered "Confidential Information" of the Vendor subject to the terms of the Master Agreement.

**APPROVALS:**

By signing below, Vendor accepts this Customer Request and Customer authorizes this Customer Request to be processed.

_____          _____

Customer Authorization                                 Vendor Acceptance

# Exhibit B

EXHIBIT C - 71

## SCHEDULE

## SOFTWARE & SERVICES

THIS Software Schedule ("Software"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and together with Vendor referred to collectively as, the "Parties").

Vendor and Customer are Parties to a certain Master Agreement, dated March 15, 2008 (the "Master Agreement"), pursuant to which certain terms and conditions have been established for the license of the Software and/or described in this Software Schedule. Any and all attachments hereto are expressly incorporated in this Software Schedule. Terms defined in the Master Agreement are used in this Software Schedule with the meanings assigned to such terms in the Master Agreement.

In consideration of the mutual covenants and conditions contained in this Software Schedule, together with the Master Agreement, the Parties agree as follows:

1. Incorporation of Software Schedule. The Software Schedule is hereby incorporated into the Master Agreement and, as set forth herein, is subject to its terms and conditions.

2. Description of the Software and Services. Vendor will provide Software and Services to support Customer's business needs as outlined in the Project Scope.

   Customer acknowledges that the description of the Software and/or Services provided in this Schedule is not a complete description of the capabilities, or limitations, of the features or functions of the Software and/or Services. The Software and/or Services have been developed to meet Vendor's estimation of the reasonable needs of the insurance industry, however, Vendor does not warrant that Software and/or Services as delivered to Customer will satisfy every business need of Customer, or the insurance industry in general, but Vendor does warrant the Software and/or Services under the terms and conditions of the Master Agreement.

3. Restrictions on Use of the Software and/or Services. Restrictions are as set forth in the Master Agreement.

4. Term of Software Schedule. The term of this Software Schedule shall be for a period of five (5) years ("Initial Term"), unless earlier terminated pursuant to the terms of Section 10 of the Master Agreement. Following the Initial Term, this Software Schedule shall

**EXHIBIT B - 1**
EXHIBIT C - 72

automatically renew, with reasonable annual increases, for successive five (5) year periods (each a "Renewal Term"), unless: (i) either Party provides the other with written notice of its intent not to renew at least six (6) months prior to the expiration of the Initial Term or any Renewal Term; or (ii) earlier terminated pursuant to the terms of Section 5 (e) herein or Section 10 of the Master Agreement. The combination of the Initial Term and any and all Renewal Terms are collectively referred to as the "Term".

5.      Client Requirements Book (CRB) Process.

(a)     The Parties shall prepare a Client Requirement Book (CRB), which will detail Licensee's business needs that fall within the scope of this project. Completion of the CRB will be the responsibility of both Parties and coordinated by a Vendor Project Manager.

(b)     During the CRB process, Customer may request a Software feature or function which is not anticipated under this Master Agreement or Software Schedule, including support for any of Customer's unique Licensee filings and forms, with the understanding that additional fees may apply. Any such fees will be documented in the CRB and implemented only as approved pursuant to a Change Order.

(c)     Once completed and approved in writing by both Parties, the CRB will become the specifications for Vendor's programming efforts. Vendor will not begin programming until both Parties approve the CRB, in writing.

(d)     During the CRB, the Parties will (a) document the forms to be delivered as part of the initial deliverable and (b) document final pricing for same.

(e)     Customer shall have the one-time option of terminating this Schedule without penalty, at the completion of the CRB but prior to the delivery of the system, with the approval of the EGC and Executive Management. The parties agree that this option shall not be invoked for non-material issues, and only after the parties have expended good faith efforts to resolve any issues arising during the CRB. The parties agree that the customer shall owe ~~customer~~ vendor for the time and materials expended. _DTB_

6.      Project Scope. Vendor will deliver the Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions as it exists as of the effective date of the Master Agreement, without modification, except as described below. During the CRB, Vendor will work with Customer to leverage prior efforts and make available certain configurations previously developed where such configurations are not proprietary or otherwise restricted.

**EXHIBIT B - 2**
EXHIBIT C - 73

(a)     The Base Software will support the following state:

   i. New York

(b)     The Base Software will support the following lines of business:

   i.   Personal Auto

   ii.  Homeowners

   iii. Personal Umbrella

(c)     The Base Software will support the following transactions:

   i.     For all lines of business:

   - New Business Quote/Issue
   - Renewal Quote/Issue
   - Endorsement
   - Cancel
   - Reinstatement
   - View and Reprint Documents
   - Non-Renewal
   - Out-of-sequence change endorsement processing
   - Rewrites

(d)     The Base Software to be implemented as part of the Implementation Services will include the following standard customization items at no additional cost to Customer:

   i.    VIN Verification

   ii.   Interfaces for ChoicePoint CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill, and ChoicePoint NY List Service.

(e) The Base Software to be implemented as part of the Implementation Services will include a Consumer User Interface and Agent User Interface. These will be delivered as part of the base at a time deemed appropriate by the Vendor Project Manager and Customer Project Manager.

(f) Batch print administration – Policy Decisions will be integrated with Insurity's Batch Print Administrator (BPA) or with a client specific batch printing tool to support batch printing of policy documents.

7.     Excluded in Project Scope.   The following modules and/or services are not included within the scope of this Master Agreement:

   - Claims

**EXHIBIT B - 3**
EXHIBIT C - 74

- Reinsurance
- Data conversion
- Each interface project will be defined separately and will have its own Schedule defining project scope, timelines and costs.
- Support for additional lines of business not specifically defined as part of this Software Schedule
- Software modifications, except those identified in the CRB, as mutually agreed in writing by the Parties, and as may be modified by mutual written agreement by the Parties from time to time, required to support Customer's business are not included. Any such other modifications will be considered to be enhancements and will be determined during the CRB.
- Any other Software and/or Services not specifically set forth in this Master Agreement or any other Schedule.

8.  Pricing and Payment Schedules

    (a)  Base Software License Fee:

    Policy Decisions, Billing Decisions, Reporting Decisions        $1,250,000

    Payment of these fees will be due as follows:

    $250,000 upon execution of the Master Agreement
    $125,000 Billable monthly beginning May 1, 2008 and ending on December 1, 2008

    (b)  Customer Specific Customizations

    The Customizations listed below will be done for a fixed bid of:   $245,500

    1.  Tristate Auto
        a.  Auto Processing, including UW and Workflows
        b.  Current Auto Rating
        c.  Auto Forms Development and Mapping
        d.  Batch print jobs
        e.  Batch processing jobs

    2.  Tristate Home
        a.  Home Processing, including UW and Workflows
        b.  Home Schedules
        c.  Current Home Rating
        d.  Home Forms Development and Mapping
        e.  Batch print jobs

**EXHIBIT B - 4**
EXHIBIT C - 75

  f. Batch processing jobs

3. Drivers Auto
  a. Auto Processing, including UW and Workflows
  b. Current Auto Rating
  c. Auto Forms Development and Mapping
  d. Batch print jobs
  e. Batch processing jobs

4. Security - Access Segmentation

5. Security - User Permissions

6. Expire Quotes

7. Copy Quotes

8. Data purge

9. Professional Services
  a. QA
10. VIN Verification Integration (Tristate must provide data)
11. Violation leveling
12. 50 completed and mapped letters are included in the fixed bid. Tristate will be responsible for providing the letters in MS Word format. Insurity will be responsible for the mapping. After these 50 letters Tristate will be responsible for the mapping.

13. Adverse Action Notices

14. Email quotes

Payment of these fees will be due as follows:

$47,750 payable upon CRB signoff

$47,750 payable upon delivery of customizations

$150,000 payable 30 days post production

(c) The following customizations will be done on a T & M Basis

1. Consumer "User Interface" for Tristate

**EXHIBIT B - 5**
EXHIBIT C - 76

2. Agent "User Interface" for Tristate
3. Consumer "User Interface" for Drivers
4. Agent "User Interface" for Drivers
5. Interfaces
   a. Bi-directional Claims Interface
   b. Address Verification
   b. Billing Decisions Customizations
   c. Payment Gateway
   d. ISO Customizations
   e. Document Management Integration
   f. Aggregator Integration for Rating, Quote import, Workflow, UW (Insweb, Insureme, NetQuote)
   g. General Ledger Export
   h. NY Auto ID Cards Integration
   i. Google Adwords integration
   j. Integration of distance data into Tristate rating
   k. Integration TransUnion credit scoring.
6. Conversion Renewals
   a. All active policies for home, auto, and umbrella will be converted at renewal
   b. Legacy policies will not be converted
7. TSC Claim data to Insurity ODS and Data Mart
8. Insurity data export of Policy data to TSC COBOL System
9. Batch Print modification to send batch print materials for ImageRight import
10. Coverage or Policy Suspension
11. Access Segmentation by line of business
12. Billing Set Up
   a. Premium refund file (checks issued to bank) – maybe can remove if core feature
   b. Direct pay file to bank – maybe can remove if core feature
13. Reporting
   a. Interfaces to ODS and data marts
   b. Canned Reports
   c. Reporting

Payment of these fees will be due upon delivery of each customization.

(d) Additional Customer Specific Customizations and costs, if any, will be identified

**EXHIBIT B - 6**

EXHIBIT C - 77

special deployment resources such as additional training, administrative support can be provided by Vendor for an additional cost.

xi. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(b) Following Delivery and before Acceptance:

i. Provide Vendor regular (weekly) status of Customer's testing results;

ii. Customer set's production target date and communicates changes to all Vendor and Customer stakeholders;

iii. Thoroughly test all Software prior to use in production and report all bugs to Vendor, including their priority, in accordance with the mutually agreed upon guidelines and project plan;

iv. Provide appropriate documentation of errors and utilize vendor's reporting tools;

v. Where needed. Customer will provide Vendor access to Customer systems for diagnostic purposes;

vi. Customer will continue to test all delivered components unless access to such component is prevented due to specific defects preventing such testing;

vii. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(c) Following Acceptance:

i. Customer provides Coordinator to qualify problems prior to being reported to Vendor;

ii. Use Vendor on-line compliance adoption and issue reporting system;

iii. Where needed, Customer will provide Vendor access to Customer systems for diagnostic purposes;

iv. Adjust test bed of policies and testing scripts in conjunction with Customer initiated changes made to the Software;

v. Following guidelines, submit to Vendor test cases for Vendor's use in testing future software releases;

vi. Assure that all Customer project coordinators are fully trained in use of the Software before assuming their role(s) as primary contact to Vendor;

vii. Stay current with Service Packs no more than 3 generations behind (6 weeks);

**EXHIBIT B - 9**
EXHIBIT C - 78

viii. Move new Mandatory Updates into a test environment within thirty (30) days of receipt and move them into production no later than seventy-five (75) days following receipt. Vendor will not support mandatory system releases later than ninety (90) days following the date a replacement release is made available to Customer;

ix. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

11. <u>Conflicting Terms</u>. In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail. In the event there are any conflicts among the terms of the specifications set forth in the CRB and those in this Software Schedule, the terms of the CRB shall prevail.

In witness of the foregoing, each of the Parties hereto has duly executed this <u>Software Schedule</u> as of the day and year first above written.

**INSURITY LLC**

Signature: _Anthony T Reis_

Name: _ANTHONY REISE_

Title: _PRESIDENT_

Date: _3/31/08_

**TRI-STATE CONSUMER INSURANCE**

Signature: _____

Name: _PENNY FERRO HART_

Title: _President_

Date: _3-31-08_

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a true and correct copy of the

within and foregoing **DEFENDANT'S ANSWER AND COUNTERCLAIMS** to

be served on all counsel of record by placing same in the United States Mail with

sufficient postage affixed thereto and properly addressed as follows:

> J. Wayne Pierce
> Georgia Bar No. 579250
> Pierce & Dunkelberger
> 6111 Peachtree-Dunwoody Rd.
> Atlanta, GA 30328

This 21st day of February, 2011.

Kamal Ghali
Georgia Bar No. 805055