# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

TRI-STATE CONSUMER          )
INSURANCE COMPANY, INC.    )
       Plaintiff,              )
                                )
v.                                )
                                )
LEXISNEXIS RISK SOLUTIONS INC., )     **CIVIL ACTION NO:**
Formerly Known as ChoicePoint     )
Services Inc., Survivor Entity of its   )     **2011CV195485**
Merger with Insurity LLC a/k/a/    )
"Insurity"                     )
       Defendant,           )

FILED IN OFFICE
FEB 21 2011
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## DEFENDANT LEXISNEXIS RISK SOLUTIONS INC.'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant LexisNexis Risk Solutions Inc. ("Defendant") respectfully requests that this Court dismiss Plaintiff Tri-State Consumer Insurance Company, Inc. ("Plaintiff")'s Complaint for Relief ("Complaint"). Despite Plaintiff's efforts to avoid the plain language of the parties' agreements, which the Complaint references and incorporates, all five of Plaintiff's causes of action[1] are specifically foreclosed by the express language of the two agreements between the parties that govern this dispute. These agreements contain (1) a contractual limitation on the time for bringing lawsuits, which has since passed; (2) a Georgia choice of law

---

[1] The Complaint alleges five counts: (1) "Unjust Enrichment/Constructive Trust;" (2) a violation of N.Y. State Gen. Bus. Law § 349; (3) "Breach of Warranty;" (4) "Breach of Warranty;" and (5) "Breach of Contract." Compl. ¶¶ 35-59.

clause, which requires the dismissal of Plaintiff's New York cause of action; (3)

warranty disclaimers and limitations, which require dismissal of Plaintiff's two

"Breach of Warranty" claims; and (4) a binding contract for the payment of certain

fees, which forecloses the unjust enrichment claim.  Lastly, Plaintiff's claims are

barred by (5) the voluntary payment doctrine.

## I.    The Factual Background of the Parties' Binding Contractual Agreements

By way of background, Defendant's business at issue here is the

development, sale and support of software for uses in, *inter alia*, the insurance

industry.[2]  Plaintiff is a New York insurance company.  *Id.* at ¶ 1.

On January 21, 2011, Plaintiff filed this action for claims arising out of a

March 15, 2008 Master Agreement ("Master Agreement"), under which Defendant

would provide Plaintiff with a customized line of proprietary software for

Plaintiff's use in its insurance business.  *Id.* at ¶¶ 9-13.[3]  The Master Agreement

contemplated the execution of a "Schedule: Software and Services" ("Schedule"),

---

[2] As the Complaint alleges, LexisNexis Risk Solutions Inc., a Georgia corporation, is the current name of ChoicePoint Services Inc., with which Insurity LLC, a Georgia limited liability company, merged. *Id.* at ¶¶ 2-5.

[3] The Master Agreement is referenced in the Complaint and attached to this Motion to Dismiss as Exhibit A. *See* Compl. ¶ 9-10 (purporting to attach a "true and accurate copy of" the Master Agreement and Schedule to the Complaint); *Id.* at ¶ 17 (quoting Master Agreement § 8.1).

which the parties executed on March 31, 2008.[4]  The Schedule further described

the software and services to be provided.  The Master Agreement and the Schedule

together constitute the relevant "Agreements" between the parties.

The Agreements did not require Defendant to complete performance by a

specific date. *See id.* at ¶ 20.  Rather, the Agreements required the cooperation and

active involvement of Plaintiff in the project, and imposed certain obligations

necessary for the development and implementation of the software—which was to

be customized for Plaintiff—on both parties. *See* Exh. B (Schedule) at §§ 8(b)-(c)

(identifying the software's "customer specific customizations").  Thus, the parties

included a number of provisions in the Agreements to allocate responsibility and

risk.[5]

---

[4] The Schedule is referenced in the Complaint and attached to this Motion to
Dismiss as Exhibit B.  *See* Exh. A (Master Agreement) at 1 ("[E]ach Schedule
shall constitute a separate independent agreement with the terms of this Master
Agreement applying to each Schedule individually."); Exh. B (Schedule) at 1
("Vendor and Customer are Parties to a certain Master Agreement, dated March
15, 2008, pursuant to which certain terms and conditions have been established.");
*id.* ("[T]ogether with the Master Agreement, the Parties agree as follows: . . ."); *id.*
at § 1 ("The [Schedule] is hereby incorporated into the Master Agreement and, as
set forth herein, is subject to its terms and conditions.").

[5] This Court may properly consider the Agreements, which were incorporated into
the Complaint, for the purpose of ruling on Defendant's Motion to Dismiss. *See*
*Brown v. Gadson*, 288 Ga. App. 323, 326 (2007) ("The trial court's order granting
[the] motion to dismiss was based on the agreement of the parties, which was
attached to and incorporated in the pleadings. As a result, the trial court's
consideration of the same did not convert the motion to dismiss to a motion for
summary judgment."); *Murrey v. Specialty Underwriters*, 233 Ga. 804, 806 (1975)

For example, the Master Agreement contained (1) a contractual limitation clause (entitled "Limitation on Time for Bringing Actions"), which required that a party intending to bring any lawsuit arising out of the Agreements do so within **one year** of when that party "should have known of the occurrence of the event giving rise to such cause of action," Exh. A (Master Agreement) at § 8.5; (2) a **Georgia** choice of law clause, *id.* at § 12.8; (3) a broad and conspicuous disclaimer of all implied warranties, *id.* at § 8.2; (4) a remedy limitation; *id.* at § 8.3; and (5) merger and non-reliance clauses, which required the parties to carefully examine the Agreements before signing them and disclaimed any reliance on statements or representations outside the Agreements, *id.* at §§ 8.2, 12.1.

Moreover, the Agreements reflected the parties' understanding that, without Plaintiff's active cooperation, Defendant could not design and produce software that would meet Plaintiff's needs.  Indeed, the Master Agreement specified that Defendant "shall have **no liability** for delays in the provision of the Project implementation services caused by [Plaintiff's] failure to complete its tasks or provide information or resources in a timely manner." *Id.* at § 11.5 (emphasis added).

---

("[A] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

Likewise, the Schedule required Plaintiff to do certain things including, for example, (1) "[a]ssign competent project, insurance/business and technical staff to review and sign-off on the final [project], Exh. B (Schedule) at § 10(a)(ii); (2) "provide adequate resources to ensure that the [Client Requirements Book, (*i.e.*, a document delineating the project's scope)] is completed within" 75 days of the Schedule's execution, *id.* at § 10(a)(iii); and (3) participate in Executive Governance Committee meetings (as required by the Master Agreement § 7.1), *id.* at § 10(a)(xi). Moreover, the Master Agreement required ongoing cooperation in the form of (1) testing after delivery of software and (2) the designation of certain coordinators to identify problems. *See* Exh. A (Master Agreement) at §§ 3, 5, 6, and 7.

The Schedule also required Plaintiff to make payments for a "Base Software License Fee" which were "due as follows: $250,000 upon execution of the Master Agreement [and] $125,000 Billable monthly beginning May 1, 2008 and ending on December 1, 2008." Exh. B (Schedule) at § 8(a). The parties also agreed that Defendant would create certain customized add-ons for a flat-fee of $245,000, *see id.* at § 8(b), and a number of other "customizations" to be paid on a [time and

materials] basis, *id.* at § 8(c); *see also id.* at § 8(e) (requiring **annual** maintenance fee of $252,000).[6]

Pursuant to the Schedule, Plaintiff voluntarily paid $1,147,726.13, which included payments for the Base Software license fee and travel reimbursements. *See* Compl. ¶ 29.[7] But Plaintiff failed to make the December 1, 2008 payment of $125,000 for the Base Software license fee, as well as a number of other required payments. *Id.*

Despite the fact that Defendant's progress was contingent on Plaintiff's cooperation, and that neither the Master Agreement nor the Schedule imposed hard-and-fast deadlines for delivery of the software, *see id.* at ¶ 20 ("At no time . . . have there been set forth and mutually agreed to **specific dates** for performance.")

---

[6] *See also* Compl. ¶ 15 ("The license fee . . . was . . . $1,250,000.  To date, Tri-State has paid . . . $1,147,726.13.").

[7] *See id.* (alleging "[Plaintiff] made payment to the Defendant of the following sums: $250,000.00 on or about April 18, 2008 representing the base software license fee; $125,000.00 on or about June 20, 2008 for the May 2008 base software license fee; $125,000.00 on or about July 24, 2008 for the June 2008 base software license fee; $125,000.00 on or about August 8, 2008 for the July 2008 base software license fee; $125,000.00 on or about August 29, 2008 for the August 2008 base software license fee; $125,000.00 on or about September 19, 2008 for the September 2008 base software license fee; $125,000.00 on or about November 7, 2008 for the October 2008 base software license fee; $125,000.00 on or about November 13, 2008 for the November 2008 base software license fee."); *see also id.* at ¶¶ 30-33 (noting August 15, 2008 payment of $4,801.23, October 13, 2008 payment of $3,403.52, October 13, 2008 payment of $2,867.61, and January 10, 2008 payment of $6,000.00).

(emphasis added), in May 2009, Plaintiff took the position that Defendant's software development was "delay[ed]" and complained about Defendant's delivered software product. *See id.* at ¶ 26.

Now, more than a year and a half later, Plaintiff has brought this suit containing allegations, made "on information and belief," that it was deceived into purchasing software from Defendant. As explained below, applicable Georgia law forecloses each of Defendant's claims for relief.

## II.   Plaintiff's Claims for Relief Should be Dismissed in Their Entirety.

Under the express language of the Agreements and Georgia law, Plaintiff's claims are barred as a matter of law. "[W]here a complaint reveals a state of facts which affirmatively shows that there is no liability on the defendant, it is subject to dismissal." *Myers v. Clark*, 126 Ga. App. 154, 155 (1972). Further, "[n]otice pleading does not allow a claimant who pleads facts which would not support his claim for the relief sought to survive a motion to dismiss." *Medoc Corp. v. Keel*, 152 Ga. App. 684, 688 (1979). This Court may dismiss a complaint that fails to identify an appropriate legal basis for recovery. *Green v. Mercury Mills, Inc.*, 136 Ga. App. 504, 505 (1975) ("Even under our liberalized notice pleading a motion to dismiss is properly sustained whenever the complaint fails to show a legal basis for recovery.").

839553.1

As explained below, the effect of the Agreements, as well as the voluntary payment doctrine, mean that Plaintiff cannot "possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought." *Thomas v. Lee*, 286 Ga. 860, 861 (2010) (citation and quotation marks omitted).[8] Therefore, all of Plaintiff's claims should be dismissed with prejudice.

### A. Plaintiff's Action is Barred by the Master Agreement's One-Year Contractual Limitation on Bringing Claims.

The Master Agreement's "Limitation on Time for Bringing Actions" expressly provides that "**No action, regardless of form or substance**, arising out of this Agreement or the performance or nonperformance of *any* **of the Parties' obligations hereunder** may be brought more than **one (1) year after a party knew or should have known** of the occurrence of the event giving rise to such cause of action." Exh. A (Master Agreement) at § 8.5 (emphasis added). According to Plaintiff's own allegations, it was aware of the grounds for its claims

---

[8] *See Stendahl v. Cobb County*, 284 Ga. 525, 525 (2008) ("A motion to dismiss for failure to state a claim upon which relief can be granted should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor.").

as early as May 18, 2009.  Compl. ¶ 26.  Plaintiff's failure to file its Complaint

until **January 2011** requires dismissal as a matter of law.

Specifically, the Complaint alleges that by May 18, 2009, Peter Kardas,

Project Manager for Plaintiff, emailed Michelle Piotrowski, Defendant's Project

Manager, to "rebuke[] [her] for [her] pattern of concealment and deception." *Id.*

Thus, by May 18, 2009, Plaintiff admittedly was aware of all of the grounds for the

claims it alleges here.  Yet the contractual limitation period came and went, and

Plaintiff did nothing.

Georgia courts vigorously enforce one-year contractual limitation periods.

*See, e.g., Thornton v. Ga. Farm Bureau Mut. Ins. Co.*, 287 Ga. 379, 380 (2010)

("Thornton fails to recognize the distinction between a statute of limitation and its

particular language and a **contractual period of limitation** and its particular

language.") (enforcing one-year contractual limitation period) (emphasis added);

*Encompass Ins. Co. of Am. v. Friedman*, 299 Ga. App. 429, 431 (2009) ("Georgia

law is clear that contractual limitations like the one presented here are valid and

will be enforced by the courts.") (reversing trial court and enforcing one-year

contractual limitation period); *Rabey Elec. Co. v. Hous. Auth. of Savannah*, 190

Ga. App. 89, 90 (1989) ("While the statute of limitation for actions on simple

contracts in writing is six years, O.C.G.A. § 9-3-24, '[t]he Georgia courts have

permitted parties to contract as to a lesser time limit.'") (affirming 120 day or six-

month contractual limitation period on contract for electrical modernization project); *Desai v. Safeco Ins. Co.*, 173 Ga. App. 815 (1985) (affirming motion to dismiss on contractual limitation grounds); *Brown v. Savannah Mut. Ins. Co.*, 24 Ga. 97, 101 (1858) ("There is no reason why a party may not enter into a covenant, that for an alleged breach of contract, the injured party shall sue within a period less than that fixed by the statute of limitations as a bar.").

Plaintiff's pleadings "affirmatively show" that by May 2009: (1) it was dissatisfied with Defendant's software; (2) it had knowledge of what it refers to and claims as Defendant's "deception"; (3) delivery of the software had been delayed; and (4) it had already paid $1,147,726.13 to Defendant. *See, e.g.*, Compl. ¶¶ 15, 21, 26, 29-33. *See Garrett v. Garrett*, 231 Ga. 754 (1974) (affirming dismissal of complaint based on complaint's "affirmative[] show[ing]" of dispositive facts); *Myers*, 126 Ga. App. at 155. In other words, under Master Agreement § 8.5, Plaintiff was obligated to bring its lawsuit by at least May 18, 2010. *See Maxwell Bros. v. Liverpool & London & Globe Ins. Co.*, 12 Ga. App. 127, 129 (1913) ("If the question were under the general statute of limitations, it would be true that the limitation did not begin to run until the accrual of the right of action, but the contract **expressly makes a period of limitation** as distinguished from the statute of limitations[.]") (emphasis added).

Therefore, each and every one of Plaintiff's causes of action is barred, even its New York tort claim. *See McCoury v. Allstate Ins. Co.*, 254 Ga. App. 27, 27 (2002) ("The plain language of the one-year limitation provision bars the present **action** against Allstate.") (barring both contractual and **tort** claims against defendant) (emphasis added).  After all, Master Agreement § 8.5's clear and unequivocal language is not limited to breach of contract claims; it forbids "**[any] action**, regardless of form or substance" so long as it "aris[es] out of th[e] Agreement or the performance or nonperformance of any of the Parties' obligations hereunder . . . ."  Exh. A (Master Agreement) at § 8.5.

Perhaps Plaintiff will argue that its claims do not arise out of nonperformance, but rather out of Defendant's so-called "deception" (which, not surprisingly, is alleged on "information and belief").  *See* Compl. ¶¶ 23, 25, 27-28. The Agreements, which this Court may properly review on this Motion to Dismiss,[9] clearly identify the software at issue, provide a framework for customizing it, and outline Plaintiff's payment schedule.  Thus, even if Plaintiff was "deceived" as it alleges, it was deceived only about the Agreements (*i.e.*, the claim "arises out of" the Agreements) and Defendant's **performance** (or ability to perform) under them.  *See id.* at ¶ 40 (identifying deception as arising out of "Defendant's services in licensing its . . . Software, its modification of the

---

[9] Cases cited *supra* n.5.

Software," "[and] non-delivery of a usable system"). Any such claims fall squarely within § 8.5's prohibition on claims brought after one year.

To the extent such a rule may be viewed as "harsh," it is only the product of Plaintiff's contractual agreement and its own delay in vindicating its rights. The result would be the same even if Plaintiff had failed to discover the basis of its claims within the limitation period. *See Third Nat'l Bank v. American Bonding Co.*, 145 Ga. 126 (1916) ("[T]he fact that a default is not discovered by the obligee or its officers until the lapse of more than a year from the expiration of the term of the bond and its continuance will not have the effect of extending the time within which suit may be brought."). But here, in contrast—by Plaintiff's own allegations—Plaintiff did in fact discover its alleged claims more than one year prior to bringing suit. Compl. ¶¶ 21, 26. Plaintiff's claims should be dismissed with prejudice.

## B. Plaintiff's New York Deceptive Trade Practices Claim Should be Dismissed.

Although Plaintiff's entire Complaint should be dismissed because it is untimely (per the parties' contractual limitation period), Plaintiff's remaining claims suffer from other terminal flaws. Plaintiff next alleges that Defendant "committed deceptive acts" pursuant to the New York State General Business Law § 349. *See* N.Y. Gen. Bus. Law § 349(h) (authorizing damages of "fifty dollars" or

a **maximum** of $1,000 for "willful or knowing" violations). This claim is barred

for several important reasons.

### 1. The Georgia Choice of Law Clause Bars Plaintiff's New York Cause of Action.

First, the parties agreed that Georgia law—not New York law—would

govern any dispute regarding the Agreements. *See* Exh. A (Master Agreement) at

§ 12.8 ("The validity, construction, and performance of this Agreement shall be

governed by and construed in accordance with the laws of the State of Georgia

without regard to its choice of law provisions.") (emphasis added). Like Plaintiff's

other claims, Plaintiff's New York § 349 claim is based entirely upon Defendant's

alleged failure to perform under the Agreements. *See* Compl. ¶ 40 (identifying

deception as arising out of "Defendant's services in licensing its . . . Software, its

modification of the Software," "[and] non-delivery of a usable system").

Therefore, Plaintiff's reliance on New York law (as opposed to Georgia law) to

support a claim for relief is expressly barred, and Count Two must be dismissed.

*See BP Lubricants USA Inc. v. Global Saturn, Inc.*, No. 1:06-cv-0149, 2007 U.S.

Dist. LEXIS 39928, at *7 (N.D. Ga. June 1, 2007) ("Georgia courts have

consistently held that choice of law provisions contracted by parties are

enforceable and apply to both a contract's construction and its **remedy**.")

(emphasis added); *Northeast Data Sys. v. McDonnell Douglas Computer Sys.*, 986

F.2d 607, 610 (1st Cir. 1993) ("[W]hen parties agree that 'contract related' claims

839553.1
13

will be tried under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach of contract will be tried under the law of Massachusetts.") (Breyer, J.); *see also New England Mortg. Sec. Co. v. McLaughlin*, 87 Ga. 1, 5-6 (1891) ("The defendant, having . . . agreed that this contract should be construed in all respects according to the laws of Georgia, should stand to his promises."); *Carr v. Kupfer*, 250 Ga. 106, 108 (1982) (enforcing choice-of-law clause unless it violates Georgia public policy).

### 2. New York General Business Law § 349 Does Not Apply to Private Contractual Disputes; It Only Addresses Transactions with Members of the Consuming Public-At-Large.

Second, even if the New York statute could be applied consistent with the Agreements, which it cannot, Plaintiff has failed to allege a necessary element— that Defendant's conduct applied to the consuming public. Section 349 is not a remedy for purely private wrongs. "Section 349 . . . is **expressly consumer oriented** in its application. A claimant relying on § 349 must establish that the alleged deceptive act or practice was directed to the consuming public at large." *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, 331 F. Supp. 2d 247, 256 (S.D.N.Y. 2004) (emphasis added). "Thus, as a threshold matter, plaintiffs claiming the benefit of section 349--whether individuals or entities . . . --must charge conduct of the defendant that is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744

(N.Y. 1995). As New York's highest court has said, "[p]rivate contract disputes, **unique to the parties,** for example, would not fall within the ambit of the statute." *Id.* The court further noted that:

> In explicating the legislative objective behind section 349, we are mindful of the potential for a tidal wave of litigation against businesses that was not intended by the Legislature. That possibility is avoided--while furthering the statutory purposes--by our adoption of an objective definition of **deceptive acts and practices,** whether representations or omissions, limited to those likely to mislead a **reasonable consumer acting reasonably under the circumstances.**

*Id.* (emphasis added); *see also Graham v. Eagle Distrib. Co.,* 637 N.Y.S.2d 583, 583 (N.Y. App. Div. 4th Dep't 1996) ("General Business Law § 349 was not intended to turn a simple breach of contract into a tort, but was intended to empower consumers; to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses. **It was not intended to supplant an action to recover damages for breach of contract between parties to an arm's length contract.**") (quotation marks omitted) (emphasis added); *Genesco Entertainment, Div. of Lymutt Indus., Inc. v. Koch,* 593 F. Supp. 743, 751-752 (S.D.N.Y. 1984) ("The consumer oriented nature of the statute is evidenced by the remedies it provides. Section 349(h) provides parties with the opportunity to receive the greater of actual damages or $50. The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions **where the amount in controversy is small.**")

(emphasis added); *see also Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 (S.D.N.Y. 1988) ("As pleaded, the acts alleged in the instant complaint are not the types of transactions that fall within the scope of the statute. Plaintiffs do not assert injury to consumers or to the public interest, but to a class of independent insurance brokers."). Plaintiff is obviously not a member of the consuming public that the statute protects in a case like this; it is a business seeking relief under a private contract. Compl. ¶ 1.

Further, Plaintiff has failed to identify a single "deceptive act or practice" that would have deceived the "reasonable consuming public." N.Y. Gen. Bus. Law § 349; *see* Compl. ¶ 23 (alleging only that Defendant "deceived Plaintiff"—not the consuming public). Plaintiff's claim that it did not get what it thought it contracted for is not the stuff of consumer deception. Plaintiff cannot show, under any set of facts, that Defendant's conduct towards Plaintiff had a broader impact on **consumers at large.** *See Oswego Laborers.*, 647 N.E.2d at 744 ("[P]laintiff must demonstrate that the acts or practices have a broader impact on consumers at large.") (emphasis added). Plaintiff does not even allege that Defendant made any representations to the "public at large." *Graham*, 637 N.Y.S.2d at 583 ("[T]he proposed amended complaint manifestly lacks merit because it does not state the nature of the material misrepresentations made to the public at large."). Given that Plaintiff has pled affirmatively that it is an insurance company attempting to

recover on a private contractual deal, it cannot, under any set of facts, recover under Count Two.[10] *See* Compl. ¶¶.1, 43, 50,55.

### C. Plaintiff's Unjust Enrichment Claim is Barred by the Parties' Agreements.

Although Plaintiff's claims should be dismissed because they have been brought after the time allowed by the contractual limitation period, Plaintiff's unjust enrichment claim should also be dismissed for an independent reason. Under Georgia law, Plaintiff cannot prevail on its unjust enrichment claim (Count One) because "[u]njust enrichment is an equitable concept and applies when as a matter of fact **there is no legal contract,** but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Wachovia Ins. Servs. v. Fallon*, 299 Ga. App. 440, 449 (2009) (emphasis added); *Bonem v. Golf Club of Ga., Inc.*, 264 Ga. App. 573, 579 (2003) ("A legal contract governs the dispute at issue here, and Bonem may not rely on unjust enrichment.").

Here, Plaintiff admits: (1) that the parties executed two contracts, the Master Agreement and the Schedule, which Plaintiff purported to attach as exhibits to its Complaint and specifically incorporated into the Complaint, *see* Compl. ¶¶ 9-10

---

[10] Further, to the extent that Plaintiff's cause of action under § 349 arises out of any alleged oral representations, such claim is barred by the Agreements' merger and non-reliance clauses. *See* Section II. F *infra* (collecting cases showing that merger and non-reliance clauses bar claims of reliance as a matter of law).

(noting the parties "executed a document entitled 'Master Agreement'" and "Schedule" and that they are attached);[11] (2) it paid Defendant pursuant to these two contracts, *i.e.*, Plaintiff's allegations regarding the money it paid Defendant mirror the precise payment schedule contained in § 8(a) of the Schedule, *compare* Exh. B (Schedule) at § 8(a) *with* Compl. ¶ 29 (identifying payments made); and (3) Plaintiff has affirmatively pled a breach of contract claim (Count Five), Compl. ¶¶54-59.

In other words, "any benefit conferred on the [Defendant] was triggered by a provision in the contract." *Tidikis v. Network for Med. Communs. & Research, LLC*, 274 Ga. App. 807, 811 (2005). "Under these circumstances, the unjust enrichment claim fails as a matter of law." *Id.* Therefore, Plaintiff's unjust enrichment claim should be dismissed with prejudice.

## D. Plaintiff's Breach of Warranty Claims are Barred by the Master Agreement's Disclaimer and Limitation of Warranties.

Plaintiff alleges two "breach of warranty" claims: (1) a breach of an express warranty (Count Three) (Compl. ¶¶ 42-46), and (2) a breach of an implied warranty (Count Four) (*id.* at. ¶¶ 47-53). Both breach of warranty claims are barred by the Master Agreement § 8.2.

In § 8.2 of the Master Agreement, Defendant expressly disclaimed all warranties except for a narrow warranty provided in § 8.1:

---

[11] The Agreements are attached to this Motion to Dismiss as Exhibits A and B.

EXCEPT AS EXPRESSLY PROVIDED FOR IN SECTION 8.1
HEREOF AND TO THE MAXIMUM EXTENT PERMITTED BY
APPLICABLE LAW, **VENDOR MAKES NO WARRANTIES,**
EITHER EXPRESS OR IMPLIED, **INCLUDING, WITHOUT**
**LIMITATION,      ANY      IMPLIED      WARRANTY      OF**
**MERCHANTABILITY,  FITNESS  FOR  A  PARTIUCLAR**
**PURPOSE,**   OR   CORRECTNESS,   COMPLETENESS   OR
CURRENTNESS OF ANY DATA OR RESULTS, **ALL OF WHICH**
**ARE HEREBY EXPRESSLY DISCLAIMED** . . . EMPLOYEES
OR AGENTS OF VENDOR . . . HAVE NO AUTHORITY TO
MAKE ANY REPRESENTATION OR WARRANTY REGARDING
THE SOFTWARE AND CONSEQUENTLY, **SHOULD NOT AND**
**MAY NOT BE RELIED UPON BY CUSTOMER.**

Exh. A (Master Agreement) at § 8.2 (boldface added).  This conspicuous, all

capitalized disclaimer of warranties (including the implied warranty of

merchantability) is valid and enforceable under Georgia law. *See, e.g., Steele v.*

*Gold Kist Inc.*, 186 Ga. App. 569, 570 (1988) ("The combination of the

capitalization of the disclaimer and its contents was sufficient to preclude an action

against appellee for breach of the implied warranties of merchantability and

fitness."); *Harris v. Sulcus Computer Corp.*, 175 Ga. App. 140, 142 (1985) ("The

heading of this disclaimer is in letters larger than any other type on the form. In

addition, significant portions of the disclaimer are capitalized, distinguishing them

from other language on the form. This language was conspicuously set forth.

Appellee's limitation of the warranty of merchantability meets the requirements of

O.C.G.A. § 11-2-316 (2), and there is no question of fact that appellee's limitation

of liability effectively precluded a claim for breach of an implied warranty of

merchantability.") (internal citation omitted); *see also Apex Supply Co. v. Benbow Indus.*, 189 Ga. App. 598, 600 (1988) ("A disclaimer is more comprehensive in its legal effect. It leaves the buyer with **no remedy** for breach of implied warranties, there being no implied warranties for the seller to breach.") (emphasis added).

Moreover, under any set of facts, Plaintiff's request for relief for a breach of the express warranty (*i.e*, a refund of $1,147,726.13, *see* Compl. ¶ 59), is **expressly barred** by the Master Agreement § 8.3, which provides that:

> The **sole and exclusive liability** of [Defendant], and the sole and exclusive remedy of [Plaintiff], in the event of any breach of or claim under the above warranty shall be, **at [Defendant's] option, (i) correction or replacement of the nonconforming** portion of the Software within a reasonable period of time after receiving written notice from [Plaintiff], or (ii) a refund, after receiving written notice from [Plaintiff], of all amounts paid by [Plaintiff] to [Defendant] which are attributable to that portion of the Software that **does not conform** to the warranty, (as determined by the [Executive Governance Committee] and Executive Management, based upon the material impact on the Software); provided, however, that [Plaintiff] shall not receive such return unless and until it ceases all use, and destroys, returns, removes and/or purges all copies[] of that portion of the Software that does not conform to the warranty.

Exh. A (Master Agreement) at § 8.3 (emphasis added).   In other words, Plaintiff is not, as it claims, entitled to monetary damages in the form of a refund for a breach of the express warranty; it is only entitled to have any nonconforming software corrected or repaired after giving notice to Defendant (assuming Plaintiff is

otherwise eligible for the warranty).[12]  Although Master Agreement § 8.3 states

that Defendant, "at [its] option," may choose instead to issue a refund, it is clear

that Plaintiff may not unilaterally demand a refund.  Moreover, even if Defendant

chooses to offer a refund, Plaintiff may obtain a refund only for portions of the

software determined to be nonconforming (as determined by the parties' Executive

Governance Committee).  In short, Plaintiff is contractually barred from obtaining

the relief it seeks here—a refund of all sums it has paid, including the licensing fee.

In addition, Plaintiff has failed to allege that it has returned, purged, or removed all

copies of the software in its possession.  Nothing in the Master Agreement or

Schedule authorizes Plaintiff to obtain a complete refund of all amounts it paid.[13]

### E.  All of Plaintiff's Claims Are Barred by the Voluntary Payment Doctrine.

All of Plaintiff's claims are barred for the additional reason that it

---

[12] Defendants note that, pursuant to Master Agreement § 8.1, Plaintiff is ineligible
for the warranty based on its own pleadings.  *See* Exh. A (Master Agreement) at §
8.1 (offering the limited warranty "provided [Plaintiff] is current on the payment **of
all fees due** and payable hereunder") (emphasis added).  By Plaintiff's own
admission, it has failed to pay Defendant the full $1,250,000 base software
licensing fee.  *See* Compl. ¶ 15 ("The license fee . . . was . . . $1,250,000.00. . . . To
date, Tri-State has paid . . . $1,147,726.13.").  Therefore, Plaintiff is ineligible for
the warranty.

[13] It makes sense for the Agreements to require significant upfront payments to
prevent a customer—such as Plaintiff—from forcing Defendant to go through the
time and expense of developing and implementing customized software only to
have that customer terminate the contract before the project has been completed.

839553.1
21

**voluntarily** paid $1,147,726.13 to Defendant. *See* Compl. ¶ 15 ("The license fee . . . was . . . $1,250,000.00. . . . To date, Tri-State has paid . . . $1,147,726.13.").

"The general presumption is that whenever one pays money to another, the money is due and the payee is entitled thereto, and its payment is voluntarily made by the payer; and in an action to recover it the burden is on him to show that the payment was not due, and that the money was not paid by him voluntarily." *New York Life Ins. Co. v. Williamson*, 53 Ga. App. 28, 36 (1936).

Although voluntary payments of claims may be recoverable where there is a showing that they "were induced by fraud," *Couch v. Blackwell & Assocs., Inc.*, 150 Ga. App. 739, 740 (1979), the parties' **merger and non-reliance clauses** mean that Plaintiff cannot avail itself of this exception to the voluntary payment doctrine under any set of facts. *See* Exh. A (Master Agreement) at § 12.1 ("This Agreement . . . constitutes the entire agreement between the Parties . . . and supersedes any and all prior . . . agreements and understandings, whether oral or written."); Exh. B (Schedule) at § 1 ("The [Schedule] is hereby incorporated into the Master Agreement."); *see also* Exh. A (Master Agreement) § 8.2 ("EMPLOYEES OR AGENTS OF VENDOR . . . HAVE NO AUTHORITY TO MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE SOFTWARE AND CONSEQUENTLY, **SHOULD NOT AND MAY NOT BE RELIED UPON BY CUSTOMER**.") (boldface added). In other words, the

Agreements expressly state that Plaintiff **does not rely** on any of Defendant's pre- or post-contractual representations.

Under any set of facts, the existence of both the merger and non-reliance clauses in the Master Agreement means that Plaintiff's decisions to pay Defendant were **voluntary** as a matter of law and not based on any pre-contractual or post-contractual fraud or deception. *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 796 (2001) ("As a matter of law, a valid **merger clause** executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations.") (barring theft-by-deception claim under Georgia civil RICO) (emphasis added); *Rountree v. Wash. Nat'l Ins. Co.*, No. 607CV014, 2007 U.S. Dist. LEXIS 36921, at *14 (S.D. Ga. May 21, 2007) ("[A]ny reliance Rountree may have placed on the agent's representations was unreasonable as a matter of law. The written contract specifically states that it represents 'the entire contract of insurance,' such that any oral representations made that were not part of the written contract were nullified. Thus, this claim also fails.") (promissory estoppel claim); *Fountainhead Dev. Corp. v. Dailey*, 263 Ga. App. 677, 680 (2003) ("[T]he contract has a merger clause, precluding any reliance on representations, promises, or inducements not included in the agreement.").

Given the language of the Agreements, Plaintiff is legally **estopped** from arguing that it was deceived by either pre-or post-contractual misrepresentations.

See *ReMax N. Atlanta v. Clark*, 244 Ga. App. 890, 894 (2000) ("This contract contained both a merger clause and a disclaimer that specifically stated that the buyers did not rely on the broker's representations pertaining to the structural condition of the property or the operating condition of certain enumerated systems, including the plumbing. Consequently, Clark is estopped from asserting reliance on alleged misrepresentations not contained within the contract."); *Ainsworth v. Perreault*, 254 Ga. App. 470, 472 (2002) ("It is undisputed that the contract at issue contained a merger or 'entire agreement' clause . . . Therefore, the plaintiffs are **estopped** from arguing that they relied on representations other than those contained in the contract.") (emphasis added); *Herman Homes, Inc. v. Smith*, 249 Ga. App. 131, 133 (2001) ("The [plaintiff] is, therefore, **barred** from claiming that he or she relied on an alleged misrepresentation not contained within the agreement.") (emphasis added); *Markowitz v. Wieland*, 243 Ga. App. 151, 153 (2000) ("[T]he merger clause precludes any reliance on oral representations."); *Worsham v. Provident Cos.*, 249 F. Supp. 2d 1325, 1332 (N.D. Ga. 2002) ("[A]s a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of fraud based upon pre-contractual representations. Accordingly, Plaintiff is estopped from asserting reliance on any statements by Defendants' agent regarding the policy or Provident's future performance under the contract.").

839553.1
24

EXHIBIT D - 24

Because Plaintiff cannot have "reliance" as a matter of law, it cannot show that it relied on Defendant's alleged deception or misrepresentations to make payments under the Agreements (*i.e.*, the only possible legal conclusion is that the decision to pay was voluntary). *See Estate of Sam Farkas v. Clark*, 238 Ga. App. 115, 118 (1999) ("In the event the contract contains an entire agreement clause, that clause operates as a **disclaimer,** establishing that the written contract completely and comprehensively represents all the parties' agreement. This clause then bars the purchaser from asserting reliance on the alleged misrepresentation not contained within the contract.") (emphasis added).

Moreover, this issue is ripe for resolution at the motion to dismiss phase. *See Robbins v. SCANA Energy Mktg.*, No. 1:08-CV-640, 2008 U.S. Dist. LEXIS 108917, at *15 (N.D. Ga. June 13, 2008) ("The voluntary payment doctrine has certainly served as a basis upon which to grant a motion to dismiss for failure to state a claim by courts applying Georgia law."). Indeed, "[t]he construction, interpretation and **legal effect** of a contract [or in this instance, the effects of the merger and non-reliance clauses,] is a question for the court to decide." *Ga. Kraft Co. v. Rhodes*, 257 Ga. 469, 472 (1987) (emphasis added). Therefore, Plaintiff's claims should be dismissed with prejudice.

## III.   Conclusion

For the above reasons, Defendant respectfully requests that the Court

dismiss the entire Complaint with prejudice because: (1) a contractual limitation on the parties' time for bringing lawsuits bars this action; (2) a Georgia choice of law clause, as well as the New York statute itself, bars Plaintiff's New York General Business Law § 349 claim (Count Two); (3) a binding contract for payment of certain fees forecloses the unjust enrichment claim (Count One); (4) the Agreements' warranty disclaimers and limitations require dismissal of Plaintiff's two "Breach of Warranty" claims (Counts Three and Four); and (5) the voluntary payment doctrine bars all of Plaintiff's requested relief.

Respectfully submitted, this 21st day of February, 2011.

Jill A. Pryor
Georgia State Bar No. 589140
Randi E. Schnell
Georgia State Bar No. 248592
Kamal Ghali
Georgia State Bar No. 805055

BONDURANT, MIXSON & ELMORE
1201 W. Peachtree Street
Suite 3900
Atlanta, Georgia 30309
(404) 881-4100 – Phone
(404) 881-4111 – Fax

Attorneys for Defendant

# Exhibit A

# MASTER AGREEMENT

THIS MASTER AGREEMENT ("Master Agreement"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and, together with Vendor, referred to collectively as, the "Parties".

## WITNESSETH

**WHEREAS,** Vendor offers proprietary software and services for use in the Insurance industry. Customer desires to obtain those services, and a limited, nonexclusive and nontransferable license to that proprietary software, as more fully described herein.

**WHEREAS,** the Parties contemplate that a number of separate services and/or software programs may be provided by Vendor to Customer. Accordingly, this Master Agreement is a master of terms and conditions, which will be incorporated by reference into separate mutually agreed upon written agreements, each referred to as a "Schedule" (as more fully defined below), and each relating to specific software programs and/or services as expressly set forth therein.

**WHEREAS,** each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively. This Master Agreement, however, does not, in and of itself, grant any license rights to Customer nor does it give rise to any other rights or obligations unless and until it is incorporated by reference into one or more Schedule(s).

**NOW THEREFORE,** for and in consideration of the promises, agreements, covenants and conditions contained herein and in the Schedules, and other good and valuable consideration, the receipt and adequacy being hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1  DEFINITIONS

For purposes of this Master Agreement and each Schedule, the following terms shall be defined as follows:

1.1     Affiliates.  The term "Affiliates" means these entities: Tri-State Consumer, Inc.; Driver's Insurance Company; (Bender); (Sterling); (Spirit/Lighthouse); and other affiliated agency and/or broker entities which TSCIC presently does business with, or may do business with in the future. This definition of "Affiliates" shall apply to, and be incorporated into other documents referencing this Master Agreement.

1.2     Agreement.  The term "Agreement" means, with respect to each individual Schedule, this Master Agreement together with such Schedule, and any and all exhibits hereto and thereto.

1.3     Authorized User The term "Authorized User" means any Affiliates, employee, contract employee or independent agent who accesses or uses the Software or Services and (a) is under the control and responsibility of Customer; (b) is authorized under Customer's license; (c) has verified they are not competing with Vendor in this or other market; in addition, the New York State Insurance Department, or some similar entity, shall be granted access to the Software or Services for the sole purpose of performing an audit, review, survey, investigation, analysis or study of Customer and/or Customer's Affiliates,.

1.4     Bureau; Bureau Materials. The term "Bureau" means any and all insurance regulatory bodies, including but not limited to ISO, NCCI and state regulatory authorities, which provides license rating and/or other information to Customer and/or to Vendor on Customer's behalf. "Bureau Materials" means any and all materials provided by any Bureau to Vendor for Customer.

1.5     CRB. The term "CRB" shall mean the "Client Requirements Book", created by Vendor and Customer, containing Customer's business needs and Vendor's resolution of those needs. The CRB shall contain the project Specifications, as further defined herein.

1.6     Customer Created Error. The term "Customer Created Error" means any improper use of the Software or any Service including, but not limited to: a) incorrect or incomplete data or input being provided for use in connection with the Software or any Service; b) any modifications to the Software made or permitted by, or at the direction of Customer; c) any use by Customer of devices or third party software which causes the Software or any Service to fail to conform to its Specifications or to perform as intended, as applicable; d) Customer's failure to promptly implement or use any Update or Mandatory Upgrade; or e) any other failure of the Software or any Service that is beyond Vendor's control.

1.7     Customer Request. The term "Customer Request" means a written request for Software or Services, which shall be submitted by Customer in the form of an Exhibit (in a form agreed upon by the Parties and attached hereto) and by this reference made a part hereof, and shall be subject to acceptance or rejection by Vendor and shall contain the fees to be paid in connection therewith.

1.8     Deliverable.    The term "Deliverable" means each specifically defined work product, identified in any individual schedule or related document, to be provided by Vendor to Customer as of a specific date.

1.9     Documentation.  The term "Documentation" means the documentation outlining the performance, use and training required by Customer and its Authorized Users to utilize the software and related systems.

1.10    Enhancement. The term "Enhancement" means any change to the Software or any Service, which is not an Update, Mandatory Upgrade or Optional Upgrade, requested on a Customer Request.  The fees for each Enhancement shall be set by Vendor as stated on the Customer Request.

1.11    Mandatory Upgrade. The term "Mandatory Upgrade" means those changes to the Software made by Vendor from time to time, which Customer is required to implement. Mandatory Upgrades will be made available to Customer when they are made available to other

Vendor customers. Failure to implement these Mandatory Upgrades may invalidate any Warranty coverage.

1.12    Optional Upgrade. The term "Optional Upgrade" means those changes to the Software made by Vendor from time to time, and which Customer is not required to implement. Optional Upgrades will be made available to Customer when made available to other Vendor customers.

1.13    Schedule. The term "Schedule" means the written agreements that specify the services and/or software to be provided to Customer in connection with such Schedule. Each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively, and shall be in the form (but not substance) attached hereto.

1.14    Services. The term "Services" means both the services offered, delivered, or performed by Vendor on any CRB, Schedule, Customer Request, or similar document, and the services accessed, derived or received by Customer through or as a result of the use of the Software or any Service.

1.15    Software. The term "Software" means the specific applications described in the Schedule, along with any and all: (i) Enhancements, Mandatory Upgrades, Optional Upgrades, if any, and Updates, and any other modifications whatsoever, in each case if and to the extent provided to the Customer pursuant hereto, and (ii) derivative works based on the foregoing if and to the extent provided to the Customer pursuant hereto.

1.16    Specifications. The term "Specifications" shall mean the requirements set forth in the relevant CRB, Customer Request or other similar document.

1.17    Update. The term "Update" means those changes to the Software, which must be made as a result of applicable one or more statutory or Bureau changes, such as those published by ISO, NCCI, or other insurance regulatory authorities having appropriate jurisdiction in those state(s) supported as identified in the Schedule.


## SECTION 2  LICENSE

2.1    Grant of License. Upon execution of the Schedule, Vendor grants to Customer a non-exclusive, perpetual, non-transferable, limited license to allow Authorized Users to use the Software or Service in the United States at Customer's or its Authorized User's place(s) of business only, in object code format only, provided that Customer and its Authorized Users comply with all of the terms and conditions of this Agreement, and do so in strict accordance with the following conditions: (i) the Software and all Services shall be used solely for Customer's own internal business purposes, and not for providing service bureau, timesharing, data processing or other similar services to third parties; (ii) Customer and its Authorized Users shall not use the Software or any Service to evaluate or scan data of or for anyone other than Customer, and such evaluation and/or scanning is expressly prohibited; (iii) Customer and its Authorized Users shall not reveal any links, user accounts, or passwords for the Software to anyone other than Customer's Authorized Users who have a need to know such information; (iv)

Customer shall ensure that all Authorized Users having access to the Software or any Services shall maintain the confidentiality of the Software and the Services, and shall abide by the terms of this Agreement; (v) Customer and its Authorized Users shall not use the Software or any Service to create a product or service that would compete with Vendor in the provision of the such Software or Service to third parties; and (vi) Customer and its Authorized Users shall use the Software and all Services, and all information accessed in connection therewith, in accordance with the requirements of all applicable laws, regulations and rules.

2.2     Restrictions on Use. The license granted under this Agreement permits the Authorized Users to use the Software only on the equipment agreed upon by the Parties. Except as permitted by this Agreement, Authorized Users shall not, nor permit others to: (i) store, run, display, load, use, produce, copy (except for archival purposes, with notice to Vendor), market, license, sell, rent, assign, transfer, or adapt the Software, any Service or any Documentation; (ii) merge or combine the Software or any Service with any other program/application; (iii) translate, disassemble, decompile, reverse engineer or otherwise attempt to discover or obtain possession of the source code of the Software; (iv) create derivative works based on the Software or any Service, or any portions thereof (except for the sole purpose of allowing Software to interface with Customer's internal business processes). Irrespective of the above, in the event that a derivative work is created, it shall be deemed a "work made for hire", or if inapplicable, Customer and Authorized Users shall (a) assign to Vendor all right, title and interest in, and to, such derivative works, and b) at Vendor's expense, provide Vendor with assistance to execute any additional instruments as may be reasonable and necessary to perfect any of Vendor's rights thereto.

2.3     Title to the Software. Vendor reserves and retains all right (other than the limited license to use granted to Customer herein), title and interest in and to the Software, the Services and all Documentation, and expressly disclaims any other grant of express or implied license, moral rights, or other right of any kind whatsoever to Customer regarding the Software, the Services or Documentation. Customer hereby acknowledges and agrees that it has and shall have no claim of ownership or interest in or to the Software, Services or Documentation and, accordingly, that it shall not challenge, dispute, lay claim to, or otherwise jeopardize Vendor's rights, title and interest in and to the Software, Services or Documentation, or create any derivative work based thereon, or any portion of the foregoing, except as set forth in Sec. 2.2. Customer acknowledges that the Software, Services and Documentation are commercially valuable, proprietary property of Vendor, the design and development of which reflects the expenditure of considerable time, effort and expense. As such, Customer acknowledges and agrees that for any breach of this Sec. 2, Vendor will not have an adequate remedy at law; and consequently, Vendor, in addition to and not in lieu of any other remedy to which it may be entitled at law or in equity, shall be entitled to specific performance and Customer hereby consents to (without limiting the right of Vendor to seek any other remedy at law or in equity) to the entry of an immediate injunction without the need for posting any bond.

2.4     Updates to Software. To the extent specified in the Schedule, scheduled Updates will be provided to Customer for no additional charge throughout the Term, provided that all license and other fees due hereunder are current; provided, however, Customer acknowledges that there may be an additional charge for extraordinary Updates, which are typically an unusual Bureau change requiring longer than sixty (60) calendar days to implement.

## SECTION 3  DELIVERY AND ACCEPTANCE

3.1     Delivery Schedule.  Vendor shall deliver the Software, any Updates, and the Services to Customer substantially as set forth in the Schedule. Each Deliverable shall be presumed to require testing, unless (a) otherwise stated in the Schedule or (b) the Deliverable has previously been accepted by Customer.

3.2     Delivery, Testing and Acceptance of Initial Development Deliverables. Vendor will deliver and Customer will accept the Deliverables in accordance with the following procedure:

(a) During the seventy-five (75) calendar days immediately following delivery of a Deliverable (the "Acceptance Test Period"), Customer shall test such Deliverable for functionality and accuracy, and shall notify Vendor in writing of any components or functions that are missing or not operating in accordance with the applicable agreed-upon specifications set forth in the Client Requirement Book ("CRB") or Customer Request (collectively, the "Specifications"). Such notification shall toll the Acceptance Test Period.

(b) Within a reasonable period of time after having received written notification, Vendor shall bring all critical components and functions of the Deliverable into compliance with the Specifications.

(c)     As soon as a Deliverable meets the Specifications, Customer will notify Vendor in writing that the Deliverable is accepted; provided, however, that if Customer does not notify Vendor in writing of any failure to meet the Specifications by the end of the Acceptance Test Period (tolled by any notices of non-compliance) or if the Deliverable is used by Customer in a production environment other than for testing or training purposes, such action or inaction shall be deemed to constitute acceptance of the Deliverable.

### SECTION 4  FEES

4.1     Fees.  Fees are ordinarily designated as Development/Enhancement, License, or Maintenance/Service fees. Fees, and the corresponding payment schedule, are as set forth in the applicable Schedule or document. Changes to the fees or the payment schedule must be agreed upon, in writing.

All fees shall be due and payable thirty (30) calendar days after the date set forth in the applicable Schedule or document and shall be considered past due the next business day thereafter.

4.2     Expenses.  Customer shall be responsible for reasonable expenses and costs incurred by Vendor, including reasonable travel and living expenses for its personnel. These expenses may be invoiced at any time up to six (6) months after they are incurred and shall be due and payable thirty (30) calendar days after the invoice date.

**EXHIBIT A - 5**

EXHIBIT D - 32

5

4.3     Interest        Interest shall accrue on past due amounts for fees and expenses from the stated due date at the lesser rate of (a) one and one-half percent (1.5%) per month, or (b) the maximum interest permitted by law.

4.4     Taxes. Customer shall be responsible for the payment of any and all federal, state and local taxes related to the Services, Software and Deliverables provided under this Agreement (except those taxes based on Vendor's net income), and shall defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with such taxes.

## SECTION 5  OBLIGATIONS AND RESPONSIBILITIES OF VENDOR

5.1     Documentation and Training. Vendor shall provide Customer with (i) copies of the appropriate Software documentation (the "Documentation") in the quantities set forth in the Schedule or make such Documentation available online, and (ii) training in the use of the Software as set forth in the Schedule. Customer agrees to maintain the Documentation on a confidential basis. Customer agrees not to make additional, unauthorized copies, or to provide or otherwise make available the Documentation, or any portion thereof, to any third party not licensed hereunder.

5.2     Mandatory and Optional Upgrades. Vendor shall make available to Customer, at no additional charge, all Mandatory Upgrades that are made generally available by Vendor to other Customers using the same Software product. Vendor shall make available to Customer, at a fee to be determined in Vendor's sole discretion, all Optional Upgrades that are made generally available by Vendor to other Customers using the same Software product.

5.3     Other Services. Vendor shall make available to Customer such other services as are specifically specified in the Schedule at the prices indicated therein, or if other services are not specified or if specified without a corresponding price, at Vendor's then current prices in effect at the time such services are provided.

5.4     Customer Options. Vendor shall make available to Customer at the prices stated in the Schedule such software and/or services as are identified in the Schedule as "Customer Options." Customer shall exercise its option to receive such software and/or services at the times and in the manner stated in the Schedule by completing a Customer Request.

5.5     Indemnification.        Vendor agrees to defend, indemnify and hold harmless Customer from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with any United States' patent or copyright infringement asserted against Customer by virtue of Customer's use as permitted hereunder of the Software during the Term, provided that such claim of infringement is not attributable to the use of the Software in combination with any other software programs/applications, or due to a Customer Created Error ("Infringement"), and provided further that the following conditions are met:

**EXHIBIT A - 6**
EXHIBIT D - 33

6

(a)  Customer shall give Vendor prompt written notice of any such claim; and

(b)  Customer shall give Vendor full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Vendor in connection with the foregoing.

In the event that such claim of Infringement occurs or in Vendor's opinion is likely to occur, Vendor may, at its option, procure for Customer the right to continued use of the Software or render its use hereunder noninfringing, or if neither of the foregoing options is available on terms that are reasonable in Vendor's judgment, then Vendor may terminate this Agreement and refund all amounts paid by Customer for the Software, whereupon the Vendor shall have no further obligations under this Agreement except in connection with those provisions which survive pursuant to the terms of Sec. 10.6 hereof.

## SECTION 6  OBLIGATIONS AND RESPONSIBILITIES OF CUSTOMER

6.1     Legends and Markings.  Customer agrees to retain and not remove, modify or destroy Vendor's trademarks, trade names, markings, logos, trade colors, or any proprietary or confidentiality notices, legends and/or markings (the "Proprietary Marks") as and where they are originally affixed to or contained within the Software, Documentation, Confidential Information or related documentation.  Use of any Proprietary Mark or any other mark or legend confusingly similar to the Proprietary Marks by Customer is strictly prohibited, and Customer agrees not to challenge, dispute, lay claim to or otherwise jeopardize Vendor's right, title and interest in and to the Proprietary Marks.

6.2     Designation of Coordinator.  Customer shall designate one system coordinator and one back-up coordinator, who shall act on behalf of the Customer and through whom all communication with Vendor pursuant to this Agreement shall occur.  Customer shall ensure that such coordinators are fully familiar with and trained in the use of the Software, and that their identity (which may be changed from time to time) is at all times made known to Vendor by written notice five (5) business days prior to their contacting Vendor.  All questions and problems regarding the use, operation, development, support or maintenance of, or otherwise concerning the Software shall be directed to Vendor through such designated coordinators, and Vendor shall direct all Deliverables, Updates, Mandatory Upgrades, Optional Upgrades, Enhancements and other issues related to the Software through such designated coordinators.

6.3     Training.  Customer agrees that it is solely responsible for the training of its personnel and acknowledges that the training described in the Schedule, if any, is provided by Vendor without any guaranty that it will enable Customer's personnel to effectively use the Software or to use the Software in the manner intended by Customer.

6.4     Indemnification.  Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities, fees, assessments and expenses (including reasonable attorneys' fees) arising out of or in connection with the procurement of Bureau Materials, the incorporation of Bureau materials into the Software or the use of the Bureau materials by Vendor on Customer's behalf.  Moreover, Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with

**EXHIBIT A - 7**                                                                   7

Customer's use of the Software or any Service, except for claims alleging Infringement (as defined in Sec. 5.5 hereof), and provided further that the following conditions are met:

(a)   Vendor shall give Customer prompt written notice of any such claim; and

(b)   Vendor shall give Customer full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Customer in connection with the foregoing.

6.5      Action to Ensure Compliance.   Customer shall take all appropriate action to ensure full compliance with Customer's obligations under this Agreement by any and all persons and entities permitted access to or use of the Software or any Service pursuant to the terms of this Agreement.  Customer acknowledges that it shall be responsible and liable for any and all acts and omissions of each such person or entity as if they were the acts and omissions of Customer.

6.6      Inspection.   Subject to reasonable advance notice and execution of appropriate confidentiality agreements, Customer agrees to permit Vendor to enter upon its premises in order to inspect such records, reports and the use of the Software and Services necessary to verify compliance with the terms of this Agreement.  Such inspection shall occur during Customer's normal business hours no more than once per calendar quarter.  Vendor shall use reasonable efforts not to disrupt or interrupt either the normal business operations of Customer or Customer's permitted use of the Software or, if inevitable, to take reasonable steps to minimize such disruption or interruption.  If Vendor determines Customer is in violation of the terms of this Agreement, Customer shall reimburse Vendor for all costs incurred in connection with the inspection.  Furthermore, if Vendor determines that Customer has exceeded the scope of its authorized use under this Agreement, Customer shall be invoiced two times the fees that would have been due and payable for any ordinary third party customer to purchase rights for the scope of use actually made by Customer, and Customer agrees to pay such invoices immediately upon receipt.  Notwithstanding the foregoing, Vendor shall (i) retain all other remedies available to it under this Agreement, or at law or in equity, and (ii) be permitted at anytime to review by remote access Customer's accounts, links and passwords to verify compliance with the terms of this Agreement.

6.7      Bureau Materials.  Customer shall be responsible for the legal procurement, on its own behalf of the right to receive and to use directly from the applicable Bureaus any and all Bureau materials to be incorporated or integrated into, or used in connection with the Software, in all forms licensed by the appropriate Bureau, including but not limited to diskette and online form.  Should such rights to receive and use the Bureau materials expire or terminate, Customer will provide prompt written notice to Vendor of such expiration or termination.

In the event that Vendor is required to obtain these Bureau Materials, Customer shall (a) reimburse Vendor for any fees or assessments charged by any Bureau and assessed to Vendor associated with procuring Bureau materials hereunder (subject to receipt of appropriate documentation to substantiate such fees or assessments), and (b) indemnify Vendor as set forth in Sec. 6.4.

**SECTION 7   JOINT OBLIGATIONS AND RESPONSIBILITIES**

**EXHIBIT A - 8**

**7.1**     Executive Governance Committee. An Executive Governance Committee ("EGC") shall be established within 45 business days of the time of execution of this Agreement, with representation from both Parties. The EGC will act as the champion of the project and ongoing relationship of the Parties. Duties of the EGC include but are not limited to responsibility for ensuring the project and ongoing Services retains appropriate priority within both organizations, understanding the overall business objectives, removal of organizational barriers to project and ongoing relationship's success, and serve as escalation point for change management. Both Parties agree to actively participate in ongoing EGC meetings whose schedule will be mutually agreed upon at the time of creation of the EGC.

**7.2**     Notice of Certain Events. Both Parties agree to give the other Party prompt notice: (i) if a Party ceases to do business for any reason and proceeds with the winding-up of its affairs; or (ii) if a Party or any third party owning an equity interest of more than fifty percent (50%) of that Party files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy (other than for reorganization).

**7.3**     Privacy. With respect to personally identifiable information regarding consumers, the parties further agree as follows: (i) Vendor has adopted the "ChoicePoint Privacy Principles" ("Principles") recognizing the importance of appropriate privacy protections for consumer data and (ii) Customer agrees that Customer (including its directors, officers, employees or agents) will comply with the Principles or Customer's own comparable privacy principles, policies, or practices, including Customer's standard contractual privacy policies. ChoicePoint's Privacy Principles are available at www.privacyatchoicepoint.com

## SECTION 8  WARRANTIES AND LIMITATION OF LIABILITY

**8.1**     Limited Warranty  During the Term, and provided Customer is current on the payment of all fees due and payable hereunder, Vendor offers the following limited Warranties.

(a)     Software Warranty.   Vendor warrants that each such portion of the Software, as delivered by Vendor, if properly installed and operated on recommended hardware and in accordance with Vendor's Documentation: (i) contains all of the features described in, shall perform all of the material functions set forth in, and shall operate in substantial conformance with, its applicable Specifications and Documentation, provided, however, Customer acknowledges and agrees that (A) the Software is not error or "bug" free;  (B) Authorized Users must have adequate skills to use the Software; (C) Customer is responsible for backing-up its data; (D) Vendor shall not be responsible for the suitability of any Customer-configuration of the Software. This warranty shall not apply to the extent that any defect in the Software would be corrected by an Update or Mandatory Upgrade which Customer has failed to implement.

(b)     Services Warranty.  Vendor warrants that it has all required rights, permits and licenses to perform the Services, that the Services will be performed by appropriately trained, experienced and competent personnel in a manner at least consistent with commercially reasonable standards of quality and care, and that the Services will conform to the Specifications and Documentation applicable thereto.

**EXHIBIT A - 9**                                                              9
EXHIBIT D - 36

8.2    Disclaimer of Warranties.  EXCEPT AS EXPRESSLY PROVIDED FOR IN SECTION 8.1 HEREOF AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VENDOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CORRECTNESS, COMPLETENESS OR CURRENTNESS OF ANY DATA OR RESULTS, ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, VENDOR MAKES NO WARRANTY WITH RESPECT TO ANY OPERATING SYSTEM OR OTHER SOFTWARE APPLICATION NOT OWNED BY VENDOR WHICH MAY BE LINKED TO OR USED IN CONNECTION WITH THE SOFTWARE, AND MAKES NO WARRANTY WITH RESPECT TO THE USE OF THE SOFTWARE IN CONNECTION WITH ANY OTHER SOFTWARE APPLICATION NOT DEVELOPED BY VENDOR.  USE OF THE SOFTWARE CONSTITUTES CUSTOMER'S CONSENT TO ASSUME THE ENTIRE RISK ARISING OUT OF THE USE OF THE SOFTWARE.  EMPLOYEES OR AGENTS OF VENDOR OR ANY THIRD PARTY HAVE NO AUTHORITY TO MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE SOFTWARE AND CONSEQUENTLY, SHOULD NOT AND MAY NOT BE RELIED UPON BY CUSTOMER.

8.3    Exclusive Remedy.  The sole and exclusive liability of Vendor, and the sole and exclusive remedy of Customer, in the event of any breach of or claim under the above warranty shall be, at Vendor's option, (i) correction or replacement of the nonconforming portion of the Software within a reasonable period of time after receiving written notice from Customer, or (ii) a refund, after receiving written notice from Customer, of all amounts paid by Customer to Vendor which are attributable to that portion of the Software that does not conform to the warranty, (as determined by the EGC and Executive Management, based upon the material impact on the Software); provided, however, that Customer shall not receive such refund unless and until it ceases all use, and destroys, returns, removes and/or purges all copies, of that portion of the Software that does not conform to the warranty.

8.4    Limitation of Liability.  CUSTOMER AGREES THAT VENDOR'S AGGREGATE LIABILITY TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR DAMAGES WHATSOEVER AND HOWEVER CAUSED, SHALL BE LIMITED TO, AND IN NO EVENT EXCEED, THE FEES ACTUALLY PAID BY CUSTOMER. .

NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT TO THE CONTRARY AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL VENDOR BE LIABLE TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER AND HOWEVER CAUSED, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, LOST OR DAMAGED DATA OR BUSINESS INFORMATION, BUSINESS INTERRUPTION OR OTHER ECONOMIC LOSS, EVEN IF VENDOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CUSTOMER ACKNOWLEDGES THAT EVERY BUSINESS DECISION INVOLVES

**EXHIBIT A - 10**

ASSUMPTION OF RISK, AND THAT VENDOR DOES NOT UNDERWRITE THAT RISK IN ANY MANNER WHATSOEVER.

8.5     Limitation on Time for Bringing Actions.  No action, regardless of form or substance, arising out of this Agreement or the performance or nonperformance of any of the Parties' obligations hereunder may be brought more than one (1) year after a party knew or should have known of the occurrence of the event giving rise to such cause of action.

## SECTION 9  CONFIDENTIALITY

9.1     Confidential Information.  "Confidential Information" under this Agreement shall include all confidential and proprietary information disclosed by either Party ("Disclosing Party) to the other Party ("Receiving Party"), including, without limitation, (i) the Software, Documentation, Services, CRB, this Agreement, all Schedules and Customer Requests, all customer contact information, and any and all portions thereof, and (ii) any and all information related to the Disclosing Party's trade secrets, technology, software, know-how, products, potential products, services, financial information, potential services, markets and/or business information, which is in writing and marked as "Confidential" or "Proprietary" (collectively, "Confidential Information").

9.2     Nondisclosure of Confidential Information.  The Receiving Party agrees to use the Confidential Information of the Disclosing Party only in connection with this Agreement. Each Party agrees to hold the other Party's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties.  Notwithstanding the foregoing, each Party may disclose the other Party's Confidential Information to those employees, agents or consultants who have a need to know such information in connection with this Agreement; provided, however, that each such employee, agent and consultant is informed of the foregoing obligations and has executed a nondisclosure agreement which binds such employee, agent or consultant to confidentiality terms no less favorable than those set forth herein.  Each Party agrees that it will take all measures necessary to protect the confidentiality of and avoid disclosure or use of the other Party's Confidential Information in order to prevent it from falling into the public domain, or into the possession of persons other than those persons expressly permitted hereunder to have any such information, which measures shall include protection of the other Party's Confidential Information with the same degree of care that it utilizes to protect its own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The obligations of confidentiality and limitations on use set forth herein shall survive the expiration or termination of this Agreement for any reason for a period of five (5) years except with respect to Confidential Information that embodies trade secrets, the confidentiality and limitation on use of which shall be maintained for so long as such Confidential Information embodies trade secrets.

9.3     Exceptions.  The obligations and limitations set forth above shall not apply to any information which: (i) was lawfully known to the Receiving Party prior to being disclosed by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is company specific information filed with any Bureau; (iv) is approved for release by written authorization of the Disclosing Party; (v) is rightfully received from a third party who provided such information without breaching any separate confidentiality obligation, or without

**EXHIBIT A - 11**

EXHIBIT D - 38

11

restriction of subsequent disclosure; or (vi) is independently developed without reference to the Disclosing Party's Confidential Information. In addition, Confidential Information may be disclosed to the extent required by court order or as otherwise required by law, provided that the Receiving Party notifies the Disclosing Party promptly in writing upon learning of the possibility of any such requirement and has given the Disclosing Party a reasonable opportunity to contest or limit the scope of such required disclosure; provided, further, that such disclosed Confidential Information shall otherwise remain subject to the terms of this Sec. 9.

9.4     Non-Exclusive Remedies. Receiving Party acknowledges that the Confidential Information is commercially valuable, proprietary information of the Disclosing Party, which reflects the expenditure of considerable time, effort and expense. As such, Receiving Party acknowledges and agrees that for any breach of this Section 9, Disclosing Party will not have an adequate remedy at law; and consequently, Disclosing Party, in addition to and not in lieu of any other remedy to which it may be entitled to at law or in equity, shall be entitled to seek specific performance and Receiving Party hereby consents (without limiting the right of Disclosing Party to seek any other remedy at law or in equity) to seek the entry of an immediate injunction without the need for posting any bond.

## SECTION 10 TERM AND TERMINATION

10.1     Term. The Term of this Agreement shall be defined in the Schedule.

10.2     Termination at Vendor's Option. This Agreement may be terminated immediately by Vendor at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a) Customer fails to pay any amount past due under this Agreement within fifteen (15) calendar days after receiving written notice that such amount is past due from Vendor;

(b) Customer breaches any material term of this Agreement (other than payment and Confidential Information obligations hereunder) and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Vendor;

(c) Customer uses or distributes any Confidential Information in a manner inconsistent with the terms of this Agreement;

(d) Customer or any third party owning an equity interest of more than fifty percent (50%) of Customer becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy, or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(e) Customer ceases to do business for any reason; provided, however, that Customer shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Customer's obligations under this Agreement.

10.3     Termination at Customer's Option.        This Agreement may be terminated immediately by Customer at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a)  Vendor breaches any material term of this Agreement and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Customer;

(b)  Vendor or any third party owning an equity interest of more than fifty percent (50%) of Vendor becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(c)  Vendor ceases to do business for any reason; provided, however, that Vendor shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Vendor's obligations under this Agreement.

10.4     Notice of Termination.      In the event either Party elects to terminate this Agreement pursuant to this Section, it shall send written notice of such election to the other Party within thirty (30) calendar days of the occurrence of the Event of Default giving rise to its right to terminate.

10.5     Customer's Obligations upon Termination.      Immediately upon expiration or termination of this Agreement, Customer shall: (i) discontinue all use of the Software and Documentation; (ii) remove all portions of the Software including without limitation, Software in or from modified or derived programs; (iii) purge the Software and all Documentation, or cause it to be purged from all human and machine-readable media (or other memory devices); (iv) return to Vendor or destroy all Confidential Information and all related materials, and copies thereof; and (v) represent and warrant to Vendor in writing within ten (10) calendar days after such expiration or termination that Customer has complied with the provisions of this Section. In addition to the foregoing, Customer agrees that it shall not, both during the Term and following expiration or termination of this Agreement, act in any manner to damage the reputation or goodwill of Vendor, or any of its products or services.

10.6     Survival of Certain Terms.  The provisions of Sections 2, 4, 6.1, 6.4, 6.6, 7, 8, 9 and 12 hereof shall survive the expiration of this Agreement; the provisions of Section 4, 6.1, 6.7, 7, 8, 9 and 12 hereof shall survive the termination of this Agreement.

10.7     Termination Not Exclusive Remedy.    Either Party's option to terminate this Agreement pursuant to the terms of this Section shall not be exclusive of any other remedy available to it whether under this Agreement or otherwise at law or in equity.

10.8     Acceleration of Payments.  Any expiration or termination of this Agreement shall not release Customer from its duty to pay any amount which may be then or with the passage of time will become owing to Vendor. Furthermore, immediately upon any termination of this Agreement, Customer shall pay to Vendor any and all amounts that are or with the passage of time will become due and payable, as determined by the EGC and Senior Management. Interest, at a rate of one and one-half percent per month or the maximum interest permitted by law, shall

**EXHIBIT A - 13**                                                                    13

EXHIBIT D - 40

begin to accrue as of the effective date of termination and continue until payment of all such amounts, plus interest, are paid in full.

## SECTION 11 CHANGE CONTROL

11.1   If either Party determines that a material change to agreed upon Software or Services as defined in a Schedule attached to this Master Agreement (such Software or Services are referred to as "Projects"), which would include, without limitation, any change that would change the fees for that Project beyond the stated fees or beyond the stated estimate for that project or delay the scheduled completion date for such Project,  then that Party's Contract Coordinator shall promptly inform the other Party's Contract Coordinator, in writing, of the facts and circumstances leading to such determination ("Request for Change").

11.2   If a Request for Change is initiated by Vendor, Vendor shall provide Customer, (a) an estimate of the additional time and cost, if any, and (b) an estimate of the impact to the scheduled completion dates, which would result from such change.

11.3   If a Request for Change is initiated by Customer, Customer acknowledges that Vendor may be required to investigate and analyze the business impact, including fees, delivery dates and deliverables, on a project.  Vendor shall notify Customer's Contract Coordinator within five (5) business days of receipt if Vendor determines that that Request for Change requires additional investigation and analysis. If Customer's Contract Coordinator approves, Customer shall pay Vendor for such research and analytical services relating to such Request for Change initiated by Customer.

11.4   If the Parties approve a Request for Change, the respective Contract Coordinators shall draft and execute a Customer Change Request, which describes the relevant changes to the Software and/or Services, if applicable, any changes to the scheduled completion dates, additional responsibilities of Customer, and any change to the stated fee or estimated fee (a "Change Order"). Until a Change Order is fully executed, (a) Vendor is not obligated to perform a change and (b) Customer is not obligated for any additional fees.

11.5   Vendor shall have no liability for delays in the provision of the Project implementation services caused by Customer's failure to complete its tasks or provide information or resources in a timely manner, provided that Customer's Project Manager was notified of such requests. For changes to a Project caused by: (i) Customer's resources not completing tasks assigned to them accurately or in a timely fashion; or (ii) events outside the control of Vendor, Vendor shall initiate a Request for Change and the parties shall negotiate in good faith the appropriate Change Order.

## SECTION 12 GENERAL

12.1   Entire Agreement.  This Agreement (including any exhibits attached hereto) constitutes the entire agreement between the Parties related to the subject matter hereof, and

supersedes any and all prior and contemporaneous proposals, communications, agreements and understandings, whether oral or written, concerning the subject matter hereof.

12.2    Construction of this Agreement; Construction with Other Agreements.    In the event and to the extent of any conflict between a term of this Master Agreement and that of the Schedule, the term of the Schedule, to the extent necessary to resolve the conflict, shall control. In the event of any conflict between the terms of this Agreement and any printed form, this Agreement shall control. The terms of this Agreement shall not be altered by the terms of any purchase order, acknowledgment or the like, even if signed by Vendor, unless such purchase order, acknowledgment or the like specifically and conspicuously states that it amends this Agreement and is signed by Vendor's Senior Vice President.

12.3    Assignment.    Neither Party shall assign this Agreement, or the rights or duties contained herein, without the prior written consent of the other.  Any attempt at assignment without such consent shall be null and void, and shall constitute an "Event of Default" under this Agreement by the Party attempting such assignment.

Notwithstanding the foregoing, Vendor may assign this Agreement and its rights and duties contained herein without such prior written consent, but with 30 days prior notice, in connection with the transfer of substantially all of the assets and business of Vendor to an entity that is subject to and assumes Vendor's obligations hereunder.

12.4    Waiver.  No waiver of any right, power, or remedy under this Agreement shall be effective unless in writing and signed by the Party against whom enforcement is sought.  No failure or delay in exercising any right, power, or remedy with respect to any of the provisions of this Agreement shall operate as a present or future waiver thereof.

12.5    Amendments and Modifications.    This Agreement shall not be amended or modified in any respect except by a writing signed by both Parties.

12.6    Notice.  Any and all notices or other communications required or permitted under this Agreement shall be in writing and shall be deemed sufficient in all respects when delivered personally, delivered by an overnight courier service, sent by facsimile, or placed in the United States mail, return receipt requested, postage prepaid, and addressed as follows:

If to Vendor:                                    If to Customer:

Insurity LLC.

170 Huyshope Avenue

Hartford, Connecticut 06106

Attn:  Tony Reisz                                Attn:

    Group VP, General Manager

With a copy to:

**EXHIBIT A - 15**
EXHIBIT D - 42

15

Insurity LLC.
c/o ChoicePoint Inc.
1000 Alderman Drive
Alpharetta, Georgia 30005
Attn:  Legal Department

Notices sent according to the provisions of this Section shall be deemed received five (5) calendar days after being deposited in the U.S. mail or on the actual date of receipt, whichever is earlier.

12.7   Successors and Assigns.  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties' respective successors, legal representatives and permitted assigns.

12.8   Governing Law.  The validity, construction, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without regard to its choice of law provisions.

12.9   Source Code Escrow.  Source Code Escrow, if desired, is available under a separate Agreement.

12.10  Relationship of the Parties.  Personnel supplied by each Party to perform services or other obligations hereunder shall not be considered employees or agents of the other Party. During the Term of this Agreement and for a period of two (2) years thereafter, Customer shall not solicit, hire or engage any person employed by Vendor who was involved in the performance of any obligations related to this Agreement without Vendor's prior express written consent.

12.11  Use of Names and Trademarks.  Neither Party shall use the name or trademark of the other for any purpose, including without limitation advertisement or public relations announcements, without the prior written consent of the other Party.

12.12  Force Majeure.  Neither Party shall be responsible for any delay or failure of performance under this Agreement (other than Customer's payment obligations) by reason of any acts, events, or circumstances beyond its control.  Such acts, events, or circumstances shall include, but shall not be limited to: acts of God, act of war, act of terrorism, riot, epidemic, fire, flood or other disaster, act of government, power failure, or labor walkout or strike.  Nothing herein shall be construed to preclude termination of this Agreement pursuant to Sec. 10 hereof in the event any such delay or failure of performance is material and persists or is likely to persist for more than one hundred eighty (180) calendar days.

12.13  Severability.  If any provision of this Agreement or portion thereof is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or portions thereof shall not be affected.

12.14  Headings.  The headings in this Agreement are inserted for reference and convenience only, and shall not be considered as substantive parts hereof.

viii. Move new Mandatory Updates into a test environment within thirty (30) days of receipt and move them into production no later than seventy-five (75) days following receipt. Vendor will not support mandatory system releases later than ninety (90) days following the date a replacement release is made available to Customer;

ix. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

11. Conflicting Terms. In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail. In the event there are any conflicts among the terms of the specifications set forth in the CRB and those in this Software Schedule, the terms of the CRB shall prevail.

In witness of the foregoing, each of the Parties hereto has duly executed this Software Schedule as of the day and year first above written.

**INSURITY LLC**

Signature: _Anthony J Reiss_

Name: _ANTHONY REISE_

Title: _PRESIDENT_

Date: _3/31/08_

**TRI-STATE CONSUMER INSURANCE**

Signature: _____

Name: _PENNY FERN HART_

Title: _President_

Date: _3-31-08_

# EXHIBIT A
## CUSTOMER REQUEST TEMPLATE

Customer:_____          Prepared By:_____

Request Number:_____             Request Date:_____

    This Customer Request is being submitted pursuant to the terms of that certain Master Agreement (the "Master Agreement") effective [MASTER AGREEMENT DATE], by and between Insurity LLC ("Vendor") and Customer and is subject to all of the terms and conditions of the Master Agreement and the applicable Schedule executed in connection therewith.

## DESCRIPTION OF BUSINESS NEED:


## PRICING METHOD AND CHARGES:

   [ ] Time & Materials for entire request

   [ ] Fixed Price for entire request

| | DEVELOPMENT CHARGE | ANNUAL OTHER FEES |
|---|---|---|
| Non-Forms Development: | $_____ | $_____ |
| Forms Development: | $_____ | N/A (see note below) |
| TOTAL CHARGES: | $_____ | $_____ |

## PAYMENT METHOD:

   Upon authorization for development, Vendor will invoice Customer for:  $_____.

   Upon delivery, Vendor will invoice Customer for:                       $_____.

**EXHIBIT A - 18**

EXHIBIT D - 45

(The maintenance fee for the current contract year will be calculated on a pro-rated basis and billed from the period of delivery until the next anniversary of the Master Agreement.)

**NOTES:**

1) If this Customer Request is not approved by Vendor by _____ [Insert Date], it will be considered rejected and closed. If approved by such date, the enhancement will be delivered in/on _____ and will be compatible with the _____ release environment.

2) The above pricing and delivery date are based on the information available at this time. Should the scope of the request change, Vendor reserves the right to modify this Customer Request. Any changes to this Customer Request must be initialed by both Parties.

3) The pricing for this Customer Request is considered "Confidential Information" of the Vendor subject to the terms of the Master Agreement.

**APPROVALS:**

By signing below, Vendor accepts this Customer Request and Customer authorizes this Customer Request to be processed.

_____                              _____

Customer Authorization                                           Vendor Acceptance

# Exhibit B

## SCHEDULE

## SOFTWARE & SERVICES

THIS Software Schedule ("Software"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and together with Vendor referred to collectively as, the "Parties").

Vendor and Customer are Parties to a certain Master Agreement, dated March 15, 2008 (the "Master Agreement"), pursuant to which certain terms and conditions have been established for the license of the Software and/or described in this Software Schedule. Any and all attachments hereto are expressly incorporated in this Software Schedule. Terms defined in the Master Agreement are used in this Software Schedule with the meanings assigned to such terms in the Master Agreement.

In consideration of the mutual covenants and conditions contained in this Software Schedule, together with the Master Agreement, the Parties agree as follows:

1. Incorporation of Software Schedule.  The Software Schedule is hereby incorporated into the Master Agreement and, as set forth herein, is subject to its terms and conditions.

2. Description of the Software and Services.  Vendor will provide Software and Services to support Customer's business needs as outlined in the Project Scope.

   Customer acknowledges that the description of the Software and/or Services provided in this Schedule is not a complete description of the capabilities, or limitations, of the features or functions of the Software and/or Services. The Software and/or Services have been developed to meet Vendor's estimation of the reasonable needs of the insurance industry, however, Vendor does not warrant that Software and/or Services as delivered to Customer will satisfy every business need of Customer, or the insurance industry in general, but Vendor does warrant the Software and/or Services under the terms and conditions of the Master Agreement.

3. Restrictions on Use of the Software and/or Services.  Restrictions are as set forth in the Master Agreement.

4. Term of Software Schedule.  The term of this Software Schedule shall be for a period of five (5) years ("Initial Term"), unless earlier terminated pursuant to the terms of Section 10 of the Master Agreement. Following the Initial Term, this Software Schedule shall

**EXHIBIT B - 1**

automatically renew, with reasonable annual increases, for successive five (5) year periods (each a "Renewal Term"), unless: (i) either Party provides the other with written notice of its intent not to renew at least six (6) months prior to the expiration of the Initial Term or any Renewal Term; or (ii) earlier terminated pursuant to the terms of Section 5 (e) herein or Section 10 of the Master Agreement. The combination of the Initial Term and any and all Renewal Terms are collectively referred to as the "Term".

5. Client Requirements Book (CRB) Process.

    (a)    The Parties shall prepare a Client Requirement Book (CRB), which will detail Licensee's business needs that fall within the scope of this project. Completion of the CRB will be the responsibility of both Parties and coordinated by a Vendor Project Manager.

    (b)    During the CRB process, Customer may request a Software feature or function which is not anticipated under this Master Agreement or Software Schedule, including support for any of Customer's unique Licensee filings and forms, with the understanding that additional fees may apply. Any such fees will be documented in the CRB and implemented only as approved pursuant to a Change Order.

    (c)    Once completed and approved in writing by both Parties, the CRB will become the specifications for Vendor's programming efforts. Vendor will not begin programming until both Parties approve the CRB, in writing.

    (d)    During the CRB, the Parties will (a) document the forms to be delivered as part of the initial deliverable and (b) document final pricing for same.

    (e)    Customer shall have the one-time option of terminating this Schedule without penalty, at the completion of the CRB but prior to the delivery of the system, with the approval of the EGC and Executive Management. The parties agree that this option shall not be invoked for non-material issues, and only after the parties have expended good faith efforts to resolve any issues arising during the CRB. The parties agree that the customer shall owe ~~customer~~ vendor for the time and materials expended. [handwritten: DTC]

6. Project Scope. Vendor will deliver the Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions as it exists as of the effective date of the Master Agreement, without modification, except as described below. During the CRB, Vendor will work with Customer to leverage prior efforts and make available certain configurations previously developed where such configurations are not proprietary or otherwise restricted.

(a)  The Base Software will support the following state:

  i. New York

(b)  The Base Software will support the following lines of business:

  i.  Personal Auto

  ii.  Homeowners

  iii.  Personal Umbrella

(c)  The Base Software will support the following transactions:

  i.  For all lines of business:

  - New Business Quote/Issue
  - Renewal Quote/Issue
  - Endorsement
  - Cancel
  - Reinstatement
  - View and Reprint Documents
  - Non-Renewal
  - Out-of-sequence change endorsement processing
  - Rewrites

(d)  The Base Software to be implemented as part of the Implementation Services will include the following standard customization items at no additional cost to Customer:

  i.  VIN Verification
  ii.  Interfaces for ChoicePoint CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill, and ChoicePoint NY List Service.

(e) The Base Software to be implemented as part of the Implementation Services will include a Consumer User Interface and Agent User Interface. These will be delivered as part of the base at a time deemed appropriate by the Vendor Project Manager and Customer Project Manager.

(f) Batch print administration – Policy Decisions will be integrated with Insurity's Batch Print Administrator (BPA) or with a client specific batch printing tool to support batch printing of policy documents.

7.  Excluded in Project Scope.  The following modules and/or services are not included within the scope of this Master Agreement:

  - Claims

- Reinsurance
- Data conversion
- Each interface project will be defined separately and will have its own Schedule defining project scope, timelines and costs.
- Support for additional lines of business not specifically defined as part of this Software Schedule
- Software modifications, except those identified in the CRB, as mutually agreed in writing by the Parties, and as may be modified by mutual written agreement by the Parties from time to time, required to support Customer's business are not included. Any such other modifications will be considered to be enhancements and will be determined during the CRB.
- Any other Software and/or Services not specifically set forth in this Master Agreement or any other Schedule.

8.    Pricing and Payment Schedules

    (a)    Base Software License Fee:

        Policy Decisions, Billing Decisions, Reporting Decisions        $1,250,000

Payment of these fees will be due as follows:

$250,000 upon execution of the Master Agreement
$125,000 Billable monthly beginning May 1, 2008 and ending on December 1, 2008

    (b)    Customer Specific Customizations

        The Customizations listed below will be done for a fixed bid of:  $245,500

        1.  Tristate Auto
            a.  Auto Processing, including UW and Workflows
            b.  Current Auto Rating
            c.  Auto Forms Development and Mapping
            d.  Batch print jobs
            e.  Batch processing jobs

        2.  Tristate Home
            a.  Home Processing, including UW and Workflows
            b.  Home Schedules
            c.  Current Home Rating
            d.  Home Forms Development and Mapping
            e.  Batch print jobs

**EXHIBIT B - 4**

  f. Batch processing jobs

3. Drivers Auto
  a. Auto Processing, including UW and Workflows
  b. Current Auto Rating
  c. Auto Forms Development and Mapping
  d. Batch print jobs
  e. Batch processing jobs

4. Security - Access Segmentation

5. Security - User Permissions

6. Expire Quotes

7. Copy Quotes

8. Data purge

9. Professional Services
  a. QA

10.  VIN Verification Integration (Tristate must provide data)

11.  Violation leveling

12.  50 completed and mapped letters are included in the fixed bid. Tristate will be responsible for providing the letters in MS Word format. Insurity will be responsible for the mapping. After these 50 letters Tristate will be responsible for the mapping.

13.  Adverse Action Notices

14.  Email quotes

Payment of these fees will be due as follows:

$47,750 payable upon CRB signoff
$47,750 payable upon delivery of customizations
$150,000 payable 30 days post production

(c) The following customizations will be done on a T & M Basis

  1. Consumer "User Interface" for Tristate

**EXHIBIT B - 5**
EXHIBIT D - 53

2. Agent "User Interface" for Tristate
3. Consumer "User Interface" for Drivers
4. Agent "User Interface" for Drivers
5. Interfaces
    a. Bi-directional Claims Interface
    b. Address Verification
    b. Billing Decisions Customizations
    c. Payment Gateway
    d. ISO Customizations
    e. Document Management Integration
    f. Aggregator Integration for Rating, Quote import, Workflow, UW (Insweb, Insureme, NetQuote)
    g. General Ledger Export
    h. NY Auto ID Cards Integration
    i. Google Adwords integration
    j. Integration of distance data into Tristate rating
    k. Integration TransUnion credit scoring.
6. Conversion Renewals
    a.   All active policies for home, auto, and umbrella will be converted at renewal
    b. Legacy policies will not be converted
7. TSC Claim data to Insurity ODS and Data Mart
8. Insurity data export of Policy data to TSC COBOL System
9. Batch Print modification to send batch print materials for ImageRight import
10. Coverage or Policy Suspension
11. Access Segmentation by line of business
12. Billing Set Up
    a. Premium refund file (checks issued to bank) – maybe can remove if core feature
    b. Direct pay file to bank – maybe can remove if core feature
13. Reporting
    a. Interfaces to ODS and data marts
    b. Canned Reports
    c. Reporting

Payment of these fees will be due upon delivery of each customization.

(d) Additional Customer Specific Customizations and costs, if any, will be identified

**EXHIBIT B - 6**

during the CRB process.

(e)     Annual Maintenance Fee

Policy Decisions, Billing Decisions, and Reporting Decisions   $252,000   (18%)

Vendor will provide Customer with 20 hours per month, for the term of this Schedule, to be used towards Professional Services. Any unused hours may be carried forward for up to six months, and at no time may the total number of available hours exceed 120. The availability of these hours will begin upon delivery of Production System and will coincide with the start of Maintenance.

Maintenance Fees will begin as follows:

The first payment of  the Annual Maintenance Fee, paid monthly, is due upon delivery of the Production System.

9.     Scope of Maintenance Services.     Vendor will provide the following Software Maintenance Services as part of the Annual License and Maintenance Fee:

(a)     Call-in assistance. Call-in assistance for Customer's trained system administrator and other trained supervisory staff will be available from 9 a.m. to 5 p.m. Eastern Standard Time, Monday through Friday. Off-hour support may be made available to Customer upon request for an additional fee.

(b)     Correction of Software Errors. Errors must be documented by Customer and must be re-creatable in order for Vendor to be able to correct the error. Vendor will correct errors within reasonable time frames based on the priority of the error as mutually agreed upon by the Parties.

(c)     Regularly scheduled system releases.     Regularly scheduled updates to the Software will be provided to Customer throughout the term of this Agreement. Such releases will include applicable Mandatory Updates, Maintenance changes, Enhancements, and/or correction of errors.

(d)     Base System Enhancements.     As Vendor adds additional enhancements or customizations to their Base Products, these enhancements will be made available to Customer as part of regularly scheduled releases. If Customer chooses to enhance or customize any of the Base Products, Vendor will enter into a Schedule with Customer leveraging prior efforts and making available certain enhancements or customizations previously developed for other customers where

**EXHIBIT B - 7**
EXHIBIT D - 55

such enhancements or customizations are not proprietary or otherwise restricted.

10.  Customer's Responsibilities.   Customer agrees to provide the following support to Vendor:

(a) During the Development Phase and before Delivery:

   i.   Begin final Client Requirements Book (CRB) within 45 calendar days from the execution of the Master Agreement.

   ii.  Assign competent project, insurance/business and technical staff to review and sign-off on the final CRB.  Insurance staff should be knowledgeable of the way Customer conducts its business.

   iii. Customer should provide adequate resources to ensure that the CRB process is completed within seventy-five (75) calendar days from the date of execution of this Agreement.  Should seventy-five (75) calendar days pass and additional Vendor time and resources are required to complete the CRB, such time will be billed to Customer on a time & material basis, provided that such time period may be extended in the event that Vendor causes a delay, prohibiting completion of the CRB.

   iv.  Provide sign-off on development artifacts within 15 business days from receipt of Vendor's request.

   v.   Using mutually agreed to guidelines; develop a test strategy, test conditions and a test plan linking test conditions to policies to be used during pre-delivery and pre-production testing.  These deliverables will be provided by the Customer to the Vendor no later than a date mutually agreed to after the CRB is signed.

   vi.  Participate in Vendor's pre-delivery testing for up to one week at Vendor's site.

   vii. Using Vendor's guidelines develop a reasonable number of policies to be used as a testing base during pre-delivery and pre-production testing.  This test bed of policies will be representative of 90% of the Customer's business to ensure thorough and accurate pre-delivery testing by Vendor.

   viii. Customer will share with Vendor all additional test plans and scripts prior to Delivery.

   ix.  Thoroughly test all Software prior to use in production and report all bugs to Vendor, including their priority, in accordance with the mutually agreed upon guidelines and project plan.

   x.   Customer will share with Vendor their deployment plan and will ensure Customer will assign and deploy competent staff to complete deployment --

special deployment resources such as additional training, administrative support can be provided by Vendor for an additional cost.

xi. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(b) Following Delivery and before Acceptance:

i. Provide Vendor regular (weekly) status of Customer's testing results;

ii. Customer set's production target date and communicates changes to all Vendor and Customer stakeholders;

iii. Thoroughly test all Software prior to use in production and report all bugs to Vendor, including their priority, in accordance with the mutually agreed upon guidelines and project plan;

iv. Provide appropriate documentation of errors and utilize vendor's reporting tools;

v. Where needed. Customer will provide Vendor access to Customer systems for diagnostic purposes;

vi. Customer will continue to test all delivered components unless access to such component is prevented due to specific defects preventing such testing;

vii. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(c) Following Acceptance:

i. Customer provides Coordinator to qualify problems prior to being reported to Vendor;

ii. Use Vendor on-line compliance adoption and issue reporting system;

iii. Where needed, Customer will provide Vendor access to Customer systems for diagnostic purposes;

iv. Adjust test bed of policies and testing scripts in conjunction with Customer initiated changes made to the Software;

v. Following guidelines, submit to Vendor test cases for Vendor's use in testing future software releases;

vi. Assure that all Customer project coordinators are fully trained in use of the Software before assuming their role(s) as primary contact to Vendor;

vii. Stay current with Service Packs no more than 3 generations behind (6 weeks);

**EXHIBIT B - 9**
EXHIBIT D - 57

viii. Move new Mandatory Updates into a test environment within thirty (30) days of receipt and move them into production no later than seventy-five (75) days following receipt. Vendor will not support mandatory system releases later than ninety (90) days following the date a replacement release is made available to Customer;

ix. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

11. <u>Conflicting Terms.</u> In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail. In the event there are any conflicts among the terms of the specifications set forth in the CRB and those in this Software Schedule, the terms of the CRB shall prevail.

In witness of the foregoing, each of the Parties hereto has duly executed this <u>Software Schedule</u> as of the day and year first above written.

**INSURITY LLC**

Signature: _Anthony J Reiss_

Name: _ANTHONY REISE._

Title: _PRESIDENT_

Date: _3/31/08_

**TRI-STATE CONSUMER INSURANCE**

Signature: _____

Name: _PENNY FERN HART_

Title: _President_

Date: _3-31-08_

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a true and correct copy of the

within and foregoing **DEFENDANT'S MOTION TO DISMISS** to be served on

all counsel of record by placing same in the United States Mail with sufficient

postage affixed thereto and properly addressed as follows:

> J. Wayne Pierce, Esq.
> Pierce & Dunkelberger
> Building G, Suite 200
> 6111 Peachtree-Dunwoody Rd.
> Atlanta, GA 30328

This 21st day of February, 2011.

Kamal Ghali
Georgia Bar No. 805055

839553.1
27