COPY

## SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

TRI-STATE CONSUMER INSURANCE )
COMPANY, INC.,                )
                              )
    Plaintiff,          )
                              )
v.                            )    Civil Case No.: 2011-CV-195485
                              )    Hon. Jerry W. Baxter
                              )
LEXISNEXIS RISK SOLUTIONS, INC., )    JURY TRIAL DEMANDED
Formerly Known as ChoicePoint Services, )
Inc., Survivor Entity of its Merger with )
Insurity, LLC a/k/a "Insurity",          )
                              )
    Defendant.          )

### FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff TRI-STATE CONSUMER INSURANCE COMPANY, INC.,

and files and serves this, its First Amended Complaint, so that its Complaint now reads as

follows:

### THE PARTIES

1.

Plaintiff TRI-STATE CONSUMER INSURANCE COMPANY, INC. ("TRI-STATE") is

now, and at all relevant times herein was, a corporation organized and existing under the laws of

the State of New York with its principal place of business at 575 Jericho Turnpike, Jericho, New

York 11753. TRI-STATE is a New York licensed insurance company.

2.

Defendant LEXISNEXIS RISK SOLUTIONS, INC. ("LEXISNEXIS") is a corporation

organized and existing under the laws of the State of Georgia who has appointed as its registered

agent for service of process CT Corporation Systems, located at 1201 Peachtree Street, NE,

Atlanta, Fulton County, Georgia 30361. LEXISNEXIS was formerly known as ChoicePoint

Services, Inc., who was a corporation organized and existing under the laws of the State of

Georgia and who was the surviving entity of its merger with Insurity, LLC, who in 2008 was a

Georgia limited liability company. The merger between ChoicePoint Services, Inc. and Insurity,

LLC took place on or about December 31, 2008. On or about January 1, 2010, Choicepoint

Services, Inc. amended its Articles of Incorporation by changing the name of its corporation to

LEXISNEXIS RISK SOLUTIONS, INC.

3.

LEXISNEXIS, as the surviving entity through ChoicePoint Services, Inc.'s name change,

is responsible for the obligations of Insurity, LLC. LEXISNEXIS, ChoicePoint Services, Inc.

and Insurity, LLC are hereinafter collectively referred to as "Defendant."

### VENUE AND JURISDICTION

4.

Defendant is subject to both the jurisdiction and the venue of this Court.

5.

Jurisdiction and venue are properly laid in the Superior Court of Fulton County.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

6.

In or about 2006, TRI-STATE decided to acquire a new software for policy

administration in the hopes of expanding its sales and improving its operational performance.

TRI-STATE identified a number of potential vendors but eventually narrowed it down to only a

few that appeared to have the capabilities that would meet its business needs, one of which was

Defendant.

7.

From late 2006 through early 2008, TRI-STATE researched Defendant and its policy administration software through its advertisements, website, internet research, telephonic and electronic communications, communications through the mail and in person meetings with representatives of Defendant.

8.

During that same time period, TRI-STATE conducted due diligence of Defendant through further inquiries by telephone, mail, in person meetings and electronic wire communications, including visits by TRI-STATE representatives to Defendant's facility in Melville, New York, as well as communications with companies represented by Defendant to have been prior purchasers of its policy administration software.

9.

Beginning in late 2007 through March 2008, when TRI-STATE was still deciding whether to use Defendant as its software vendor, Defendant provided TRI-STATE with a sample and/or demonstration of the software Defendant proposed to sell to TRI-STATE. Defendant represented that the software that it would sell to TRI-STATE would conform with the sample and/or demonstration provided and would deviate only with respect to the specific customizations TRI-STATE requested.

10.

Throughout October and November 2007, TRI-STATE representatives communicated via telephone, in person meetings and electronic wire communications with Defendant's representatives, including Clyde Owen, Insurity, LLC's Senior Vice President of Business & Product Development, and Mark Menard, Insurity, LLC's Regional Vice President of Sales, on

TRI-STATE's needs and expectations, the capabilities of Defendant's policy administration software and TRI-STATE's concerns relating to perceived shortcomings in Defendant's software, as well as its high cost. At all times Defendant's representatives highlighted the flexibility, functionality and capabilities, including ad-hoc capabilities, of Defendant's policy administration software and assured TRI-STATE that they could deliver the product TRI-STATE needed at an affordable cost.

11.

On or about November 29, 2007, TRI-STATE met with Mark Menard and visited Defendant's facility in Melville, New York where the parties discussed TRI-STATE's concerns regarding Defendant's policy administration and billing integrations, as well as its concerns on Defendant's Billing Decisions software. During this meeting, Defendant again represented to TRI-STATE that it could deliver the product TRI-STATE needed at an affordable cost.

12.

During the week of December 17, 2007, again, before TRI-STATE had made its final decision on which vendor to use to purchase its computer software, Defendant's representatives visited TRI-STATE's offices and conducted a "Requirements Assessment," which included four full days of meetings with TRI-STATE's employees and executives. The purpose of this Requirements Assessment was to provide Defendant an opportunity to review, analyze and document TRI-STATE's high level functional requirements and its business processes with the goal of ensuring that Defendant had a solid understanding of TRI-STATE's core business and software requirements so that both sides could evaluate, plan for and/or budget any subsequent agreed-upon software implementation. The representatives of Defendant that attended this Requirements Assessment included Clyde Owen, Mark Menard and Carmen Benz, Insurity,

LLC's Director of Business Requirements.  During the Requirements Assessment, TRI-STATE informed Defendant that it required a favorable cost benefit result within an acceptable time period that would expand its sales and improve its operational performance.  Defendant represented to TRI-STATE that its policy administration software would improve TRI-STATE's operational and financial performance and enhance its accuracy, effectiveness and efficiency while decreasing operational expenses, all at an affordable cost and within a reasonable period of time.

13.

In late 2007/early 2008 and before TRI-STATE had decided which software to purchase, Defendant provided TRI-STATE with a demonstration of its personal lines software product. This demonstration contained screenshots from the purported delivery and integration of Defendant's personal lines software to Merastar Insurance Company, leading TRI-STATE to believe that Defendant had successfully integrated and delivered the software, which it had not.

14.

Beginning in October of 2007, TRI-STATE requested information from Defendant on other clients using Defendant's personal lines software product.  Months later, on or about January 23, 2008, when TRI-STATE was still making its decision on which vendor to utilize for its new software system, Defendant provided a list of its purported personal lines clients that, unbeknownst to TRI-STATE, affirmatively misrepresented or omitted highly material facts relating to these clients and their alleged use of Defendant's personal lines software.

15.

Thereafter, on or about January 29, 2008, in response to TRI-STATE's questions regarding Merastar Insurance Company and its purchase of Defendant's personal lines software

product, Defendant, again unbeknownst to TRI-STATE, materially misrepresented the facts

surrounding Defendant's failed attempt to integrate and implement its personal lines software for

Merastar, a failure that resulted in a lawsuit. In this correspondence, Defendant represented to

TRI-STATE that the Merastar lawsuit was filed in July 2006, prior to Defendant's acquisition of

the product that was thereafter integrated into its own personal lines software and that it was

attempting to then get TRI-STATE to purchase and that is the subject of this lawsuit, and that the

Merastar lawsuit was only against the former owners of the product. Contrary to Defendant's

misrepresentations, the Merastar lawsuit was filed on or about September 8, 2006, after

Defendant obtained the product, and the lawsuit not only named the former owners of the

product as defendants but also named both Insurity, LLC and Clyde Owen as defendants.

Defendant failed to disclose this information to TRI-STATE.

16.

Beginning in November of 2007, TRI-STATE also asked Defendant to set up a

conference call with a client to whom Defendant had delivered a policy and billing integration.

On April 1, 2008, when TRI-STATE asked again whether Defendant had set up the requested

conference call with Merastar, the company TRI-STATE had been led to believe had been

delivered Defendant's policy and billing integration software, Defendant quickly re-directed

TRI-STATE's attention to Affirmative, the client to whom Defendant claimed it had delivered its

policy and billing integration software.

17.

After conducting extensive due diligence on TRI-STATE's operations and business needs

and expectations, Defendant represented that it had the experience and capability, both

technologically and in the insurance industry, to install, implement, customize, interface,

integrate and maintain its policy administration software within a reasonable time period in order to support and satisfy TRI-STATE's business objectives.

18.

Based upon Defendant's representations, on March 31, 2008, TRI-STATE executed a Master Agreement with Defendant. TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the Master Agreement until on or about April 30, 2008, but back-dated the Master Agreement to reflect a March 31, 2008 signing date. A true and correct copy of the Master Agreement is attached hereto as Exhibit A.

19.

On March 31, 2008, TRI-STATE also executed a Software & Services Schedule with Defendant. Again, TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the Software & Services Schedule until on or about April 30, 2008, although it again back-dated the document to reflect a March 31, 2008 signing date. A true and correct copy of the Software & Services Schedule is attached hereto as Exhibit B.

20.

Under the Master Agreement and Software & Services Schedule, Defendant agreed to license, customize, develop, deliver, integrate and implement its "Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions" (hereinafter "Base Software") to and/or for TRI-STATE.

21.

Defendant represented that its Base Software would support New York insurance issues and would also support TRI-STATE's personal auto, homeowners' and personal umbrella lines of business. Defendant also represented that the Base Software would support all of the

following for TRI-STATE's personal auto, homeowners' and personal umbrella lines of business: (a) New Business Quote/Issue; (b) Renewal Quote/Issue; (c) Endorsement; (d) Cancel; (e) Reinstatement; (f) View and Reprint Documents; (g) Non-Renewal; (h) Out-of-Sequence Change Endorsement Processing; and (i) Rewrites.

22.

Under the Master Agreement and Software & Services Schedule, this Base Software was to be implemented as part of the Implementation Services and was to include a Consumer User Interface and Agent User Interface and a batch print administration, as well as the following standard customization items at no additional cost to TRI-STATE: (a) VIN Verification; (b) Interfaces for ChoicePoint CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill and ChoicePoint NY List Service.

23.

Under the Master Agreement and Software & Services Schedule, the license fee for the Base Software was One Million Two Hundred Fifty Thousand Dollars ($1,250,000), Two Hundred Fifty Thousand Dollars ($250,000) of which was to be paid upon execution of the Master Agreement and the remaining balance to be paid in monthly installments of One Hundred Twenty Five Thousand Dollars ($125,000) starting May 1, 2008 and ending on December 1, 2008.

24.

Under the Master Agreement and Software & Services Schedule, certain Customer Specific Customizations were to be done for a fixed bid of Two Hundred Forty-Five Thousand Five Hundred Dollars ($245,500). These Customer Specific Customizations included, but were not limited to, batch print jobs and batch processing jobs for TRI-STATE Auto, TRI-STATE

Home and Drivers Auto. Payment of the Two Hundred Forty-Five Thousand Five Hundred Dollars ($245,500) for the delineated Customer Specific Customizations was due as follows: (1) Forty-Seven Thousand Seven Hundred Fifty Dollars ($47,750) payable upon signoff of the Client Requirements Book ("CRB"); (2) Forty-Seven Thousand Seven Hundred Fifty Dollars ($47,750) payable upon delivery of customizations; and (3) One Hundred Fifty Thousand Dollars ($150,000) payable 30 days post production.

25.

To date, TRI-STATE has paid One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) under the Master Agreement and Software & Services Schedule and still cannot even access, let alone utilize, any portion of the promised policy administration software on its system.

**FIRST CAUSE OF ACTION:**
**FRAUD IN THE INDUCEMENT**

26.

TRI-STATE refers to paragraphs 1 through 25 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

27.

On or about March 31, 2008, TRI-STATE executed a contract with Defendant under which TRI-STATE agreed to license software developed by Defendant, more commonly known as its Personal Lines Software, including its Base Software for Policy Decisions, Billing Decisions and Reporting Decisions.

9
EXHIBIT F - 9

28.

On numerous occasions between February 2007 and March 28, 2008, Defendant intentionally and knowingly made false representations to TRI-STATE including, but not limited to, the following:

a.      That it possessed significant knowledge of and expertise in the personal lines insurance business, including the products, processes and required systems conversions necessary to install, implement, customize, interface, integrate and maintain its Base Software for TRI-STATE;

b.      That it had the expertise and capability to install its Base Software within TRI-STATE's operations in a fully functional and usable manner within a reasonable time period;

c.      That it had the ability to implement, integrate, customize and deliver its Base Software, which would improve TRI-STATE's operational and financial performance and enhance its accuracy, effectiveness and efficiency while decreasing operational expenses;

d.      That its Base Software can be seamlessly integrated with existing internal and external systems;

e.      That its Base Software was flexible, robust, functional and capable of fulfilling all of TRI-STATE's business needs, including its reporting and correspondence needs, at an affordable cost;

f.      That its Base Software would improve speed to market, increase TRI-STATE's overall productivity and enhance its customer experience;

g.      That its Base Software is highly configurable and customizable;

h.    That it had sufficient previous experience with the successful implementation of its Base Software for numerous clients;

i.    That its Base Software would provide all the functionality necessary for the full and compliant administration of Property & Casualty policies;

j.    That its Base Software would provide for the automation of all functions necessary for managing the life cycle of a policy from underwriting and writing to policy issuance and maintenance;

k.    That its Base Software provides accurate real-time rating;

l.    That TRI-STATE could make changes to its Base Software, such as updating rates, with merely a few simple keystrokes;

m.    That it successfully delivered a policy and billing integration to Merastar Insurance Company;

n.    That it had successfully integrated and delivered its personal lines software to Merastar Insurance Company, by providing TRI-STATE with a demonstration of this software that contained screenshots from the purportedly successful delivery;

o.    That the Merastar Insurance Company lawsuit was filed before Defendant obtained the Base Software and that it was only against the previous owners of the software, but not against Insurity, LLC or any of its managers, agents or directors;

p.    That TRI-STATE would not be charged on a time and materials ("T&M") basis for services and customizations encompassed within the Master Agreement and the Software & Services Schedule including, but not limited to, batch printing and processing;

q.    That the software implementation would be complete within six (6) to nine (9) months, give or take thirty percent (30%);

r.      That it would deliver timely quality assurance documents and builds to TRI-STATE for testing and signoff;

s.      That it could take on and successfully deliver to TRI-STATE the New York Auto ID Card effort it required;

t.      That it would ensure it had a sufficient number of knowledgeable and qualified resources working on the project to ensure timely delivery of the Base Software to TRI-STATE; and

u.      That the Base Software would conform with the sample and/or demonstration Defendant provided to TRI-STATE and would deviate only with respect to the specific customizations TRI-STATE requested.

29.

TRI-STATE is informed and believes and on that basis alleges that at the time Defendant made these representations, Defendant knew that they were false and that it made them with the intent to induce TRI-STATE to enter into the aforementioned contract for software and services.

30.

TRI-STATE believed that Defendant's representations were true and reasonably relied on them in entering into the aforementioned contract.  At the time TRI-STATE entered into the contract, it was ignorant of the falsity of the representations described above, and believing them to be accurate descriptions of the software and the software's capabilities, as well as Defendant's expertise and capabilities, decided to license the software and contract Defendant's services.

31.

Had TRI-STATE known the truth, it would not have entered into the contract with Defendant.

32.

As a result of being so induced, TRI-STATE has been damaged in that it has paid One

Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen

Cents ($1,147,726.13) for the software license and services and has not received a functional,

marketable or stable product. In fact, as of February 21, 2010, and even to this date, TRI-

STATE still could not even access, let alone utilize, any portion of the promised policy

administration software on its system.

33.

In performing the acts as alleged above, Defendant acted with malice, oppression and

fraud and with the intent to cause injury, and with a willful and conscious disregard of the rights

of others, thereby warranting the imposition of punitive and exemplary damages.

## SECOND CAUSE OF ACTION:
## FRAUD AND DECEIT

34.

TRI-STATE refers to paragraphs 1 through 33 of the foregoing allegations and

incorporates them by this reference as though fully set forth herein.

35.

As alleged above, Defendant made promises to TRI-STATE with the intent to induce

TRI-STATE to enter into the aforementioned contract for software and services.

36.

In addition to the false and/or misleading representations alleged above, from March 28,

2008 through March 26, 2010, Defendant intentionally and knowingly made the additional false

and/or misleading representations:

a.      That it possessed significant knowledge of and expertise in the personal lines insurance business, including the products, processes and required systems conversions necessary to install, implement, customize, interface, integrate and maintain its Base Software for TRI-STATE;

b.      That it had the expertise and capability to install its Base Software within TRI-STATE's operations in a fully functional and usable manner within a reasonable time period;

c.      That it had the ability to implement, integrate, customize and deliver its Base Software, which would improve TRI-STATE's operational and financial performance and enhance its accuracy, effectiveness and efficiency while decreasing operational expenses;

d.      That its Base Software can be seamlessly integrated with existing internal and external systems;

e.      That its Base Software was flexible, robust, functional and capable of fulfilling all of TRI-STATE's business needs, including its reporting and correspondence needs, at an affordable cost;

f.      That its Base Software would improve speed to market, increase TRI-STATE's overall productivity and enhance its customer experience;

g.      That its Base Software is highly configurable and customizable;

h.      That it had successfully delivered, implemented and integrated its Base Software for numerous other clients;

i.      That its Base Software would provide all the functionality necessary for the full and compliant administration of Property & Casualty policies;

j.      That its Base Software would provide for the automation of all functions necessary for managing the life cycle of a policy from underwriting and writing to policy issuance and maintenance;

k.      That its Base Software provides accurate real-time rating;

l.      That TRI-STATE could make changes to its Base Software, such as updating rates, with merely a few simple keystrokes;

m.      That it successfully delivered a policy and billing integration to Merastar Insurance Company;

n.      That it had successfully integrated and delivered its personal lines software to Merastar Insurance Company, by providing TRI-STATE with a demonstration of this software that contained screenshots from the purportedly successful delivery;

o.      That the Merastar Insurance Company lawsuit was filed before Defendant obtained the Base Software and that it was only against the previous owners of the software, but not against Insurity, LLC or any of its managers, agents or directors;

p.      That TRI-STATE would not be charged on a T&M basis for services and customizations encompassed within the Master Agreement and the Software & Services Schedule including, but not limited to, batch printing and processing;

q.      That the software implementation would be complete within six (6) to nine (9) months, give or take thirty percent (30%);

r.      That it would deliver timely quality assurance documents and builds to TRI-STATE for testing and signoff;

s.      That it could take on and successfully deliver to TRI-STATE the New York Auto

ID Card effort it required and the reporting requirements for both its Policy Decisions and

Billing Decisions software;

t.      That it would ensure it had a sufficient number of knowledgeable and qualified

resources working on the project to ensure timely delivery of the Base Software to TRI-

STATE;

u.      That it would provide TRI-STATE with documentation relating to and supporting

its Base Software, including Defendant's print technology and Billing Decisions software;

v.      That it would provide TRI-STATE with its demo site on its Policy Decisions and

Billing Decisions software;

w.      That it could add a scannable bar code to TRI-STATE's invoices, an addition that

would take less than a day's worth of time;

x.      That its development of TRI-STATE's software was progressing as planned

without any significant problems or delays; and

y.      That it delivered completed "Deliverables" to TRI-STATE for testing up to July

21, 2009.

37.

TRI-STATE is informed and believes and on that basis alleges that at the time Defendant

made these representations, Defendant knew that they were false or fraudulently or recklessly

made them without having sufficient knowledge as to their accuracy and that it made them with

the intent to deceive TRI-STATE.

38.

TRI-STATE believed that Defendant's representations were true and reasonably relied on them in entering into the aforementioned contract with Defendant and continuing to pay Defendant for the software and services contemplated under the contract. At all relevant times mentioned herein, TRI-STATE was ignorant of the falsity of the representations described above, and believing them to be accurate descriptions of the software and the software's capabilities, as well as Defendant's expertise and capabilities, decided to license the software, contract Defendant's services and continue to work with and pay Defendant for the software and services contemplated under the contract.

39.

Had TRI-STATE known the truth, it would not have entered into the contract with Defendant, nor would it have considered continuing to work with or pay Defendant.

40.

As a result of Defendant's knowingly fraudulent, deceiving and misleading representations, TRI-STATE has been damaged in that it has paid One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) for the software license and services and has not received a functional, marketable or stable product. In fact, as of February 21, 2010, and even to this date, TRI-STATE still could not even access, let alone utilize, any portion of the promised policy administration software on its system.

41.

In performing the acts as alleged above, Defendant acted with malice, oppression and fraud and with the intent to cause injury, and with a willful and conscious disregard of the rights of others, thereby warranting the imposition of punitive and exemplary damages.

## THIRD CAUSE OF ACTION:
## BREACH OF CONTRACT

42.

TRI-STATE refers to paragraphs 1 through 41 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

43.

On March 31, 2008, TRI-STATE executed a Master Agreement with Defendant.  TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the Master Agreement until on or about April 30, 2008, but back-dated the Master Agreement to reflect a March 31, 2008 signing date.  A true and correct copy of the Master Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

44.

On March 31, 2008, TRI-STATE also executed a Software & Services Schedule with Defendant.  Again, TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the Software & Services Schedule until on or about April 30, 2008, although it again back-dated the document to reflect a March 31, 2008 signing date.  A true and correct copy of the Software & Services Schedule is attached hereto as Exhibit B and is incorporated herein by reference.

45.

Under the Master Agreement and Software & Services Schedule, Defendant agreed to license, customize, develop, deliver, integrate and implement its Base Software and TRI-STATE's requested customizations, in exchange for TRI-STATE's agreement to pay a total of One Million Four Hundred Ninety-Five Thousand Five Hundred Dollars ($1,495,500) plus any agreed-upon T&M customizations.

46.

Under the terms of the contract TRI-STATE agreed to pay according to the schedule set forth in Section 8 of the Software & Services Schedule, attached as Exhibit B, and has done so. To date, TRI-STATE has paid a total of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) due under the contract. TRI-STATE has fully performed all terms and conditions of the contract that it agreed to perform, except for those obligations that it was prevented or excused from performing, and has been ready and willing to receive the goods and services purchased from Defendant.

47.

Under the terms of the contract, Defendant agreed, among other things, to deliver its software and services, including but not limited to implementation, customization, integration, training and maintenance, to TRI-STATE on various dates between April 1, 2008 and January 21, 2010. In fact, in August 2009, Defendant provided TRI-STATE with a written guarantee of its performance under the contract to TRI-STATE by promising that it would deliver the Base Software to TRI-STATE in a completed and functional form as contemplated and required by the contract in two phases. In this writing, Defendant guaranteed that all Phase 1 software and services would be delivered in a complete and functional form by November 19, 2009 and all Phase 2 software and services by January 21, 2010. Defendant also agreed in writing that TRI-STATE did not have to pay the entire remaining balance due under the contract unless Defendant performed by these timelines as it promised and guaranteed. In a written response, TRI-STATE agreed to these timelines and terms.

48.

On each of those dates, and all of them, Defendant failed to make the promised delivery, nor has Defendant delivered any functional portion of the software and services to date despite TRI-STATE's demands that it do so.  Whenever Defendant failed to meet specified timelines or deliver a workable component of the software, TRI-STATE notified Defendant as required by the contract and gave it an opportunity to cure the problem.  Each time, Defendant assured TRI-STATE that the deficiencies would be corrected.

49.

On January 22, 2010, following Defendant's failure to deliver the completed software and services as promised, TRI-STATE notified Defendant of its breach, which Defendant failed to remedy within thirty (30) days or any reasonable time thereafter.

50.

As a direct result of Defendant's total and fundamental breach of the contract by failing to deliver the software and services as promised, TRI-STATE has been damaged in an amount to be determined according to proof at trial.

## FOURTH CAUSE OF ACTION:
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

51.

TRI-STATE refers to paragraphs 1 through 50 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

52.

On March 31, 2008, TRI-STATE executed a Master Agreement with Defendant.  TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the

Master Agreement until on or about April 30, 2008, but back-dated the Master Agreement to reflect a March 31, 2008 signing date.  A true and correct copy of the Master Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

53.

On March 31, 2008, TRI-STATE also executed a Software & Services Schedule with Defendant.  Again, TRI-STATE is informed and believes and on that basis alleges that Defendant did not execute the Software & Services Schedule until on or about April 30, 2008, although it again back-dated the document to reflect a March 31, 2008 signing date.  A true and correct copy of the Software & Services Schedule is attached hereto as Exhibit B and is incorporated herein by reference.

54.

Under the Master Agreement and Software & Services Schedule, Defendant agreed to license, customize, develop, deliver, integrate and implement its Base Software and TRI-STATE's requested customizations, in exchange for TRI-STATE's agreement to pay a total of One Million Four Hundred Ninety-Five Thousand Five Hundred Dollars ($1,495,500) plus any agreed-upon T&M customizations.

55.

Under the terms of the contract TRI-STATE agreed to pay according to the schedule set forth in Section 8 of the Software & Services Schedule, attached as Exhibit B, and has done so. To date, TRI-STATE has paid a total of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) due under the contract.  TRI-STATE has fully performed all terms and conditions of the contract that it agreed to perform,

21

except for those obligations that it was prevented or excused from performing, and has been ready and willing to receive the goods and services purchased from Defendant.

56.

The contract between TRI-STATE and Defendant contained an implied warranty of good faith and fair dealing under which each party agreed to satisfy their respective obligations under the contract and not to interfere with each other's right to receive the benefits under the contract.

57.

All of the conditions required for Defendant's performance have occurred.  Despite this fact, Defendant unfairly interfered with TRI-STATE's right to receive the benefits of the contract and failed to satisfy its obligations by failing to deliver any completed, functional portion of the software and services by any of the promised deadlines and still has not done so to date despite TRI-STATE's repeated demands that it do so.

58.

As a direct result of Defendant's conduct, TRI-STATE has been damaged in an amount to be determined according to proof at trial.

### FIFTH CAUSE OF ACTION:
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

59.

TRI-STATE refers to paragraphs 1 through 58 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

60.

At all relevant times herein, Defendant was in the business of selling computer software, including the Base Software at issue in this lawsuit, as well as services relating thereto, including but not limited to, its implementation, integration, customization, training and maintenance.

61.

In August 2009, Defendant provided TRI-STATE with a written guarantee of its performance to TRI-STATE by promising that it would deliver the Base Software to TRI-STATE in a completed and functional form as contemplated and required by the contract in two phases. In this writing, Defendant guaranteed that all Phase 1 software and services would be delivered in a complete and functional form by November 19, 2009 and all Phase 2 software and services by January 21, 2010. Defendant also agreed in writing that TRI-STATE did not have to pay the entire remaining balance due under the contract unless Defendant performed by these timelines as it promised and guaranteed. In a written response, TRI-STATE agreed to these timelines and terms.

62.

Between March 31, 2008 and January 21, 2010, Defendant sold and delivered to TRI-STATE software and services, for which TRI-STATE has paid a total of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) in accordance with the contract.

63.

The contract between TRI-STATE and Defendant contained an implied warranty that the software and services would be of merchantable quality and that they were, among other things, fit for the ordinary purposes for which such software and services are used. The software and services were not of merchantable quality and were not fit for the ordinary purposes for which they are used as stated in detail above and incorporated herein by reference.

64.

In addition to what is stated above and incorporated herein, the software and services were not of merchantable quality for numerous reasons, including but not limited to, the following:

a.      The "Deliverables" Defendant actually delivered to TRI-STATE were not in a workable or functional condition; and

b.      The "Deliverables" Defendant actually delivered to TRI-STATE were so error-ridden they were not usable and were of no value.

65.

In fact, as of February 21, 2010, nearly two (2) full years after TRI-STATE executed the Master Agreement and Software & Services Schedule, and even to the present date, TRI-STATE still cannot even access, let alone utilize, any portion of the software on its system.

66.

TRI-STATE discovered the breaches in or about late 2008 through February 21, 2010. As the breaches occurred and within a reasonable amount of time after receiving the goods and/or services, TRI-STATE provided ongoing notices to Defendant of the defective nature of the software and services delivered, which Defendant failed to remedy.

67.

TRI-STATE attempted to use the software and services in the manner and for the purpose for which they were intended but, due to their error-ridden, unusable and non-functioning condition, was unable to do so.

68.

At the time and place of acceptance of the software and services, the software and services had a value of Zero Dollars ($0.00). Had the software and services been as warranted, the value would have been One Million Five Hundred Eighteen Thousand Two Hundred Twenty-Six Dollars and Thirteen Cents ($1,518,226.13), at a minimum. TRI-STATE is entitled to damages in the sum of One Million Five Hundred Eighteen Thousand Two Hundred Twenty-Six Dollars and Thirteen Cents ($1,518,226.13), which represents the difference between the value of the goods and services as warranted and the value of the goods and services as delivered.

## SIXTH CAUSE OF ACTION:
## BREACH OF THE IMPLIED WARRANTY OF
## FITNESS FOR A PARTICULAR PURPOSE

69.

TRI-STATE refers to paragraphs 1 through 68 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

70.

At all relevant times herein, Defendant was in the business of selling computer software, including the Base Software at issue in this lawsuit, as well as services relating thereto, including but not limited to, its implementation, integration, customization, training and maintenance.

71.

In August 2009, Defendant provided TRI-STATE with a written guarantee of its performance to TRI-STATE by promising that it would deliver the Base Software to TRI-STATE in a completed and functional form as contemplated and required by the contract in two phases. In this writing, Defendant guaranteed that all Phase 1 software and services would be delivered in a complete and functional form by November 19, 2009 and all Phase 2 software and

services by January 21, 2010. Defendant also agreed in writing that TRI-STATE did not have to pay the entire remaining balance due under the contract unless Defendant performed by these timelines as it promised and guaranteed. In a written response, TRI-STATE agreed to these timelines and terms.

72.

Between March 31, 2008 and January 21, 2010, Defendant sold and delivered to TRI-STATE software and services, for which TRI-STATE has paid a total of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) in accordance with the contract.

73.

The contract between TRI-STATE and Defendant contained an implied warranty that the software and services would be fit for any ordinary or particular purpose known to it for which such software and services are used.

74.

At the time of entering into the contract for the sale of the software and services, and continuing thereafter, Defendant was informed and knew, or had reason to know, that TRI-STATE required the software and services for full policy administration. TRI-STATE relied on Defendant's represented skills and expertise in technology and the Property & Casualty insurance industry in selecting the goods and services under the contract. The goods and services sold and delivered to TRI-STATE were not fit for their intended purpose, however, as set forth in detail above and incorporated herein by reference.

75.

TRI-STATE discovered the breaches in or about late 2008 through February 21, 2010. As the breaches occurred and within a reasonable amount of time after receiving the goods and/or services, TRI-STATE provided ongoing notices to Defendant of the defective nature of the software and services delivered, which Defendant failed to remedy.

76.

TRI-STATE attempted to use the software and services in the manner and for the purpose for which they were intended but, due to their error-ridden, unusable and non-functioning condition, was unable to do so.

77.

At the time and place of acceptance of the software and services, the software and services had a value of Zero Dollars ($0.00). Had the software and services been as warranted, the value would have been One Million Five Hundred Eighteen Thousand Two Hundred Twenty-Six Dollars and Thirteen Cents ($1,518,226.13) at a minimum. TRI-STATE is entitled to damages in the sum of One Million Five Hundred Eighteen Thousand Two Hundred Twenty-Six Dollars and Thirteen Cents ($1,518,226.13), which represents the difference between the value of the goods and services as warranted and the value of the goods and services as delivered.

## SEVENTH CAUSE OF ACTION:
## BREACH OF THE WARRANTY OF REPAIR

78.

TRI-STATE refers to paragraphs 1 through 77 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

79.

At all relevant times herein, Defendant was in the business of selling computer software, including the Base Software at issue in this lawsuit, as well as services relating thereto, including but not limited to, its implementation, integration, customization, training and maintenance.

80.

In August 2009, Defendant provided TRI-STATE with a written guarantee of its performance to TRI-STATE by promising that it would deliver the Base Software to TRI-STATE in a completed and functional form as contemplated and required by the contract in two phases. In this writing, Defendant guaranteed that all Phase 1 software and services would be delivered in a complete and functional form by November 19, 2009 and all Phase 2 software and services by January 21, 2010. Defendant also agreed in writing that TRI-STATE did not have to pay the entire remaining balance due under the contract unless Defendant performed by these timelines as it promised and guaranteed. In a written response, TRI-STATE agreed to these timelines and terms.

81.

Between March 31, 2008 and January 21, 2010, Defendant sold and delivered to TRI-STATE software and services, for which TRI-STATE has paid a total of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) in accordance with the contract.

82.

The contract between TRI-STATE and Defendant contained a warranty of repair, under which Defendant warranted that it would repair any defects and/or errors found in the software and services provided to TRI-STATE within a reasonable period of time.

83.

Beginning in about late 2008 through January 22, 2010, TRI-STATE discovered defects and/or errors in the software and services that Defendant delivered to it. Within a reasonable amount of time after receiving the defective goods and services, TRI-STATE provided ongoing notices to Defendant of the specific defects and errors, which Defendant failed to remedy.

84.

In fact, as of February 21, 2010, nearly two (2) full years after TRI-STATE executed the Master Agreement and Software & Services Schedule, and even to this date, TRI-STATE still cannot even access, let alone utilize, any portion of the software on its system.

85.

As a direct result of Defendant's conduct, TRI-STATE has been damaged in an amount to be determined according to proof at trial.

### EIGHTH CAUSE OF ACTION: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – MAIL AND WIRE FRAUD

86.

TRI-STATE refers to paragraphs 1 through 85 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

87.

This cause of action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

88.

Defendant and its agents are engaged in an enterprise within the meaning of 18 U.S.C. § 1961(4), the activities of which affect, interstate or foreign commerce. Defendant and its agents

knowingly and fraudulently misrepresented to TRI-STATE and to the general public that its policy administration software that it was providing to TRI-STATE met certain standards and would perform certain functions as more fully set forth above. These misrepresentations include, but are not limited to, the following, which were posted on Defendant's website and in its print media from at least 2006 to the present:

a.      That it possesses significant knowledge of and expertise in the personal lines insurance business, including the products, processes and required systems conversions necessary to install, implement, customize, interface, integrate and maintain its policy administration software for customers;

b.      That it has the expertise and capability to install its policy administration software within its customers' operations in a fully functional and usable manner;

c.      That it has the ability to implement, integrate, customize and deliver its policy administration software, which will improve its customers' operational and financial performance and enhance their accuracy, effectiveness and efficiency while decreasing operational expenses;

d.      That its policy administration software can be seamlessly integrated with existing internal and external systems;

e.      That its policy administration software is flexible, robust, functional and capable of fulfilling all of its customers' business needs;

f.      That its policy administration software will improve speed to market, increase overall productivity and enhance customer experience;

g.      That its policy administration software is highly configurable and customizable;

h.      That it has sufficient previous experience with the successful implementation of its policy administration software for numerous clients;

i.      That its policy administration software will provide all the functionality necessary for the full and compliant administration of Property & Casualty policies;

j.      That its policy administration software will provide for the automation of all functions necessary for managing the life cycle of a policy from underwriting and writing to policy issuance and maintenance;

k.      That its policy administration software provides accurate real-time rating; and

l.      That business users of its policy administration software can make changes to it, such as updating rates, with merely a few simple keystrokes.

89.

These misrepresentations remain up on Defendant's website and in its print media up to and including the date of the filing of this First Amended Complaint and were intended to and did induce TRI-STATE to purchase the products discussed therein. Defendant's website and print media are also intended to induce the general public to purchase the products on the website and in the print media under false pretenses.

90.

The fraudulent misrepresentations as set forth above represent a scheme and artifice to defraud TRI-STATE and the general public, and to obtain money from TRI-STATE and the general public by means of false or fraudulent pretenses, representations or promises for which TRI-STATE and others were invoiced by Defendant, electronically and through the mail, and for which Defendant accepted payment in return through the mail, resulting in mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

91.

Mail and wire fraud constitute racketeering activity as defined in 18 U.S.C. § 1961(1)(B).

92.

Defendant's multiple and repeated fraudulent misrepresentations as detailed above, that were made through its public advertisements, website and print media and through telephone, email and mail communications, that were systematic and ongoing over a at least a period of five (5) years, that are continuing to the present date and that have been concealed by a scheme of subterfuge and artifice, constitute a pattern of racketeering activity within the meaning of 19 U.S.C. § 1961(5).

93.

Defendant and Defendant's agents, associates and representatives have conducted and have conspired to conduct the affairs of Defendant through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, Defendant and its agents have made fraudulent representations to TRI-STATE and the general public through its public advertisements, website and print media and through telephone, email and mail communications regarding the capabilities and qualities of its policy administration software and services as set forth above and have invoiced TRI-STATE and others, electronically and through the mail, for licenses, services and expenses performed pursuant to contracts entered into with Defendant for said software and services and then denied any responsibility for the obligations under the contracts while accepting monies paid thereon through the mail.

94.

As a direct and proximate result of Defendant's violations of 18 U.S.C. § 1962(c), TRI-STATE has suffered actual damages as a result of injury to its business and property in an amount to be determined according to proof at trial.

95.

Defendant is liable to TRI-STATE for treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided for under 18 U.S.C. § 1964(c).

## NINTH CAUSE OF ACTION:
## VIOLATION OF GEORGIA'S RICO ACT

96.

TRI-STATE refers to paragraphs 1 through 95 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

97.

This cause of action arises under the Georgia RICO Act, O.C.G.A. § 16-14-1 et seq.

98.

Defendant and its agents are engaged in an enterprise within the meaning of O.C.G.A. § 16-14-3(6), the activities of which affect, interstate or foreign commerce. As set forth above, from at least January 2007 to the present, Defendant and its agents knowingly and fraudulently misrepresented to TRI-STATE and to the general public that its policy administration software that it was providing to TRI-STATE met certain standards and would perform certain functions.

99.

These misrepresentations remain up on Defendant's website and in its print media up to and including the date of the filing of this First Amended Complaint and were intended to and did induce TRI-STATE to purchase the products discussed therein. Defendant's website and

print media are also intended to induce the general public to purchase the products on the website and in the print media under false pretenses.

100.

The fraudulent misrepresentations as set forth above represent a scheme and artifice to defraud TRI-STATE and the general public, and to obtain money from TRI-STATE and the general public by means of false or fraudulent pretenses, representations or promises for which TRI-STATE and others were invoiced by Defendant, electronically and through the mail, and for which Defendant accepted payment in return through the mail, resulting in mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

101.

Mail and wire fraud constitute racketeering activity under 18 U.S.C. § 1961(1)(B) and O.C.G.A. § 15-14-3(9)(A)(xxix).

102.

Defendant's multiple and repeated fraudulent misrepresentations as detailed above, that were made through its public advertisements, website and print media and through telephone, email and mail communications, that were systematic and ongoing over a at least a period of five (5) years, that are continuing to the present date and that have been concealed by a scheme of subterfuge and artifice, constitute a pattern of racketeering activity within the meaning of 19 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(8)(A).

103.

Defendant and Defendant's agents, associates and representatives have conducted and have conspired to conduct the affairs of Defendant through a pattern of racketeering activity in

violation of 16-14-4(a) and (b). Specifically, Defendant and its agents have made fraudulent representations to TRI-STATE and the general public through its public advertisements, website and print media and through telephone, email and mail communications regarding the capabilities and qualities of its policy administration software and services as set forth above and have invoiced TRI-STATE and others, electronically and through the mail, for licenses, services and expenses performed pursuant to contracts entered into with Defendant for said software and services and then denied any responsibility for the obligations under the contracts while accepting monies paid thereon through the mail.

104.

As a direct and proximate result of Defendant's violations of 16-14-4, TRI-STATE has suffered actual damages as a result of injury to its business and property in an amount to be determined according to proof at trial.

105.

Defendant is liable to TRI-STATE for treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided for under 16-14-6.

106. .

In performing the acts as alleged above, Defendant acted with malice, oppression and fraud and with the intent to cause injury, and with a willful and conscious disregard of the rights of others, thereby warranting the imposition of punitive and exemplary damages.

## TENTH CAUSE OF ACTION:
## VIOLATION OF THE LANHAM ACT – FALSE AND MISLEADING
## DESCRIPTION OF GOODS AND SERVICES

107.

TRI-STATE refers to paragraphs 1 through 106 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

108.

This cause of action arises under the Lanham Act, 15 U.S.C. § 1125.

109.

Defendant, with respect to the commercial advertising, marketing and sale of its policy administration software and services in interstate or foreign commerce, made false and misleading descriptions and representations of fact relating to the nature, characteristics and qualities of its goods, services and commercial activities as more fully set forth above.

110.

Defendant's false and misleading descriptions and representations of fact relating to the nature, characteristics and qualities of its goods, services and commercial activities were and are material in effect on the buying decisions of TRI-STATE and the general public. In fact, TRI-STATE was deceived and induced by Defendant into buying its goods and services based upon Defendant's false and misleading descriptions and representations of fact relating to their nature, characteristics and qualities as more fully set forth above.

111.

Defendant's false and misleading descriptions and representations of fact relating to the nature, characteristics and qualities of its goods, services and commercial activities were and are likely to cause confusion or mistake or deceive the public with respect to the nature,

characteristics or qualities of its goods, services and commercial activities and TRI-STATE was, in fact, deceived by Defendant's false and misleading descriptions and misrepresentations as set forth in detail above.

112.

Since at least January 2007 and continuing to the present day, Defendant has made false and misleading descriptions and representations of fact relating to its goods and services on both its website and in its print media as set forth above.

113.

As a direct and proximate result of Defendant's conduct, TRI-STATE has suffered actual damages as a result of injury to its business and property in an amount to be determined according to proof at trial.

## ELEVENTH CAUSE OF ACTION:
## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE
## TRADE PRACTICES ACT

114.

TRI-STATE refers to paragraphs 1 through 113 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

115.

This cause of action arises under the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. 10-1-370 et seq.

116.

Defendant is a person within the meaning of O.C.G.A. § 10-1-371(5).

117.

Defendant, in the course of its business, vocation or occupation, represented that its goods and services had and have sponsorship, approval, characteristics, uses, benefits and/or quantities that they did not and do not have and also represented that its goods and services were and are of a particular standard, quality, style and/or model when they were not and are not at this time, as more fully set forth above.

118.

Defendant's false and misleading representations relating to the sponsorship, approval, characteristics, uses, benefits, quantities, standards, qualities, styles and/or models of its goods and services were and are material in effect on the buying decisions of TRI-STATE and the general public. In fact, TRI-STATE was deceived and induced by Defendant into buying its goods and services based upon Defendant's false and misleading representations of fact relating to their sponsorship, approval, characteristics, uses, benefits and/or quantities as more fully set forth above.

119.

Defendant's false and misleading representations of fact relating to the sponsorship, approval, characteristics, uses, benefits and/or quantities of its goods and services were and are likely to cause confusion or misunderstanding or to deceive the public with respect to the sponsorship, approval, characteristics, uses, benefits and/or quantities of its goods and services and TRI-STATE was, in fact, deceived by Defendant's false and misleading representations as set forth in detail above.

120.

Since at least January 2007 and continuing to the present day, Defendant has made false and misleading descriptions and representations of fact relating to its goods and services on both its website and in its print media as set forth above.

121.

As a direct and proximate result of Defendant's conduct, TRI-STATE has suffered damages as a result of injury to its business and property.

## TWELFTH CAUSE OF ACTION:
## UNFAIR COMPETITION

122.

TRI-STATE refers to paragraphs 1 through 121 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

123.

Defendant, in the course of its business and with respect to the commercial advertising, marketing and sale of its policy administration software and services in interstate or foreign commerce, made false and misleading descriptions and representations of fact relating to the nature, characteristics, uses, benefits and qualities of its goods, services and commercial activities as more fully set forth above.

124.

Defendant's false and misleading descriptions and representations of fact relating to the nature, characteristics, uses, benefits and qualities of its goods, services and commercial activities were and are material in effect on the buying decisions of TRI-STATE and the general public. In fact, TRI-STATE was deceived and induced by Defendant into buying its goods and

services based upon Defendant's false and misleading descriptions and representations of fact relating to their nature, characteristics, uses, benefits and qualities as more fully set forth above.

125.

Defendant's false and misleading descriptions and representations of fact relating to the nature, characteristics, uses, benefits and qualities of its goods, services and commercial activities were and are likely to cause confusion or mistake or deceive the public with respect to the nature, characteristics or qualities of its goods, services and commercial activities and TRI-STATE was, in fact, deceived by Defendant's false and misleading descriptions and misrepresentations as set forth in detail above.

126.

Since at least January 2007 and continuing to the present day, Defendant has made false and misleading descriptions and representations of fact relating to its goods and services on both its website and in its print media as set forth above.

127.

As a direct and proximate result of Defendant's conduct, TRI-STATE has suffered actual damages as a result of injury to its business and property in an amount to be determined according to proof at trial.

128.

In performing the acts as alleged above, Defendant acted with malice, oppression and fraud and with the intent to cause injury, and with a willful and conscious disregard of the rights of others, thereby warranting the imposition of punitive and exemplary damages.

## THIRTEENTH CAUSE OF ACTION:
## UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

129.

TRI-STATE refers to paragraphs 1 through 128 of the foregoing allegations and incorporates them by this reference as though fully set forth herein.

130.

In the alternative, should it be determined that the Master Agreement and Software & Services Schedule do not constitute a valid and enforceable contract, the payments made by TRI-STATE to Defendant totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) constitute an unjust enrichment of Defendant at TRI-STATE's expense.

131.

TRI-STATE made payments to Defendant totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) based on Defendant's promise that Defendant would deliver to TRI-STATE a fully functioning and operating Base Software system.

132.

To date, TRI-STATE still cannot even access, let alone utilize, any portion of the promised Base Software system.

133.

Defendant has been conferred a benefit by TRI-STATE totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) to which Defendant should have no claim or any right to retain any of those benefits.

134.

The Court should impose a constructive trust upon the monies paid by TRI-STATE to Defendant for the amount of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13), and order the return of said amount to TRI-STATE.

WHEREFORE, Plaintiff TRI-STATE CONSUMER INSURANCE COMPANY, INC. prays for judgment against Defendant LEXISNEXIS RISK SOLUTIONS, INC., formerly known as ChoicePoint Services, Inc., survivor entity of its merger with Insurity, LLC a./k/a "Insurity" as follows:

AS TO THE FIRST CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT:

1. Rescission of the Master Agreement and Software & Services Agreement;

2. Return of all monies paid to Defendant under the Master Agreement and Software & Services Agreement, in the amount of One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13);

3. Interest on the damages according to law;

4. Costs incurred in this action;

5. Punitive and exemplary damages; and

6. Any other and further relief as this Court considers just and proper.

AS TO THE SECOND CAUSE OF ACTION FOR FRAUD AND DECEIT:

1. Return of all monies paid to Defendant under the Master Agreement and Software & Services Agreement, in the amount of One Million One Hundred

Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents

($1,147,726.13);

2.      Compensatory damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action;

5.      Punitive and exemplary damages; and

6.      Any other and further relief as this Court considers just and proper.

AS TO THE THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT:

1.      Compensatory damages;

2.      Incidental damages;

3.      Consequential damages;

4.      Interest on the damages according to law;

5.      Costs incurred in this action; and

6.      Any other and further relief as this Court considers just and proper.

AS TO THE FOURTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING:

1.      Compensatory damages;

2.      Consequential damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action; and

5.      Any other and further relief as this Court considers just and proper.

AS TO THE FIFTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED
WARRANTY OF MERCHANTABILITY:

1.      Compensatory damages;

2.      Consequential damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action; and

5.      Any other and further relief as this Court considers just and proper.

AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED
WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE:

1.      Compensatory damages;

2.      Consequential damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action; and

5.      Any other and further relief as this Court considers just and proper.

AS TO THE SEVENTH CAUSE OF ACTION FOR BREACH OF THE WARRANTY
OF REPAIR:

1.      Compensatory damages;

2.      Consequential damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action; and

5.      Any other and further relief as this Court considers just and proper.

AS TO THE EIGHTH CAUSE OF ACTION FOR VIOLATION OF RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT:

1.      Compensatory damages;

2.      Treble damages;

3.      Interest on the damages according to law;

4.      Costs incurred in this action;

5.      Reasonable attorneys' fees incurred in the action; and

6.    Any other and further relief as this Court considers just and proper.

AS TO THE NINTH CAUSE OF ACTION FOR VIOLATION OF GEORGIA'S RICO ACT:

1.    Compensatory damages;

2.    Treble damages;

3.    Interest on the damages according to law;

4.    Costs incurred in this action;

5.    Reasonable attorneys' fees incurred in the action;

6.    Punitive and exemplary damages; and

7.    Any other and further relief as this Court considers just and proper.

AS TO THE TENTH CAUSE OF ACTION FOR VIOLATIONS OF THE LANHAM ACT:

1.    That a preliminary and permanent injunction issue restraining and

enjoining Defendant, as well as its officers, agents, attorneys, directors,

employees and those acting in privity or in concert therewith, from directly or

indirectly making false or misleading descriptions or representations regarding

their goods and services;

2.    Disgorgement of Defendant's profits from the sale of its Base Software;

3.    Compensatory damages;

4.    Interest on the damages according to law;

5.    Costs incurred in this action;

6.    Reasonable attorneys' fees incurred in the action; and

7.    Any other and further relief as this Court considers just and proper.

AS TO THE ELEVENTH CAUSE OF ACTION FOR VIOLATION OF GEORGIA'S
UNIFORM DECEPTIVE TRADE PRACTICES ACT:

1.     That a preliminary and permanent injunction issue restraining and
enjoining Defendant, as well as its officers, agents, attorneys, directors, employees and
those acting in privity or in concert therewith, from directly or indirectly making false or
misleading descriptions or representations regarding their goods and services;

2.     Costs incurred in this action;

3.     Reasonable attorneys' fees incurred in the action; and

4.     Any other and further relief as this Court considers just and proper.

AS TO THE TWELFTH CAUSE OF ACTION FOR UNFAIR COMPETITION:

1.     Disgorgement of Defendant's profits from the sale of its Base Software;

2.     Compensatory damages;

3.     Interest on the damages according to law;

4.     Costs incurred in this action;

5.     Punitive and exemplary damages; and

6.     Any other and further relief as this Court considers just and proper.

AS TO THE THIRTHEEN CAUSE OF ACTION FOR UNJUST ENRICHMENT AND
CONSTRUCTIVE TRUST:

1.     Return of all monies paid to Defendant in the amount of One Million One
Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen
Cents ($1,147,726.13);

2.     A constructive trust for all monies paid by TRI-STATE to Defendant in
the amount of One Million One Hundred Forty-Seven Thousand Seven Hundred
Twenty-Six Dollars and Thirteen Cents ($1,147,726.13);

3.   Compensatory damages;

4.   Interest on the damages according to law;

5.   Costs incurred in this action;

6.   Any other and further relief as this Court considers just and proper

PIERCE & DUNKELBERGER

*Wayne Pierce*

J. Wayne Pierce
Georgia Bar No. 579250
Attorney for Plaintiff, Tri-State
Consumer Insurance Company, Inc.

Building G, Suite 200
6111 Peachtree-Dunwoody Road
Atlanta, Georgia 30328
Ph:  (770) 817-8500
Fax: (770) 817-8504

## CERTIFICATE OF SERVICE

The undersigned certifies that he has this day served a copy of the foregoing **FIRST AMENDED COMPLAINT** by depositing a copy of same in the United States mail, postage prepaid and addressed to:

> Jill A. Pryor
> Randi E. Schnell
> Kamal Ghali
> Bondurant, Mixon & Elmore, LLP
> 1201 West Peachtree Street NW
> Suite 3900
> Atlanta, GA 30309

This _25_ day of March, 2011.

_J. Wayne Pierce_
J. Wayne Pierce