

**SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

TRI-STATE CONSUMER INSURANCE )
COMPANY, INC., )
)
     Plaintiff, )
)     Civil Case No.: 2011-CV-195485
v. )     Hon. Jerry W. Baxter
)
LEXISNEXIS RISK SOLUTIONS, INC., )
Formerly Known as ChoicePoint Services, )
Inc., Survivor Entity of its Merger with )
Insurity, LLC a/k/a "Insurity", )
)
     Defendant. )

### PLAINTIFF TRI-STATE CONSUMER INSURANCE COMPANY, INC.'S RESPONSE IN OPPOSITION TO DEFENDANT LEXISNEXIS RISK SOLUTIONS, INC.'S MOTION TO DISMISS AND BRIEF IN SUPPORT

COMES NOW Plaintiff TRI-STATE CONSUMER INSURANCE COMPANY, INC. and files and serves this, its Response in Opposition to Defendant LEXISNEXIS RISK SOLUTIONS, INC.'s Motion to Dismiss and Brief in Support, showing this Honorable Court the following:

**I.**      **STATEMENT OF FACTS**

On or about January 21, 2011, Plaintiff Tri-State Consumer Insurance Company, Inc. filed its Complaint as a result of the failure of Defendant LexisNexis Risk Solutions, Inc. (hereafter "Lexis") to deliver a functioning software product, as agreed upon in the Master Agreement ("Master Agreement") and Schedule: Software & Services ("Schedule"). Attached hereto as Exhibit A is a true and correct copy of the Master Agreement. Attached hereto as Exhibit B is a true and correct copy of the Schedule. Tri-State alternatively asserts that no contract legally existed which can be enforced, due to uncertainty, and Lexis has been unjustly enriched as a result. Further, Tri-State also alternatively asserts, by its amended complaint, that Lexis fraudulently induced it to enter

into an agreement resulting in rescission.

Under the Master Agreement and Schedule, Lexis agreed to license, customize, develop, deliver, integrate and implement its "Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions" (hereinafter "Base Software") to and/or for Tri-State. (See Exhibit B attached hereto, Paragraph 6 of the Schedule.) Lexis further represented that its Base Software would support New York insurance issues and would also support Plaintiff's personal auto, homeowners' and personal umbrella lines of business. (See Exhibit B attached hereto, Paragraph 6(b) of the Schedule.) Lexis also represented that the Base Software would support all of the following for Tri-State's personal auto, homeowners and personal umbrella lines of business: (a) New Business Quote/Issue; (b) Renewal Quote/Issue; (c) Endorsement; (d) Cancel; (e) Reinstatement; (f) View and Reprint Documents; (g) Non-Renewal; (h) Out-of-Sequence Change Endorsement Processing; and (i) Rewrites. (See Exhibit B attached hereto, Paragraph 6(c) of the Schedule.)

Pursuant to the Master Agreement and Software & Services Schedule, this Base Software was to be implemented as part of the Implementation Services and was to include a Consumer User Interface and Agent User Interface and a batch print administration, as well as the following standard customization items at no additional cost to Tri-State: (a) VIN Verification; (b) Interfaces for ChoicePoint CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill and ChoicePoint NY List Service. (See Exhibit B attached hereto, Paragraph 6(d) of the Schedule.)

Most importantly, the Master Agreement contained a warranty which guaranteed that the software would contain all of the features described above and would properly perform and operate in substantial conformance with all of the applicable specifications and documentation. (See Exhibit A attached hereto, § 8.1(a) of the Master Agreement.) Subsequently, Lexis also provided a full guaranty without restriction as to their software

system, including the agreed upon customizations. As referenced in the Complaint, Tri-State became aware that the final delivery of the software was being prolonged due to Lexis's delay in the development of the software. (See Complaint, ¶ 26.)

However, pursuant to Lexis's continued reassurances that the software would be developed, delivered, and implemented in a manner that would be useful and beneficial to Tri-State, Tri-State continued to perform its obligations under the Master Agreement and Schedule and made payments set forth pursuant to the contract totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13). (See Complaint, ¶¶ 28, 29.) Nevertheless, it was not until much later that Tri-State became aware that Lexis could not deliver the software by any means as promised in the Master Agreement and Schedule, as well as the subsequent agreement and promises. To date, Tri-State still cannot even access, let alone utilize, any portion of the promised software on its system. (See Complaint, ¶ 34.)

Contrary to assertions in the Motion to Dismiss, Tri-State does not contend that it initiated this action a result of any delay in the delivery of the software; rather, the Complaint is based on the fact that LEXIS failed to deliver the software at all. As such, by way of its Complaint, Tri-State seeks to recover the sums paid to Lexis, as Tri-State did not receive anything of value in exchange for the One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) paid to Lexis in exchange for a functional system.

Tri-State's claims are asserted, as permissible, based upon alternative theories: First, that Lexis breached the contract with Tri-State, to the extent a contract existed. Second, that no enforceable contract existed and Lexis has been unjustly enriched as a result.

EXHIBIT G - 3

## II. PLAINTIFF'S CLAIMS FOR RELIEF SHOULD NOT BE DISMISSED.

"On a motion to dismiss, a complaint should be construed in the light most favorable to plaintiff with all doubts resolved in his favor ... The plaintiff is entitled to the most favorable inferences that can be reasonably drawn from the complaint, even if contrary inferences are also possible ... The motion to dismiss should not be granted unless the averments in the complaint disclose with certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of his claim. (Citations omitted)." *Western Contracting Corp. v. State Highway Dept.* 125 Ga.App. 376, 379 (1972).

As set forth below, the facts alleged in both the Complaint and First Amended Complaint do not disclose with certainty that Tri-State would not be entitled to any relief. As such, Tri-State respectfully requests the Court deny Lexis's Motion to Dismiss.

### A. Even if An Enforceable Contract Exists in the Form of the Master Agreement and Software Schedule, Tri-State's Action is Not Barred by the Master Agreement's Warranty Provisions One-Year Contractual Limitation on Bringing Claims.

Lexis erroneously asserts that the Complaint, in its entirety, is barred by the Master Agreement's one-year "Limitation on Time for Bringing Actions", which states in pertinent part: "No action...may be brought more than one (1) year after a **party knew or should have known of the occurrence of the event giving rise to such cause of action**." (See Exhibit A attached hereto, Master Agreement, § 8.5. Emphasis added.) Lexis relies on a May 18, 2009 email from Peter Kardas to Michelle Piotrowski referenced in the Complaint for its assertion.

#### 1. The May 18, 2009 email from Peter Kardas to Michelle Piotrowski does not start the clock on any limitation period.

Lexis asserts that the clock on the contractual limitation period began on May 18, 2009, when Peter Kardas, Project Manager for Plaintiff, emailed Michelle Piotrowski,

4

Project Manager for Defendant: "The only thing I can surmise is that your dev was late, thus your QA was late, thus I wasn't being given an accurate information on the status of Insurity's development of TSC software." (See Motion to Dismiss, Pg. 9, referencing Complaint, ¶ 26.)

Lexis points to this email for the proposition that Tri-State was aware of the grounds for all of the claims it alleges in its Complaint. However, Lexis erroneously assumes that the grounds for the claims alleged in the Complaint are based on Defendant's <u>delay</u> in the delivery of the software. Instead, the crux of Tri-State's Complaint lies in the fact that Lexis <u>failed to deliver the software by any means</u> as promised in the Master Agreement and Schedule. (See Complaint, ¶¶ 11, 17, 34, 43, 45, 55.) As such, the May 18, 2009 email relied on in support of Lexis's Motion to Dismiss only expresses that Tri-State was questioning whether Lexis's delivery of the software would be further delayed – nothing in the email states that Tri-State was yet aware, or should have been aware, that Lexis <u>could not</u> deliver a properly functioning software product at all. Further, any inferences that can be drawn from this email must be construed in the light most favorable to Tri-State with all doubt resolved in its favor. Such is true even if contrary inferences are also possible. *Western Contracting Corp* 125 Ga.App. at 379 (1972).

Pursuant to the Master Agreement's "Limitation on Time for Bringing Actions" upon which Lexis now relies, the one-year contractual limitation period begins when Tri-State knew or should have known of Lexis's failure to deliver a software product that performed the material functions set forth within the intended project scope and operated in substantial conformance with all of the applicable specifications and documentation as agreed upon in the Master Agreement and Schedule. In this instance, Tri-State was unaware of Lexis's inability to deliver such a software product until well after the May 18, 2009 email because Lexis continued to make reassurances that the software would be developed, delivered, and implemented in a manner that would be useful and beneficial

5

EXHIBIT G - 5

to Tri-State.  (See Complaint, ¶¶ 12, 13, 14, 23, 28.)  These reassurances even included a full unlimited guaranty of complaint software delivery in a specified time period in order to nullify any concerns Tri-State may have had.   As a result, Lexis made misrepresentations to Tri-State and intentionally omitted and withheld material information from Tri-State regarding the capabilities, functionalities, and performance of the subject software.  (See Complaint, ¶28.)  These misrepresentations were relied on by Tri-State at the time because they did not yet know them to be false.

Hence, even if applicable, the contractual limitation period did not expire prior to filing of the Complaint and, consequently, does not bar Tri-State from litigating its Complaint against Lexis.

## 2.   Lexis's interpretation of the one-year contractual limitation period is inconsistent with the Master Agreement and Schedule.

The interpretation and application of the one-year contractual limitation period urged by Lexis in its Motion to Dismiss would result in inconsistency and conflict between it and other clauses appearing in the Master Agreement and Schedule.  Hence, such an interpretation should not be adopted by this Court.

In construing the contract, it is incumbent upon the Court to look at the contract as a whole in arriving at the construction of any part.  *Western Contracting Corp. v. State Highway Dept.* 125 Ga.App. at 381 (1972).  The cardinal rule of construction is to ascertain the intention of parties.  *O.C.G.A. § 13-2-3.*   In so doing, the court should ascertain the parties' intent after considering the whole agreement and interpreting each provision so as to harmonize with the others.  *Friedman v. Friedman* 259 Ga. 530, 532. The court must also look to the substantial purpose of the contract which must be supposed to have influenced the minds of the parties rather that at the details of making such purpose effectual.  *Id.* at 532-533.  Further, in construing a contract, the court must put a fair and reasonable construction thereon and avoid an interpretation of the contract which renders portions of the language of the contract meaningless.  *Smiths' Properties,*

6

*Inc. v. TRM Enters., Inc.* 160 Ga. App. 102; *Etowah Valley Sporting Clay Park, LLC v. Dawson County* 294 Ga. App. 586, 589.

In interpreting and applying the contractual limitations period as requested by Lexis, the court must look also to other provisions in the Agreement and harmonize them so as to effectuate the intent of the parties. Here, Paragraph 6 of the Schedule explicitly promises that "[Defendant] will deliver the Base Software for Policy Decisions, Billing Decision, and Reporting Decisions" with the specifications provided in Paragraph 6, Subsections (a) through (f). (See Exhibit B attached hereto, Paragraph 6 of the Schedule. Emphasis added.) However, and more importantly, §§ 8.3 and 10.3(a) of the Master Agreement and Paragraph 9(b) of the Schedule require Tri-State to provide Lexis with an opportunity to cure any defects that occur in the software. Yet, none of these clauses places a time limit on Lexis to cure said defects but purports to leave it solely to the discretion of Lexis. Thus, essentially, Lexis could take months or years to attempt to cure the software defects as occurred here, thereby rendering it impossible for Tri-State to comply with the contractual limitations period by bringing its claims within the one-year period while complying with the opportunity to cure provision. Under Lexis's urged interpretation of the contractual limitations period, it could unilaterally prevent Tri-State from ever bringing claims on the contract within the one-year contractual limitation period without forcing Tri-State into breaching the opportunity to cure provisions of the contract. Conversely, Lexis could use its discretionary cure period in order to avoid liability for its breach by delaying until the limitations period expired, as it did here.

Here, Lexis attempted to cure the software defects for well over one year and, to date, has been unable to deliver a functional, marketable, or stable product that is useful to Plaintiff in any way. (See Complaint, ¶ 34.) Lexis now seeks to capitalize on its inability to perform under the contract by curing the defects in the software by asserting that the contractual limitations period ran before its cure period expired. By entering into an agreement providing for a cure period, it is self evident that the intent of the

7

parties was to provide Lexis an opportunity to cure any defects in the software <u>prior to</u>
Tri-State running to court to seek redress for Lexis's breach of the contract.   This
interpretation takes into account the substantial purpose of these provisions which must
have influenced the minds of parties at the time they entered into the contract.  Any other
interpretation of the contractual limitations provision would fail to harmonize the
opportunity to cure provisions of the agreement and, thus, would not effectuate the intent
of the parties.

Lexis's interpretation of the contractual limitations period fails to harmonize the
agreement as a whole and fails to account for the intent of the parties.  As such, under
Georgia's long standing rules of contract interpretation, Lexis's urged interpretation of
the agreement should be disregarded.

To the extent the court concludes that these provisions create any ambiguity, such
provisions must be interpreted against Lexis, the drafter of the Agreements.  *C.A. May
Marine Supply Co. v. Brunswick Corp.*  557 F.2d 1163, 1165 (1977).

> Ambiguity is defined as duplicity, indistinctness, an
> uncertainty of meaning or expression used in a written
> instrument, and [it] also signifies . . . doubtful or uncertain
> nature;  wanting clearness or definiteness; difficult to
> comprehend or distinguish; of doubtful purport; open to
> various interpretations.
> *Holcim (US) Inc. v. AMDG, Inc.* 265 Ga. App. 818, 820
> (*citing, Early v. Kent* 215 Ga. 49, 50 (1959).

If any ambiguity remains after attempting to ascertain the intent of the parties,
harmonizing the provisions of the agreement, and construing such ambiguities against the
drafter, which the court cannot resolve, the issue of what the ambiguous language means
and what the parties intended must be resolved by a jury.  *Id.* Any such uncertainty
warrants denial of the Motion to Dismiss.

### 3. The one-year contractual limitation period does not apply to Tri-State's claims to terminate the contract under Paragraph 5(e) of the Schedule under any interpretation.

Paragraph 5(e) of the Schedule provides that Tri-State shall have the one-time option of terminating the contract without penalty. (See Exhibit B attached hereto, Paragraph 5(e) of the Schedule.) The clause allows Tri-State to terminate the contract for any reason as long as it is based on a material issue.

In the case at hand, the one-year contractual limitation period provision does not apply to Tri-State's right to terminate the contract without penalty under the express provisions of the Agreement. The one-year time limitation applies to claims arising out of the performance or nonperformance of any of the parties' obligations under the contract. (See Exhibit A attached hereto, § 8.5 of the Master Agreement.) However, since Paragraph 5(e) of the Schedule allows Tri-State to terminate the contract for any material reason, regardless of the performance or nonperformance of the parties, the one-year contractual limitation period does not bar Tri-State's claim arising from its right to terminate the contract.

### 4. The one-year contractual limitation period only applies to warranty claims.

The one-year limitation period clause appears in § 8 of the Master Agreement entitled "Warranties and Limitation of Liability", rather than appearing under § 12 of the Master Agreement entitled "General". As such, a reasonable interpretation of that the one-year contractual limitation period is that it only applies to warranty claims under Section 8. Had the parties intended the one-year contractual limitation period to apply to all claims, the provision would have appeared in § 12 of the Master Agreement, where the general provisions applying to the entire agreement appear. In construing a contract, the court should look to both the paragraph heading and the text to determine the intent of the parties. *Donchi, Inc. v Robdol, LLC* 283 Ga. App. 161, 164 (2007). Thus, the one-

9

year contractual limitation period, at best, only applies to warranty claims.

### 5. The one-year contractual limitation does not apply to warranties made by a written and signed agreement after the original contract was executed.

In August 2009, the parties modified the contract, or entered into a new contract, in a signed and written agreement in which Lexis explicitly guaranteed its performance under the Master Agreement and Schedule to Tri-State by promising that Lexis would deliver the Base Software to Tri-State in a completed and functional form as contemplated and required by the contract in two phases.    (See First Amended Complaint, ¶¶ 70, 79.) Lexis guaranteed that all Phase 1 software would be delivered in a complete and functional form by November 19, 2009 and all Phase 2 software and services by January 21, 2010. *Id.* The parties further agreed that Tri-State did not have to pay the entire remaining balance due under the contract unless Lexis performed by these timelines as promised and guaranteed. *Id.*

As stated above, because the one-year contractual limitation period only applies to the limited warranty appearing § 8 of the Master Agreement, it does not apply to the subsequent warranties made by Lexis by a separate writing.   As such, the one-year contractual limitation period does not bar Tri-State from bringing its warranty claims for breach of the warranties made after the initial Master Agreement and Schedule were executed.

### 6. The one-year contractual limitation period does not apply to the warranties made in Paragraph 6 of the Schedule.

As previously discussed above, Paragraph 6 of the Schedule explicitly warrants that Lexis would deliver to Tri-State the Base Software containing certain specifications and capabilities.   However, nowhere in Paragraph 6 of the Schedule, is there a clause limiting the time during which Tri-State must bring suit against Lexis for breach of the warranties appearing in said paragraph.

10

Paragraph 11 of the Schedule states in pertinent part: "In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail." Similarly, § 12.1 of the Master Agreement states in pertinent part: "In the event and to the extent of any conflict between a term of this Master Agreement and that of the Schedule, the term of the Schedule, to the extent necessary to resolve the conflict, shall control."

Consequently, since Paragraph 6 of the Schedule does not limit the time in which Tri-State must bring suit for the warranties in the Schedule and the Schedule controls over the Master Agreement, the one-year contractual limitation period appearing in the Master Agreement does not apply. Thus, Tri-State cannot be barred by the contractual limitation period from brining its warranty claims against Lexis.

> **7. The one-year contractual limitation period does not bar Tri-State's claims because the contract is void for lack of certainty and failure of the meeting of the minds.**

As discussed in further detail below, the Complaint alleges that no contract exists because there was no meeting of the minds between the Tri-State and Lexis and the terms of the contract are fatally uncertain. (See Complaint, ¶ 22.) Thus, because the contract is void, the one-year contractual limitation period contained within it is unenforceable. As a result, Tri-State's claims are not barred by the unenforceable one-year contractual limitation period.

> **B. Plaintiff's Unjust Enrichment Claim is Not Barred by the Parties' Agreements.**

Lexis contends that Tri-State's claim for unjust enrichment must be dismissed because unjust enrichment applies only when there is no legal contract. (See Motion to Dismiss, Pg. 17.) However, Tri-State is entitled to plead such a claim, as it alleges its claim for unjust enrichment as an alternative theory of recovery to its breach of contract claim. (See Complaint, ¶ 55.)

11

*Official Code of Georgia Annotated* ("O.C.G.A.") § 9-11-8(e)(2) expressly provides: "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them, if made independently, would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both."

Consequently, a complaint which contains alternative statements of claims will not be dismissed if any one alternative statement supports the claim. *Hodges v. Youmans*, 120 Ga.App. 805, 809 (1969); *Utica Mut. Ins. Co. v. Kelly & Cohen*, 233 Ga.App. 555, 556 (1998) ("Such alternative pleading is expressly authorized by O.C.G.A. § 9-11-8 (e) (2), regardless of any inconsistencies that may exist between the two causes of action."). In fact, it is common practice to file inconsistent pleadings and it is perfectly acceptable under the law to do so. *City of Waycross v. Beaty*, 157 Ga.App. 765, 767 (1981). Moreover, a plaintiff has the right to try cases on alternate theories, and cannot be required to elect upon which theory to proceed. *D.H. Overmyer Co. v. Kapplin*, 122 Ga.App. 51, 53 (1970).

Accordingly, Tri-State is entitled to remain in court under its pleading whereby Count One proceeds upon a claim for unjust enrichment and Count Five is based upon a claim for breach of contract. It then depends upon the facts produced at the trial for a determination as to whether the proof presented is sufficient to prove a case under any of the theories contained in the complaint. *Matthews v. Greiner*, 130 Ga.App. 817, 821 (1974). Contract existence is a question of fact for a jury. *Terry Hunt Consr., Inc. v. AON Risk Servs.* 272 Ga. App. 547, 551. This alone should defeat the Motion to Dismiss.

Therefore, because Tri-State alleges its claims for unjust enrichment and breach of contract as alternative theories of recovery, the Complaint cannot be dismissed and the

12

Court must deny Lexis's Motion to Dismiss.

### C. Tri-State's Breach of Warranty Claims are Not Barred by the Master Agreement's Disclaimer and Limitations of Warranties.

Lexis contends that Tri-State's breach of warranty claims are barred by the "Disclaimer of Warranties", found in § 8.2 of the Master Agreement, and the "Exclusive Remedy" provision, found in § 8.3 of the Master Agreement. However, it is well-established that when a contract essentially bars all remedies, the exclusion of warranties is unconscionable and, therefore, is unenforceable. *Esquire Mobile Homes, Inc. v. Arrendale*, 182 Ga.App. 528, 529-530 (1987).

"The parties to a contract subject to the UCC [*Uniform Commercial Code*] may provide for remedies in substitution for those provided by the UCC, and may limit the measure of damages. *O.C.G.A.* § 11-2-719(1)(a); *Esquire Mobile Homes, Inc., supra,* 182 Ga.App. 528 at 529; *Freeman v. Hubco Leasing, Inc.*, 253 Ga. 698, 705. However, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title. *O.C.G.A.* § 11-2-719(2); *Esquire Mobile Homes, Inc., supra,* 182 Ga.App. 528 at 529; *Freeman, supra,* 253 Ga. 698 at 705.

The Official Comment to *O.C.G.A.* § 11-2-719 states:

> "[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article, *they must accept the legal consequences that there be at least a fair quantum of remedy for breach* of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), *where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provision of this Article.*

13

(Emphasis supplied.)"

*Esquire Mobile Homes, Inc.*, *supra*, 182 Ga.App. 528 at 529-530; *Freeman*, *supra*, 253 Ga. 698 at 705.

### 1. The "Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement were incorporated to limit Lexis's liability.

In the case at hand, the Master Agreement and Schedule are subject to the UCC because they are contracts to provide certain computer services, including software, which constitute a sale of goods within the province of the *Uniform Commercial Code*. *Richard Haney Ford, Inc. v. Ford Dealer Computer Services*, 218 Ga.App. 315, 316 (1995).

Further, it is obvious that Lexis attempted to limit its damages by incorporating the "Disclaimer of Warranties" and "Exclusive Remedy" provisions into the Master Agreement. The "Disclaimer of Warranties" provisions disclaim any and all implied and express warranties (excluding the limited warranty made in § 8.1 of the Master Agreement). (See Exhibit A attached hereto, § 8.2 "Disclaimer of Warranties" of Master Agreement.) The "Exclusive Remedy" provision of the Master Agreement provides that Lexis's sole liability and Tri-State's sole remedy for any breach of Lexis's limited warranty is either:

(i)    Correction or replacement of the nonconforming parts of the Software, or

(ii)    A refund of all amounts paid by Tri-State to Lexis for any portions of the Software that do not conform to the limited warranty.

This provision further states that either of these remedies are at Lexis's sole option. (See Exhibit A attached hereto, § 8.3 "Exclusive Remedy" of Master Agreement.)

14

2. **"Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement effectively bar Tri-State from all remedies, thereby, failing of their essential purpose.**

However, it is abundantly clear that the circumstances surrounding Lexis's inability to deliver a functioning software system pursuant to the Master Agreement and Schedule have caused the "Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement to fail of their essential purpose.

The allegations of the Complaint demonstrate that the first option under the "Exclusive Remedy" provision, which allows for correction or replacement of any nonconforming parts of the software, is unfeasible because Lexis's failure to deliver a properly functioning software product to Tri-State to this day has proven that Lexis cannot rectify the issues with the software. (See Complaint, ¶¶ 11, 17, 34, 43, 45, 55.)

Moreover, Lexis argues in its Motion to Dismiss, that the contract provides that Tri-State cannot be granted relief under the second option of the "Exclusive Remedy" provision that allows for a refund because "Plaintiff is...not entitled to monetary damages in the form of a refund for a breach of the express warranty." (See Motion to Dismiss, Pg. 20.) As a result, in conjunction with the "Disclaimer of Warranties" provision of the Master Agreement, Tri-State is left without any remedies under the contract.

3. **The limitation of remedies provided in the "Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement is unconscionable and subject to deletion from the contract.**

The Official Comment to *O.C.G.A.* § 11-2-719, as cited above, clearly speaks to the circumstances appearing in this action. Although Lexis may have intended for the "Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement to limit its damages, these provisions have, by Lexis's own assertions, in effect, barred Tri-State from any remedies under the contract. When a plaintiff is barred

15

from all remedies under the contract, those clauses that limit the plaintiff's remedies are unconscionable and subject to deletion from the contract. *Esquire Mobile Homes, Inc.*, *supra*, 182 Ga.App. 528 at 529-530; *Freeman, supra*, 253 Ga. 698 at 705.

Consequently, the "Disclaimer of Warranties" and "Exclusive Remedy" provisions of the Master Agreement, which purport to limit Tri-State's remedies and Lexis's damages, are unconscionable because they leave Tri-State without any remedies. Thus, the "Disclaimer of Warranties" and "Exclusive Remedy" provisions must be stricken from the contract as if they had never existed. By doing so, Tri-State is entitled to bring its breach of warranty claims in its Complaint and seek monetary damages for a refund of monies paid to Lexis and any other damages provided by the *Uniform Commercial Code.*

**D. Tri-State's Claims for Breach of Warranties, New York Deceptive Practices, and Unjust Enrichment are Not Barred Because the Contract is Invalid Since There was No Meeting of the Minds and the Contract Fails for Uncertainty.**

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." *O.C.G.A.* § 13-3-1. Each of these essential terms must be certain. *Gill v. B & R Int'l*, 234 Ga.App. 528, 531 (1998); *Laverson v. Macon Bibb County Hosp. Auth.*, 226 Ga.App. 761, 762 (1997). The requirement of certainty extends not only to the subject matter and purpose of the contract, but also to the parties, consideration, and even the time and place of performance where time and place are essential. *Id.* If terms and conditions are left to future negotiations, the requisite meeting of the minds is absent and no contract is formed. *Dumas v. First Federal Savings and Loan Assoc.* 654 F.2d 359, 360 (1981). An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto. *Hartrampt v. Citizens & Southern Realty Investors* 157 Ga. App. 879

16

(1981).

Further, "[t]he concept of a contract requires that the minds of the parties shall meet and accord at the same time, upon the same subject-matter, and in the same sense. In the absence of this meeting of the minds, there was no contract between the alleged contracting parties." *Amwest Sur. Ins. Co. v. Ra-Lin & Assoc.*, 216 Ga.App. 526, 530 (1995). Additionally, determination as to contract existence is a question of fact for a jury sufficient to defeat a Motion to Dismiss. *Terry Hunt Consr., Inc. v. AON Risk Servs.* 272 Ga. App. 547, 551.

In the instant action, the Complaint plainly alleges that there was no meeting of the minds between Tri-State and Lexis and the terms of the contract are uncertain: "Essential elements were not defined or agreed to either in the 'agreement' or 'schedule.' Nor were there sufficient details agreed to which would permit the determination of a time for delivery of ether the 'base software' as set forth within the 'schedule' or any of the individual elements comprising the 'base software' as set forth within the 'schedule.' (See Complaint, ¶ 22.) By Lexis's own admission, the Agreement was nothing more than an agreement to agree at a later time.

Moreover, § 1.2 of the Master Agreement defines the "Agreement" as the "Master Agreement together with such Schedule, and any and all exhibits hereto and thereto." (See Exhibit A attached hereto, § 1.2 of the Master Agreement.) The Schedule further includes the contents of the Client Requirement Book (CRB) as terms to be incorporated within the contract. Paragraph 5 of the Schedule states that the CRB will detail Plaintiff's business needs that fall within the scope of the project. (See Exhibit B attached hereto, Paragraph 5(a) of the Schedule.) Once the CRB is completed, the CRB is to become the specifications for Lexis's programming efforts. (See Exhibit B attached hereto, Paragraph 5(c) of the Schedule.) In addition, the CRB will document the forms to be delivered as a part of the initial deliverable and document the final pricing. (See Exhibit B attached hereto, Paragraph 5(d) of the Schedule.) However, no such CRB was ever

completed and agreed upon, thereby leaving material terms of the contract (i.e., project specifications, forms to be delivered as a part of the initial deliverable, and final pricing) undefined and uncertain.

In addition, as stated above, the Master Agreement provides that Lexis's sole liability and Tri-State's sole remedy for any breach of Lexis's limited warranty is either:

(iii)    Correction or replacement of the nonconforming parts of the Software, or

(iv)    A refund of all amounts paid by Tri-State to Lexis for any portions of the Software that do not conform to the limited warranty.

This provision further states that either of these remedies are at Lexis's sole option. (See Exhibit A attached hereto, § 8.3 "Exclusive Remedy" of Master Agreement.)    The Software Schedule further provides a  litany of agreements to agree which, again, are subject to the sole discretion of Lexis (ie., whether competent individuals have been assigned to the project by Tri-State; whether those individuals are committing adequate resources; etc.)

Where a contract specifies conditions which may be accepted or refused in the discretion of one of the contracting parties, they do not constitute a binding contract between the parties. *Charter Investment & Development Co. v. Urban Medical Service, Inc.* 136 Ga. App. 297 (1975).   The Agreement provides for a litany of terms and conditions upon which Lexis held sole discretion.

As a result, the subject matter of the contract lacks the requisite certainty, thereby preventing the parties from having a common understanding and meeting of the minds as to material terms of the contract.   Without the necessary meeting of the minds and certainty of the terms, the contract, as a whole, is unenforceable. This renders the following provisions, among others, contained in the Master Agreement void:

- Section 8.2: "Disclaimer of Warranties" whereby Lexis purportedly disclaims all implied and express warranties (except for the limited warranty in Section 8.1 of the Master Agreement);

18

- Section 8.3: "Exclusive Remedy" whereby Lexis purportedly limits Tri-State's remedies to either a correction/replacement of the nonconforming portions of the software or a refund of the nonconforming portions of the software (both at the sole discretion of Lexis);

- Section 8.4: "Limitation of Liability" whereby Lexis purportedly limits its liability to the fees actually paid by Tri-State;

- Section 8.5: "Limitation on Time for Bringing Actions" whereby Tri-State purportedly must bring its claim within one year of when it knew or should have known of the circumstances arising from its Complaint; and

- Section 12.8: "Governing Law" whereby the contract is purportedly governed by the laws of the State of Georgia.

Lexis asserts that Tri-State is barred from bringing its claim for unjust enrichment because said claim only applies when there is no legal contract. (See Motion to Dismiss, Pg. 17.) As previously discussed, Tri-State is entitled to state separate claims, regardless of consistency, as alternative theories of recovery. [*O.C.G.A.* § 9-11-8(e)(2); *Hodges v. Youmans*, 120 Ga.App. 805, 809 (1969) (A complaint which contains alternative statements of claim will not be dismissed if any one alternative statement supports the claim; *Utica Mut. Ins. Co. v. Kelly & Cohen*, 233 Ga.App. 555, 556 (1998) ("Such alternative pleading is expressly authorized by O.C.G.A. § 9-11-8 (e) (2), regardless of any inconsistencies that may exist between the two causes of action.")]. However, the Complaint clearly alleges that no valid contract exists because there was no meeting of the minds and it lacks certainty in its terms. (See Complaint, ¶ 22.) Therefore, Tri-State cannot be barred from bringing its claim for unjust enrichment.

Moreover, Lexis claims that the above-referenced provisions bar Tri-State from bringing its other claims, including its breach of warranty claims and New York Deceptive Practices claim. However, without being able to enforce the contract and said provisions contained therein (i.e., disclaimer of warranties, Tri-State's exclusive remedy,

19

Lexis's limitation of liability, the one-year contractual limitation period, and the State of Georgia choice of law provisions), Tri-State cannot be barred from all of the claims alleged in its Complaint.

### E. Tri-State's Claims are Not Barred by the Voluntary Payment Doctrine.

Lexis asserts that Tri-State's claims are barred by the voluntary payment doctrine because Tri-State cannot show that the payment was not due and that the money was not paid by Tri-State voluntarily. (See Motion to Dismiss, Pg. 22.) Lexis further contends that voluntary payment of claims may only be recoverable by showing that Tri-State was induced by fraud. *Id.*

However, Lexis misstates the law. The voluntary payments doctrine is codified in *O.C.G.A.* § 13-1-13, which states in pertinent part: "Payments of claims made through ignorance of the law of **where all facts are known** and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property." (Emphasis added.)

As such, the following three conditions must be met before recovery of payment is barred by the voluntary payment doctrine: (1) Payment must have been made through ignorance of law or where all the fact are known; (2) Payment must not have been induced by misplaced confidence, artifice, deception, or fraudulent practice on the part of the person to whom the money is paid; and (3) The payment must not have been made under an urgent necessity or for the other reasons specified in the statute. *Cotton v. Med-Cor Health Information Solutions, Inc.*, 221 Ga.App. 609, 611 (1996).

#### 1. Payment was made without the knowledge of all material facts.

"[T]he voluntary payment doctrine does not bar recovery by the payor where the payor lacked knowledge of material facts and the means to obtain that knowledge." *Robbins v. Scana Energy Marketing, Inc.*, No. 1:08-CV-640, 2008 U.S. Dist. LEXIS

108917, at 18 (N.D. Ga. June 13, 2008).

In the instant case, Tri-State made payments totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) to Lexis without knowledge of the material fact that Lexis would be unable to deliver a fully functioning and operating software product as promised under the Master Agreement and Schedule. The Complaint clearly demonstrates Tri-State's lack of knowledge of such facts wherein it states "Defendant Insurity and its employees and agents materially misrepresented to Plaintiff and intentionally omitted and withheld material information from Plaintiff and its employees and agents regarding the capabilities, functionalities and performance of its proprietary Software as they attempted to modify it for the benefit and use of Plaintiff." (See Complaint, ¶ 28.)

Further, Tri-State lacked the means to obtain the knowledge that Lexis would be unable to deliver a fully functioning and operating software product as promised under the Master Agreement and Schedule because only Lexis had such knowledge. According to the Complaint, Lexis conducted a "Requirements Assessment" to determine whether Lexis's software product would satisfy Tri-State's known requirements. (See Complaint, ¶ 24.) Although Lexis knew that its software would not or could not satisfy Tri-State's known requirements, Lexis failed to divulge that information to Tri-State. (See Complaint, ¶¶ 25, 26, 28.) As a result, Tri-State had no means of knowing that Lexis could not deliver its software product to Tri-State.

Since the first condition set forth above was not met because Tri-State made payments to Lexis without the knowledge of the material fact that Lexis could not deliver a functioning software product, recovery of payment is not barred by the voluntary payment doctrine.

### 2. Payment was induced by misplaced confidence.

Although Tri-State has already shown that the first condition to barring recovery of payments is not met, Tri-State can also demonstrate that the second condition is also

not met; In order for recovery of payment to be barred under the voluntary payment doctrine, payment must not have been induced by misplaced confidence. *Cotton, supra,* 221 Ga.App. 609 at 611; *Goldstein v. Home Depot U.S.A, Inc.,* 609 F.Supp.2d 1340, 1346 (2009) (The store's guarantee of a quality, reliable, and professional installation of each dryer that the store sold provided material facts supporting the misplaced confidence exception to the voluntary payment doctrine.)

In the case at hand, Tri-State's payments to Lexis were clearly induced by misplaced confidence. The "Limited Warranty" provision of the Master Agreement warrants that the subject software "contains all of the features described in, shall perform all of the material functions set forth in, and shall operate in substantial conformance with, its applicable Specifications and Documentation..." (See Exhibit A attached hereto, § 8.1 of the Master Agreement.)

Moreover, the Complaint plainly alleges that Tri-State made payments to Lexis totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) "[i]n anticipation of and with the expectation that the Defendant would develop, deliver, and implement the 'software' to Tri-State in a manner which would be useful in its business..." (See Complaint, ¶ 29.) As a result, Tri-State's payments to Lexis were induced by Tri-State's misplaced confidence in Lexis's warranty.

Therefore, Tri-State's lack of knowledge of the material fact that Lexis would be unable to deliver a fully functioning and operating software product and its misplaced confidence in Lexis's warranty do not bar Tri-State's recovery of payments made to Lexis.

### 3. Tri-State is entitled to recovery of payments made to Lexis because Lexis failed to perform under the contract.

The voluntary payment doctrine is inapplicable where the plaintiff pays the defendant an advanced fee for performing a contractual service and then sues the

defendant for failing to perform. *Broome v. Cavanaugh*, 102 Ga.App. 563, 565 (1960). As such, "[w]here the purpose for which funds were paid failed of accomplishment, the defendants cannot in good conscience retain such money, and the plaintiff is entitled to the return of such money." *Id.*

In the instant action, Tri-State made payments totaling One Million One Hundred Forty-Seven Thousand Seven Hundred Twenty-Six Dollars and Thirteen Cents ($1,147,726.13) for Lexis's services to provide Tri-State with a functional, marketable, or stable software product. However, due to Lexis's failure to perform its obligations, Tri-State is entitled to the return of said sum paid to Lexis because Lexis cannot in good conscience retrain such money when it did not deliver the software product as promised.

In addition, the contract provides for a refund of monies paid for any part of the software that is defective (See Exhibit A attached hereto, § 8.3 "Exclusive Remedy" of Master Agreement.) As such, if the contract is enforceable, the parties have contracted for refund as a remedy of Lexis's breach of the contract. Lexis, cannot, therefore, assert the voluntary payments doctrine when its own drafted contract provides for exactly that remedy.

### 4. The voluntary payment doctrine does not bar Tri-State from recovering payments made to Lexis because the contract was void.

The voluntary payment doctrine does not apply to payments made under a contract that is rendered invalid. *Cochran v. Ogletree*, 244 Ga.App. 537, 540 (2000). In *Cochran,* the parties to a contract labored under a mutual mistake of fact that there was a valid contract. *Id.* However, the contract was later voided due to vagueness. *Id.* at 538. Since the plaintiff made payments to the defendants in belief that such payment was required under the contract, the court held that the voluntary payment doctrine did not apply because the money was not due and payable under a void contract. *Id.* at 540.

Like *Cochran,* Tri-State made payments to Lexis under the initial mistake of fact that the Master Agreement and Schedule constituted a valid contract and believed that

23

said payments were required under the contract.  However, as asserted in the Complaint, the contract is void due to its uncertain terms and the fact that there was no meeting of the minds.  (See Complaint, ¶ 22.)  Because the payments are not due and payable under a void contract, the voluntary payment doctrine does not apply and, therefore, does not bar Tri-State from recovering the payments it made to Lexis.

As such, in light of these circumstances, it would be premature to dismiss Tri-State's claims based on the voluntary payment doctrine.

## III.   CONCLUSION

For the reasons stated above, the Complaint and First Amended Complaint do not disclose with certainty that Tri-State would not be entitled to any relief under the claims alleged.  As such, the Motion to Dismiss should be denied.

PIERCE & DUNKELBERGER

J. Wayne Pierce
Georgia Bar No. 579250
Attorney for Plaintiff,
Tri-State Consumer Insurance
Company, Inc.

Building G, Suite 200
6111 Peachtree-Dunwoody Road
Atlanta, Georgia 30328
Ph:  (770) 817-8500
Fax: (770) 817-8504

24

## CERTIFICATE OF SERVICE

The undersigned certifies that he has this day served a copy of the foregoing **PLAINTIFF TRI-STATE CONSUMER INSURANCE COMPANY, INC.'S RESPONSE IN OPPOSITION TO DEFENDANT LEXISNEXIS RISK SOLUTIONS, INC.'S MOTION TO DISMISS AND BRIEF IN SUPPORT** by depositing a copy of same in the United States mail, postage prepaid and addressed to:

> Jill A. Pryor
> Randi E. Schnell
> Kamal Ghali
> Bondurant, Mixon & Elmore, LLP
> 1201 West Peachtree Street NW
> Suite 3900
> Atlanta, GA 30309

This ___28th___ day of March, 2011.

_J. Wayne Pierce_
J. Wayne Pierce

25

# MASTER AGREEMENT

THIS MASTER AGREEMENT ("Master Agreement"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and, together with Vendor, referred to collectively as, the "Parties".

## WITNESSETH

**WHEREAS,** Vendor offers proprietary software and services for use in the Insurance industry. Customer desires to obtain those services, and a limited, nonexclusive and nontransferable license to that proprietary software, as more fully described herein.

**WHEREAS,** the Parties contemplate that a number of separate services and/or software programs may be provided by Vendor to Customer. Accordingly, this Master Agreement is a master of terms and conditions, which will be incorporated by reference into separate mutually agreed upon written agreements, each referred to as a "Schedule" (as more fully defined below), and each relating to specific software programs and/or services as expressly set forth therein.

**WHEREAS,** each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively. This Master Agreement, however, does not, in and of itself, grant any license rights to Customer nor does it give rise to any other rights or obligations unless and until it is incorporated by reference into one or more Schedule(s).

**NOW THEREFORE,** for and in consideration of the promises, agreements, covenants and conditions contained herein and in the Schedules, and other good and valuable consideration, the receipt and adequacy being hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1   DEFINITIONS

For purposes of this Master Agreement and each Schedule, the following terms shall be defined as follows:

1.1     <u>Affiliates</u>.  The term "Affiliates" means these entities: Tri-State Consumer, Inc.; Driver's Insurance Company; (Bender); (Sterling); (Spirit/Lighthouse); and other affiliated agency and/or broker entities which TSCIC presently does business with, or may do business with in the future. This definition of "Affiliates" shall apply to, and be incorporated into other documents referencing this Master Agreement.

1.2     <u>Agreement</u>.  The term "Agreement" means, with respect to each individual Schedule, this Master Agreement together with such Schedule, and any and all exhibits hereto and thereto.



PLAINTIFF'S EXHIBIT "A"

1.3    Authorized User The term "Authorized User" means any Affiliates, employee, contract employee or independent agent who accesses or uses the Software or Services and (a) is under the control and responsibility of Customer; (b) is authorized under Customer's license; (c) has verified they are not competing with Vendor in this or other market; in addition, the New York State Insurance Department, or some similar entity, shall be granted access to the Software or Services for the sole purpose of performing an audit, review, survey, investigation, analysis or study of Customer and/or Customer's Affiliates,.

1.4    Bureau; Bureau Materials. The term "Bureau" means any and all insurance regulatory bodies, including but not limited to ISO, NCCI and state regulatory authorities, which provides license rating and/or other information to Customer and/or to Vendor on Customer's behalf. "Bureau Materials" means any and all materials provided by any Bureau to Vendor for Customer.

1.5    CRB. The term "CRB" shall mean the "Client Requirements Book", created by Vendor and Customer, containing Customer's business needs and Vendor's resolution of those needs. The CRB shall contain the project Specifications, as further defined herein.

1.6    Customer Created Error. The term "Customer Created Error" means any improper use of the Software or any Service including, but not limited to: a) incorrect or incomplete data or input being provided for use in connection with the Software or any Service; b) any modifications to the Software made or permitted by, or at the direction of Customer; c) any use by Customer of devices or third party software which causes the Software or any Service to fail to conform to its Specifications or to perform as intended, as applicable; d) Customer's failure to promptly implement or use any Update or Mandatory Upgrade; or e) any other failure of the Software or any Service that is beyond Vendor's control.

1.7    Customer Request. The term "Customer Request" means a written request for Software or Services, which shall be submitted by Customer in the form of an Exhibit (in a form agreed upon by the Parties and attached hereto) and by this reference made a part hereof, and shall be subject to acceptance or rejection by Vendor and shall contain the fees to be paid in connection therewith.

1.8    Deliverable. The term "Deliverable" means each specifically defined work product, identified in any individual schedule or related document, to be provided by Vendor to Customer as of a specific date.

1.9    Documentation. The term "Documentation" means the documentation outlining the performance, use and training required by Customer and its Authorized Users to utilize the software and related systems.

1.10    Enhancement. The term "Enhancement" means any change to the Software or any Service, which is not an Update, Mandatory Upgrade or Optional Upgrade, requested on a Customer Request. The fees for each Enhancement shall be set by Vendor as stated on the Customer Request.

1.11    Mandatory Upgrade. The term "Mandatory Upgrade" means those changes to the Software made by Vendor from time to time, which Customer is required to implement. Mandatory Upgrades will be made available to Customer when they are made available to other

2

Vendor customers. Failure to implement these Mandatory Upgrades may invalidate any Warranty coverage.

1.12    Optional Upgrade. The term "Optional Upgrade" means those changes to the Software made by Vendor from time to time, and which Customer is not required to implement. Optional Upgrades will be made available to Customer when made available to other Vendor customers.

1.13    Schedule. The term "Schedule" means the written agreements that specify the services and/or software to be provided to Customer in connection with such Schedule. Each Schedule shall constitute a separate independent agreement with the terms of this Master Agreement applying to each Schedule individually and not all Schedules collectively, and shall be in the form (but not substance) attached hereto.

1.14    Services. The term "Services" means both the services offered, delivered, or performed by Vendor on any CRB, Schedule, Customer Request, or similar document, and the services accessed, derived or received by Customer through or as a result of the use of the Software or any Service.

1.15    Software. The term "Software" means the specific applications described in the Schedule, along with any and all: (i) Enhancements, Mandatory Upgrades, Optional Upgrades, if any, and Updates, and any other modifications whatsoever, in each case if and to the extent provided to the Customer pursuant hereto, and (ii) derivative works based on the foregoing if and to the extent provided to the Customer pursuant hereto.

1.16    Specifications. The term "Specifications" shall mean the requirements set forth in the relevant CRB, Customer Request or other similar document.

1.17    Update. The term "Update" means those changes to the Software, which must be made as a result of applicable one or more statutory or Bureau changes, such as those published by ISO, NCCI, or other insurance regulatory authorities having appropriate jurisdiction in those state(s) supported as identified in the Schedule.


## SECTION 2   LICENSE

2.1    Grant of License. Upon execution of the Schedule, Vendor grants to Customer a non-exclusive, perpetual, non-transferable, limited license to allow Authorized Users to use the Software or Service in the United States at Customer's or its Authorized User's place(s) of business only, in object code format only, provided that Customer and its Authorized Users comply with all of the terms and conditions of this Agreement, and do so in strict accordance with the following conditions: (i) the Software and all Services shall be used solely for Customer's own internal business purposes, and not for providing service bureau, timesharing, data processing or other similar services to third parties; (ii) Customer and its Authorized Users shall not use the Software or any Service to evaluate or scan data of or for anyone other than Customer, and such evaluation and/or scanning is expressly prohibited; (iii) Customer and its Authorized Users shall not reveal any links, user accounts, or passwords for the Software to anyone other than Customer's Authorized Users who have a need to know such information; (iv)

3

Customer shall ensure that all Authorized Users having access to the Software or any Services shall maintain the confidentiality of the Software and the Services, and shall abide by the terms of this Agreement; (v) Customer and its Authorized Users shall not use the Software or any Service to create a product or service that would compete with Vendor in the provision of the such Software or Service to third parties; and (vi) Customer and its Authorized Users shall use the Software and all Services, and all information accessed in connection therewith, in accordance with the requirements of all applicable laws, regulations and rules.

      2.2    Restrictions on Use. The license granted under this Agreement permits the Authorized Users to use the Software only on the equipment agreed upon by the Parties. Except as permitted by this Agreement, Authorized Users shall not, nor permit others to: (i) store, run, display, load, use, produce, copy (except for archival purposes, with notice to Vendor), market, license, sell, rent, assign, transfer, or adapt the Software, any Service or any Documentation; (ii) merge or combine the Software or any Service with any other program/application; (iii) translate, disassemble, decompile, reverse engineer or otherwise attempt to discover or obtain possession of the source code of the Software; (iv) create derivative works based on the Software or any Service, or any portions thereof (except for the sole purpose of allowing Software to interface with Customer's internal business processes). Irrespective of the above, in the event that a derivative work is created, it shall be deemed a "work made for hire", or if inapplicable, Customer and Authorized Users shall (a) assign to Vendor all right, title and interest in, and to, such derivative works, and b) at Vendor's expense, provide Vendor with assistance to execute any additional instruments as may be reasonable and necessary to perfect any of Vendor's rights thereto.

      2.3    Title to the Software. Vendor reserves and retains all right (other than the limited license to use granted to Customer herein), title and interest in and to the Software, the Services and all Documentation, and expressly disclaims any other grant of express or implied license, moral rights, or other right of any kind whatsoever to Customer regarding the Software, the Services or Documentation. Customer hereby acknowledges and agrees that it has and shall have no claim of ownership or interest in or to the Software, Services or Documentation and, accordingly, that it shall not challenge, dispute, lay claim to, or otherwise jeopardize Vendor's rights, title and interest in and to the Software, Services or Documentation, or create any derivative work based thereon, or any portion of the foregoing, except as set forth in Sec. 2.2. Customer acknowledges that the Software, Services and Documentation are commercially valuable, proprietary property of Vendor, the design and development of which reflects the expenditure of considerable time, effort and expense. As such, Customer acknowledges and agrees that for any breach of this Sec. 2, Vendor will not have an adequate remedy at law; and consequently, Vendor, in addition to and not in lieu of any other remedy to which it may be entitled at law or in equity, shall be entitled to specific performance and Customer hereby consents to (without limiting the right of Vendor to seek any other remedy at law or in equity) to the entry of an immediate injunction without the need for posting any bond.

      2.4    Updates to Software. To the extent specified in the Schedule, scheduled Updates will be provided to Customer for no additional charge throughout the Term, provided that all license and other fees due hereunder are current; provided, however, Customer acknowledges that there may be an additional charge for extraordinary Updates, which are typically an unusual Bureau change requiring longer than sixty (60) calendar days to implement.

4

## SECTION 3 DELIVERY AND ACCEPTANCE

3.1    Delivery Schedule.  Vendor shall deliver the Software, any Updates, and the Services to Customer substantially as set forth in the Schedule. Each Deliverable shall be presumed to require testing, unless (a) otherwise stated in the Schedule or (b) the Deliverable has previously been accepted by Customer.

3.2    Delivery, Testing and Acceptance of Initial Development Deliverables. Vendor will deliver and Customer will accept the Deliverables in accordance with the following procedure:

(a) During the seventy-five (75) calendar days immediately following delivery of a Deliverable (the "Acceptance Test Period"), Customer shall test such Deliverable for functionality and accuracy, and shall notify Vendor in writing of any components or functions that are missing or not operating in accordance with the applicable agreed-upon specifications set forth in the Client Requirement Book ("CRB") or Customer Request (collectively, the "Specifications"). Such notification shall toll the Acceptance Test Period.

(b) Within a reasonable period of time after having received written notification, Vendor shall bring all critical components and functions of the Deliverable into compliance with the Specifications.

(c)    As soon as a Deliverable meets the Specifications, Customer will notify Vendor in writing that the Deliverable is accepted; provided, however, that if Customer does not notify Vendor in writing of any failure to meet the Specifications by the end of the Acceptance Test Period (tolled by any notices of non-compliance) or if the Deliverable is used by Customer in a production environment other than for testing or training purposes, such action or inaction shall be deemed to constitute acceptance of the Deliverable.

## SECTION 4 FEES

4.1    Fees.  Fees are ordinarily designated as Development/Enhancement, License, or Maintenance/Service fees. Fees, and the corresponding payment schedule, are as set forth in the applicable Schedule or document. Changes to the fees or the payment schedule must be agreed upon, in writing.

All fees shall be due and payable thirty (30) calendar days after the date set forth in the applicable Schedule or document and shall be considered past due the next business day thereafter.

4.2    Expenses.  Customer shall be responsible for reasonable expenses and costs incurred by Vendor, including reasonable travel and living expenses for its personnel. These expenses may be invoiced at any time up to six (6) months after they are incurred and shall be due and payable thirty (30) calendar days after the invoice date.

5

4.3     Interest      Interest shall accrue on past due amounts for fees and expenses from the stated due date at the lesser rate of (a) one and one-half percent (1.5%) per month, or (b) the maximum interest permitted by law.

4.4     Taxes.  Customer shall be responsible for the payment of any and all federal, state and local taxes related to the Services, Software and Deliverables provided under this Agreement (except those taxes based on Vendor's net income), and shall defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with such taxes.

## SECTION 5  OBLIGATIONS AND RESPONSIBILITIES OF VENDOR

5.1     Documentation and Training.  Vendor shall provide Customer with (i) copies of the appropriate Software documentation (the "Documentation") in the quantities set forth in the Schedule or make such Documentation available online, and (ii) training in the use of the Software as set forth in the Schedule.  Customer agrees to maintain the Documentation on a confidential basis. Customer agrees not to make additional, unauthorized copies, or to provide or otherwise make available the Documentation, or any portion thereof, to any third party not licensed hereunder.

5.2     Mandatory and Optional Upgrades.  Vendor shall make available to Customer, at no additional charge, all Mandatory Upgrades that are made generally available by Vendor to other Customers using the same Software product. Vendor shall make available to Customer, at a fee to be determined in Vendor's sole discretion, all Optional Upgrades that are made generally available by Vendor to other Customers using the same Software product.

5.3     Other Services.  Vendor shall make available to Customer such other services as are specifically specified in the Schedule at the prices indicated therein, or if other services are not specified or if specified without a corresponding price, at Vendor's then current prices in effect at the time such services are provided.

5.4     Customer Options.  Vendor shall make available to Customer at the prices stated in the Schedule such software and/or services as are identified in the Schedule as "Customer Options."  Customer shall exercise its option to receive such software and/or services at the times and in the manner stated in the Schedule by completing a Customer Request.

5.5     Indemnification.   Vendor agrees to defend, indemnify and hold harmless Customer from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with any United States' patent or copyright infringement asserted against Customer by virtue of Customer's use as permitted hereunder of the Software during the Term, provided that such claim of infringement is not attributable to the use of the Software in combination with any other software programs/applications, or due to a Customer Created Error ("Infringement"), and provided further that the following conditions are met:

6

(a) Customer shall give Vendor prompt written notice of any such claim; and

(b) Customer shall give Vendor full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Vendor in connection with the foregoing.

In the event that such claim of Infringement occurs or in Vendor's opinion is likely to occur, Vendor may, at its option, procure for Customer the right to continued use of the Software or render its use hereunder noninfringing, or if neither of the foregoing options is available on terms that are reasonable in Vendor's judgment, then Vendor may terminate this Agreement and refund all amounts paid by Customer for the Software, whereupon the Vendor shall have no further obligations under this Agreement except in connection with those provisions which survive pursuant to the terms of Sec. 10.6 hereof.

## SECTION 6 OBLIGATIONS AND RESPONSIBILITIES OF CUSTOMER

6.1 Legends and Markings. Customer agrees to retain and not remove, modify or destroy Vendor's trademarks, trade names, markings, logos, trade colors, or any proprietary or confidentiality notices, legends and/or markings (the "Proprietary Marks") as and where they are originally affixed to or contained within the Software, Documentation, Confidential Information or related documentation. Use of any Proprietary Mark or any other mark or legend confusingly similar to the Proprietary Marks by Customer is strictly prohibited, and Customer agrees not to challenge, dispute, lay claim to or otherwise jeopardize Vendor's right, title and interest in and to the Proprietary Marks.

6.2 Designation of Coordinator. Customer shall designate one system coordinator and one back-up coordinator, who shall act on behalf of the Customer and through whom all communication with Vendor pursuant to this Agreement shall occur. Customer shall ensure that such coordinators are fully familiar with and trained in the use of the Software, and that their identity (which may be changed from time to time) is at all times made known to Vendor by written notice five (5) business days prior to their contacting Vendor. All questions and problems regarding the use, operation, development, support or maintenance of, or otherwise concerning the Software shall be directed to Vendor through such designated coordinators, and Vendor shall direct all Deliverables, Updates, Mandatory Upgrades, Optional Upgrades, Enhancements and other issues related to the Software through such designated coordinators.

6.3 Training. Customer agrees that it is solely responsible for the training of its personnel and acknowledges that the training described in the Schedule, if any, is provided by Vendor without any guaranty that it will enable Customer's personnel to effectively use the Software or to use the Software in the manner intended by Customer.

6.4 Indemnification. Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities, fees, assessments and expenses (including reasonable attorneys' fees) arising out of or in connection with the procurement of Bureau Materials, the incorporation of Bureau materials into the Software or the use of the Bureau materials by Vendor on Customer's behalf. Moreover, Customer agrees to defend, indemnify and hold harmless Vendor from and against any and all claims, losses, costs, liabilities and expenses (including reasonable attorneys' fees) arising out of or in connection with

7

Customer's use of the Software or any Service, except for claims alleging Infringement (as defined in Sec. 5.5 hereof), and provided further that the following conditions are met:

(a)  Vendor shall give Customer prompt written notice of any such claim; and

(b)  Vendor shall give Customer full and complete authority to control and direct the investigation, preparation, defense, and settlement of each such claim, and shall fully cooperate with Customer in connection with the foregoing.

6.5     Action to Ensure Compliance.  Customer shall take all appropriate action to ensure full compliance with Customer's obligations under this Agreement by any and all persons and entities permitted access to or use of the Software or any Service pursuant to the terms of this Agreement.  Customer acknowledges that it shall be responsible and liable for any and all acts and omissions of each such person or entity as if they were the acts and omissions of Customer.

6.6     Inspection.  Subject to reasonable advance notice and execution of appropriate confidentiality agreements, Customer agrees to permit Vendor to enter upon its premises in order to inspect such records, reports and the use of the Software and Services necessary to verify compliance with the terms of this Agreement.  Such inspection shall occur during Customer's normal business hours no more than once per calendar quarter.  Vendor shall use reasonable efforts not to disrupt or interrupt either the normal business operations of Customer or Customer's permitted use of the Software or, if inevitable, to take reasonable steps to minimize such disruption or interruption.  If Vendor determines Customer is in violation of the terms of this Agreement, Customer shall reimburse Vendor for all costs incurred in connection with the inspection.  Furthermore, if Vendor determines that Customer has exceeded the scope of its authorized use under this Agreement, Customer shall be invoiced two times the fees that would have been due and payable for any ordinary third party customer to purchase rights for the scope of use actually made by Customer, and Customer agrees to pay such invoices immediately upon receipt.  Notwithstanding the foregoing, Vendor shall (i) retain all other remedies available to it under this Agreement, or at law or in equity, and (ii) be permitted at anytime to review by remote access Customer's accounts, links and passwords to verify compliance with the terms of this Agreement.

6.7     Bureau Materials.  Customer shall be responsible for the legal procurement, on its own behalf of the right to receive and to use directly from the applicable Bureaus any and all Bureau materials to be incorporated or integrated into, or used in connection with the Software, in all forms licensed by the appropriate Bureau, including but not limited to diskette and online form.  Should such rights to receive and use the Bureau materials expire or terminate, Customer will provide prompt written notice to Vendor of such expiration or termination.

In the event that Vendor is required to obtain these Bureau Materials, Customer shall (a) reimburse Vendor for any fees or assessments charged by any Bureau and assessed to Vendor associated with procuring Bureau materials hereunder (subject to receipt of appropriate documentation to substantiate such fees or assessments), and (b) indemnify Vendor as set forth in Sec. 6.4.

## SECTION 7  JOINT OBLIGATIONS AND RESPONSIBILITIES

8

7.1     Executive Governance Committee. An Executive Governance Committee ("EGC") shall be established within 45 business days of the time of execution of this Agreement, with representation from both Parties. The EGC will act as the champion of the project and ongoing relationship of the Parties. Duties of the EGC include but are not limited to responsibility for ensuring the project and ongoing Services retains appropriate priority within both organizations, understanding the overall business objectives, removal of organizational barriers to project and ongoing relationship's success, and serve as escalation point for change management. Both Parties agree to actively participate in ongoing EGC meetings whose schedule will be mutually agreed upon at the time of creation of the EGC.

7.2     Notice of Certain Events. Both Parties agree to give the other Party prompt notice: (i) if a Party ceases to do business for any reason and proceeds with the winding-up of its affairs; or (ii) if a Party or any third party owning an equity interest of more than fifty percent (50%) of that Party files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy (other than for reorganization).

7.3     Privacy. With respect to personally identifiable information regarding consumers, the parties further agree as follows: (i) Vendor has adopted the "ChoicePoint Privacy Principles" ("Principles") recognizing the importance of appropriate privacy protections for consumer data and (ii) Customer agrees that Customer (including its directors, officers, employees or agents) will comply with the Principles or Customer's own comparable privacy principles, policies, or practices, including Customer's standard contractual privacy policies. ChoicePoint's Privacy Principles are available at www.privacyatchoicepoint.com

## SECTION 8  WARRANTIES AND LIMITATION OF LIABILITY

8.1     Limited Warranty  During the Term, and provided Customer is current on the payment of all fees due and payable hereunder, Vendor offers the following limited Warranties.

(a)     Software Warranty.  Vendor warrants that each such portion of the Software, as delivered by Vendor, if properly installed and operated on recommended hardware and in accordance with Vendor's Documentation: (i) contains all of the features described in, shall perform all of the material functions set forth in, and shall operate in substantial conformance with, its applicable Specifications and Documentation, provided, however, Customer acknowledges and agrees that (A) the Software is not error or "bug" free;  (B) Authorized Users must have adequate skills to use the Software; (C) Customer is responsible for backing-up its data; (D) Vendor shall not be responsible for the suitability of any Customer-configuration of the Software.  This warranty shall not apply to the extent that any defect in the Software would be corrected by an Update or Mandatory Upgrade which Customer has failed to implement.

(b)     Services Warranty.  Vendor warrants that it has all required rights, permits and licenses to perform the Services, that the Services will be performed by appropriately trained, experienced and competent personnel in a manner at least consistent with commercially reasonable standards of quality and care, and that the Services will conform to the Specifications and Documentation applicable thereto.

9

8.2     Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED FOR IN SECTION 8.1 HEREOF AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VENDOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CORRECTNESS, COMPLETENESS OR CURRENTNESS OF ANY DATA OR RESULTS, ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, VENDOR MAKES NO WARRANTY WITH RESPECT TO ANY OPERATING SYSTEM OR OTHER SOFTWARE APPLICATION NOT OWNED BY VENDOR WHICH MAY BE LINKED TO OR USED IN CONNECTION WITH THE SOFTWARE, AND MAKES NO WARRANTY WITH RESPECT TO THE USE OF THE SOFTWARE IN CONNECTION WITH ANY OTHER SOFTWARE APPLICATION NOT DEVELOPED BY VENDOR. USE OF THE SOFTWARE CONSTITUTES CUSTOMER'S CONSENT TO ASSUME THE ENTIRE RISK ARISING OUT OF THE USE OF THE SOFTWARE. EMPLOYEES OR AGENTS OF VENDOR OR ANY THIRD PARTY HAVE NO AUTHORITY TO MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE SOFTWARE AND CONSEQUENTLY, SHOULD NOT AND MAY NOT BE RELIED UPON BY CUSTOMER.

8.3     Exclusive Remedy. The sole and exclusive liability of Vendor, and the sole and exclusive remedy of Customer, in the event of any breach of or claim under the above warranty shall be, at Vendor's option, (i) correction or replacement of the nonconforming portion of the Software within a reasonable period of time after receiving written notice from Customer, or (ii) a refund, after receiving written notice from Customer, of all amounts paid by Customer to Vendor which are attributable to that portion of the Software that does not conform to the warranty, (as determined by the EGC and Executive Management, based upon the material impact on the Software); provided, however, that Customer shall not receive such refund unless and until it ceases all use, and destroys, returns, removes and/or purges all copies, of that portion of the Software that does not conform to the warranty.

8.4     Limitation of Liability. CUSTOMER AGREES THAT VENDOR'S AGGREGATE LIABILITY TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR DAMAGES WHATSOEVER AND HOWEVER CAUSED, SHALL BE LIMITED TO, AND IN NO EVENT EXCEED, THE FEES ACTUALLY PAID BY CUSTOMER. .

NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT TO THE CONTRARY AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL VENDOR BE LIABLE TO CUSTOMER UNDER ANY CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), INDEMNITY OR OTHER LEGAL, CONTRACTUAL OR EQUITABLE THEORY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER AND HOWEVER CAUSED, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, LOST OR DAMAGED DATA OR BUSINESS INFORMATION, BUSINESS INTERRUPTION OR OTHER ECONOMIC LOSS, EVEN IF VENDOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CUSTOMER ACKNOWLEDGES THAT EVERY BUSINESS DECISION INVOLVES

10

ASSUMPTION OF RISK, AND THAT VENDOR DOES NOT UNDERWRITE THAT RISK IN ANY MANNER WHATSOEVER.

8.5     Limitation on Time for Bringing Actions.  No action, regardless of form or substance, arising out of this Agreement or the performance or nonperformance of any of the Parties' obligations hereunder may be brought more than one (1) year after a party knew or should have known of the occurrence of the event giving rise to such cause of action.

## SECTION 9  CONFIDENTIALITY

9.1     Confidential Information.  "Confidential Information" under this Agreement shall include all confidential and proprietary information disclosed by either Party ("Disclosing Party") to the other Party ("Receiving Party"), including, without limitation, (i) the Software, Documentation, Services, CRB, this Agreement, all Schedules and Customer Requests, all customer contact information, and any and all portions thereof, and (ii) any and all information related to the Disclosing Party's trade secrets, technology, software, know-how, products, potential products, services, financial information, potential services, markets and/or business information, which is in writing and marked as "Confidential" or "Proprietary" (collectively, "Confidential Information").

9.2     Nondisclosure of Confidential Information.  The Receiving Party agrees to use the Confidential Information of the Disclosing Party only in connection with this Agreement. Each Party agrees to hold the other Party's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties.  Notwithstanding the foregoing, each Party may disclose the other Party's Confidential Information to those employees, agents or consultants who have a need to know such information in connection with this Agreement; provided, however, that each such employee, agent and consultant is informed of the foregoing obligations and has executed a nondisclosure agreement which binds such employee, agent or consultant to confidentiality terms no less favorable than those set forth herein.  Each Party agrees that it will take all measures necessary to protect the confidentiality of and avoid disclosure or use of the other Party's Confidential Information in order to prevent it from falling into the public domain, or into the possession of persons other than those persons expressly permitted hereunder to have any such information, which measures shall include protection of the other Party's Confidential Information with the same degree of care that it utilizes to protect its own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The obligations of confidentiality and limitations on use set forth herein shall survive the expiration or termination of this Agreement for any reason for a period of five (5) years except with respect to Confidential Information that embodies trade secrets, the confidentiality and limitation on use of which shall be maintained for so long as such Confidential Information embodies trade secrets.

9.3     Exceptions.  The obligations and limitations set forth above shall not apply to any information which: (i) was lawfully known to the Receiving Party prior to being disclosed by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is company specific information filed with any Bureau; (iv) is approved for release by written authorization of the Disclosing Party; (v) is rightfully received from a third party who provided such information without breaching any separate confidentiality obligation, or without

11

restriction of subsequent disclosure; or (vi) is independently developed without reference to the Disclosing Party's Confidential Information. In addition, Confidential Information may be disclosed to the extent required by court order or as otherwise required by law, provided that the Receiving Party notifies the Disclosing Party promptly in writing upon learning of the possibility of any such requirement and has given the Disclosing Party a reasonable opportunity to contest or limit the scope of such required disclosure; provided, further, that such disclosed Confidential Information shall otherwise remain subject to the terms of this Sec. 9.

9.4    Non-Exclusive Remedies. Receiving Party acknowledges that the Confidential Information is commercially valuable, proprietary information of the Disclosing Party, which reflects the expenditure of considerable time, effort and expense. As such, Receiving Party acknowledges and agrees that for any breach of this Section 9, Disclosing Party will not have an adequate remedy at law; and consequently, Disclosing Party, in addition to and not in lieu of any other remedy to which it may be entitled to at law or in equity, shall be entitled to seek specific performance and Receiving Party hereby consents (without limiting the right of Disclosing Party to seek any other remedy at law or in equity) to seek the entry of an immediate injunction without the need for posting any bond.

## SECTION 10  TERM AND TERMINATION

10.1    Term. The Term of this Agreement shall be defined in the Schedule.

10.2    Termination at Vendor's Option. This Agreement may be terminated immediately by Vendor at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a)  Customer fails to pay any amount past due under this Agreement within fifteen (15) calendar days after receiving written notice that such amount is past due from Vendor;

(b)  Customer breaches any material term of this Agreement (other than payment and Confidential Information obligations hereunder) and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Vendor;

(c)  Customer uses or distributes any Confidential Information in a manner inconsistent with the terms of this Agreement;

(d)  Customer or any third party owning an equity interest of more than fifty percent (50%) of Customer becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy, or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(e)  Customer ceases to do business for any reason; provided, however, that Customer shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Customer's obligations under this Agreement.

12

10.3    Termination at Customer's Option.    This Agreement may be terminated immediately by Customer at its option upon the occurrence of any of the following events (each an "Event of Default"):

(a)  Vendor breaches any material term of this Agreement and fails to initiate a remedy for such breach within thirty (30) calendar days after receiving written notice thereof from Customer;

(b)  Vendor or any third party owning an equity interest of more than fifty percent (50%) of Vendor becomes insolvent, becomes unable to meet its obligations in the ordinary course of business as they fall due, files a petition in bankruptcy (other than for reorganization), or has filed against it a petition in bankruptcy that is not discharged within thirty (30) calendar days; or

(c)  Vendor ceases to do business for any reason; provided, however, that Vendor shall not be deemed to have ceased to do business if it shall transfer substantially all of its assets and business to a solvent entity that shall assume in writing all of Vendor's obligations under this Agreement.

10.4    Notice of Termination.    In the event either Party elects to terminate this Agreement pursuant to this Section, it shall send written notice of such election to the other Party within thirty (30) calendar days of the occurrence of the Event of Default giving rise to its right to terminate.

10.5    Customer's Obligations upon Termination.    Immediately upon expiration or termination of this Agreement, Customer shall: (i) discontinue all use of the Software and Documentation; (ii) remove all portions of the Software including without limitation, Software in or from modified or derived programs; (iii) purge the Software and all Documentation, or cause it to be purged from all human and machine-readable media (or other memory devices); (iv) return to Vendor or destroy all Confidential Information and all related materials, and copies thereof; and (v) represent and warrant to Vendor in writing within ten (10) calendar days after such expiration or termination that Customer has complied with the provisions of this Section. In addition to the foregoing, Customer agrees that it shall not, both during the Term and following expiration or termination of this Agreement, act in any manner to damage the reputation or goodwill of Vendor, or any of its products or services.

10.6    Survival of Certain Terms.    The provisions of Sections 2, 4, 6.1, 6.4, 6.6, 7, 8, 9 and 12 hereof shall survive the expiration of this Agreement; the provisions of Section 4, 6.1, 6.7, 7, 8, 9 and 12 hereof shall survive the termination of this Agreement.

10.7    Termination Not Exclusive Remedy.    Either Party's option to terminate this Agreement pursuant to the terms of this Section shall not be exclusive of any other remedy available to it whether under this Agreement or otherwise at law or in equity.

10.8    Acceleration of Payments.    Any expiration or termination of this Agreement shall not release Customer from its duty to pay any amount which may be then or with the passage of time will become owing to Vendor. Furthermore, immediately upon any termination of this Agreement, Customer shall pay to Vendor any and all amounts that are or with the passage of time will become due and payable, as determined by the EGC and Senior Management. Interest, at a rate of one and one-half percent per month or the maximum interest permitted by law, shall

13

begin to accrue as of the effective date of termination and continue until payment of all such amounts, plus interest, are paid in full.

## SECTION 11 CHANGE CONTROL

11.1   If either Party determines that a material change to agreed upon Software or Services as defined in a Schedule attached to this Master Agreement (such Software or Services are referred to as "Projects"), which would include, without limitation, any change that would change the fees for that Project beyond the stated fees or beyond the stated estimate for that project or delay the scheduled completion date for such Project,  then that Party's Contract Coordinator shall promptly inform the other Party's Contract Coordinator, in writing, of the facts and circumstances leading to such determination ("Request for Change").

11.2 If a Request for Change is initiated by Vendor, Vendor shall provide Customer, (a) an estimate of the additional time and cost, if any, and (b) an estimate of the impact to the scheduled completion dates, which would result from such change.

11.3 If a Request for Change is initiated by Customer, Customer acknowledges that Vendor may be required to investigate and analyze the business impact, including fees, delivery dates and deliverables, on a project.   Vendor shall notify Customer's Contract Coordinator within five (5) business days of receipt if Vendor determines that that Request for Change requires additional investigation and analysis. If Customer's Contract Coordinator approves, Customer shall pay Vendor for such research and analytical services relating to such Request for Change initiated by Customer.

11.4 If the Parties approve a Request for Change, the respective Contract Coordinators shall draft and execute a Customer Change Request, which describes the relevant changes to the Software and/or Services, if applicable, any changes to the scheduled completion dates, additional responsibilities of Customer, and any change to the stated fee or estimated fee (a "Change Order"). Until a Change Order is fully executed, (a) Vendor is not obligated to perform a change and (b) Customer is not obligated for any additional fees.

11.5    Vendor shall have no liability for delays in the provision of the Project implementation services caused by Customer's failure to complete its tasks or provide information or resources in a timely manner, provided that Customer's Project Manager was notified of such requests. For changes to a Project caused by: (i) Customer's resources not completing tasks assigned to them accurately or in a timely fashion; or (ii) events outside the control of Vendor, Vendor shall initiate a Request for Change and the parties shall negotiate in good faith the appropriate Change Order.

## SECTION 12 GENERAL

12.1    Entire Agreement.   This Agreement (including any exhibits attached hereto) constitutes the entire agreement between the Parties related to the subject matter hereof, and

14

supersedes any and all prior and contemporaneous proposals, communications, agreements and understandings, whether oral or written, concerning the subject matter hereof.

12.2    Construction of this Agreement; Construction with Other Agreements.  In the event and to the extent of any conflict between a term of this Master Agreement and that of the Schedule, the term of the Schedule, to the extent necessary to resolve the conflict, shall control. In the event of any conflict between the terms of this Agreement and any printed form, this Agreement shall control. The terms of this Agreement shall not be altered by the terms of any purchase order, acknowledgment or the like, even if signed by Vendor, unless such purchase order, acknowledgment or the like specifically and conspicuously states that it amends this Agreement and is signed by Vendor's Senior Vice President.

12.3    Assignment.  Neither Party shall assign this Agreement, or the rights or duties contained herein, without the prior written consent of the other.  Any attempt at assignment without such consent shall be null and void, and shall constitute an "Event of Default" under this Agreement by the Party attempting such assignment.

Notwithstanding the foregoing, Vendor may assign this Agreement and its rights and duties contained herein without such prior written consent, but with 30 days prior notice, in connection with the transfer of substantially all of the assets and business of Vendor to an entity that is subject to and assumes Vendor's obligations hereunder.

12.4    Waiver.  No waiver of any right, power, or remedy under this Agreement shall be effective unless in writing and signed by the Party against whom enforcement is sought.   No failure or delay in exercising any right, power, or remedy with respect to any of the provisions of this Agreement shall operate as a present or future waiver thereof.

12.5    Amendments and Modifications.   This Agreement shall not be amended or modified in any respect except by a writing signed by both Parties.

12.6    Notice.  Any and all notices or other communications required or permitted under this Agreement shall be in writing and shall be deemed sufficient in all respects when delivered personally, delivered by an overnight courier service, sent by facsimile, or placed in the United States mail, return receipt requested, postage prepaid, and addressed as follows:

If to Vendor:                                             If to Customer:

    Insurity LLC.

    170 Huyshope Avenue

    Hartford, Connecticut 06106

    Attn:   Tony Reisz                               Attn:

            Group VP, General Manager

With a copy to:

15

Insurity LLC.
c/o ChoicePoint Inc.
1000 Alderman Drive
Alpharetta, Georgia 30005
Attn: Legal Department

Notices sent according to the provisions of this Section shall be deemed received five (5) calendar days after being deposited in the U.S. mail or on the actual date of receipt, whichever is earlier.

12.7    Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties' respective successors, legal representatives and permitted assigns.

12.8    Governing Law. The validity, construction, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without regard to its choice of law provisions.

12.9    Source Code Escrow. Source Code Escrow, if desired, is available under a separate Agreement.

12.10   Relationship of the Parties. Personnel supplied by each Party to perform services or other obligations hereunder shall not be considered employees or agents of the other Party. During the Term of this Agreement and for a period of two (2) years thereafter, Customer shall not solicit, hire or engage any person employed by Vendor who was involved in the performance of any obligations related to this Agreement without Vendor's prior express written consent.

12.11   Use of Names and Trademarks. Neither Party shall use the name or trademark of the other for any purpose, including without limitation advertisement or public relations announcements, without the prior written consent of the other Party.

12.12   Force Majeure. Neither Party shall be responsible for any delay or failure of performance under this Agreement (other than Customer's payment obligations) by reason of any acts, events, or circumstances beyond its control. Such acts, events, or circumstances shall include, but shall not be limited to: acts of God, act of war, act of terrorism, riot, epidemic, fire, flood or other disaster, act of government, power failure, or labor walkout or strike. Nothing herein shall be construed to preclude termination of this Agreement pursuant to Sec. 10 hereof in the event any such delay or failure of performance is material and persists or is likely to persist for more than one hundred eighty (180) calendar days.

12.13   Severability. If any provision of this Agreement or portion thereof is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or portions thereof shall not be affected.

12.14   Headings. The headings in this Agreement are inserted for reference and convenience only, and shall not be considered as substantive parts hereof.

16

12.15  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.


IN WITNESS WHEREOF, each of the Parties hereto has duly executed and delivered this Agreement as of the day and year first above written..

| INSURITY LLC | TRI-STATE CONSUMER INSURANCE |
|---|---|
| Signature: _Anthony J Reisz_ | Signature: _____ |
| Name: _ANTHONY REISZ_ | Name: _PENNY FERN HART_ |
| Title: _PRESIDENT_ | Title: _President_ |
| Date: _3/31/08_ | Date: _3-31-08_ |

17

## EXHIBIT A
## CUSTOMER REQUEST TEMPLATE

Customer:_____          Prepared By:_____

Request Number:_____          Request Date:_____

This Customer Request is being submitted pursuant to the terms of that certain Master Agreement (the "Master Agreement") effective ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀, by and between Insurity LLC ("Vendor") and Customer and is subject to all of the terms and conditions of the Master Agreement and the applicable Schedule executed in connection therewith.

**DESCRIPTION OF BUSINESS NEED:**

**PRICING METHOD AND CHARGES:**

[ ] Time & Materials for entire request

[ ] Fixed Price for entire request

|  | DEVELOPMENT CHARGE | ANNUAL OTHER FEES |
|---|---|---|
| Non-Forms Development: | $_____ | $_____ |
| Forms Development: | $_____ | N/A (see note below) |
| TOTAL CHARGES: | $_____ | $_____ |

**PAYMENT METHOD:**

Upon authorization for development, Vendor will invoice Customer for:  $_____.

Upon delivery, Vendor will invoice Customer for:                              $_____.

18

(The maintenance fee for the current contract year will be calculated on a pro-rated basis and billed from the period of delivery until the next anniversary of the Master Agreement.)

**NOTES:**

1) If this Customer Request is not approved by Vendor by _____ [Insert Date], it will be considered rejected and closed. If approved by such date, the enhancement will be delivered in/on _____ and will be compatible with the _____ release environment.

2) The above pricing and delivery date are based on the information available at this time. Should the scope of the request change, Vendor reserves the right to modify this Customer Request. Any changes to this Customer Request must be initialed by both Parties.

3) The pricing for this Customer Request is considered "Confidential Information" of the Vendor subject to the terms of the Master Agreement.

**APPROVALS:**

By signing below, Vendor accepts this Customer Request and Customer authorizes this Customer Request to be processed.

_____          _____

Customer Authorization                   Vendor Acceptance

## SCHEDULE

## SOFTWARE & SERVICES

THIS Software Schedule ("Software"), is made on this 15th day of March, 2008, by and between Insurity LLC, a Georgia Limited Liability Corporation conducting business at 170 Huyshope Avenue, Hartford, Ct 06106 ("Vendor") and Tri-State Consumer Insurance Company conducting business at 575 Jericho Turnpike, Jericho, NY 11753 ("Company"), and together with the Affiliates (as defined below) collectively, "Customer", and together with Vendor referred to collectively as, the "Parties").

Vendor and Customer are Parties to a certain Master Agreement, dated March 15, 2008 (the "Master Agreement"), pursuant to which certain terms and conditions have been established for the license of the Software and/or described in this Software Schedule. Any and all attachments hereto are expressly incorporated in this Software Schedule. Terms defined in the Master Agreement are used in this Software Schedule with the meanings assigned to such terms in the Master Agreement.

In consideration of the mutual covenants and conditions contained in this Software Schedule, together with the Master Agreement, the Parties agree as follows:

1. Incorporation of Software Schedule. The Software Schedule is hereby incorporated into the Master Agreement and, as set forth herein, is subject to its terms and conditions.

2. Description of the Software and Services. Vendor will provide Software and Services to support Customer's business needs as outlined in the Project Scope.

   Customer acknowledges that the description of the Software and/or Services provided in this Schedule is not a complete description of the capabilities, or limitations, of the features or functions of the Software and/or Services. The Software and/or Services have been developed to meet Vendor's estimation of the reasonable needs of the insurance industry, however, Vendor does not warrant that Software and/or Services as delivered to Customer will satisfy every business need of Customer, or the insurance industry in general, but Vendor does warrant the Software and/or Services under the terms and conditions of the Master Agreement.

3. Restrictions on Use of the Software and/or Services. Restrictions are as set forth in the Master Agreement.

4. Term of Software Schedule. The term of this Software Schedule shall be for a period of five (5) years ("Initial Term"), unless earlier terminated pursuant to the terms of Section 10 of the Master Agreement. Following the Initial Term, this Software Schedule shall

PLAINTIFF'S EXHIBIT "B"

automatically renew, with reasonable annual increases, for successive five (5) year periods (each a "Renewal Term"), unless: (i) either Party provides the other with written notice of its intent not to renew at least six (6) months prior to the expiration of the Initial Term or any Renewal Term; or (ii) earlier terminated pursuant to the terms of Section 5 (e) herein or Section 10 of the Master Agreement. The combination of the Initial Term and any and all Renewal Terms are collectively referred to as the "Term".

5.   Client Requirements Book (CRB) Process.

   (a)   The Parties shall prepare a Client Requirement Book (CRB), which will detail Licensee's business needs that fall within the scope of this project. Completion of the CRB will be the responsibility of both Parties and coordinated by a Vendor Project Manager.

   (b)   During the CRB process, Customer may request a Software feature or function which is not anticipated under this Master Agreement or Software Schedule, including support for any of Customer's unique Licensee filings and forms, with the understanding that additional fees may apply. Any such fees will be documented in the CRB and implemented only as approved pursuant to a Change Order.

   (c)   Once completed and approved in writing by both Parties, the CRB will become the specifications for Vendor's programming efforts. Vendor will not begin programming until both Parties approve the CRB, in writing.

   (d)   During the CRB, the Parties will (a) document the forms to be delivered as part of the initial deliverable and (b) document final pricing for same.

   (e)   Customer shall have the one-time option of terminating this Schedule without penalty, at the completion of the CRB but prior to the delivery of the system, with the approval of the EGC and Executive Management. The parties agree that this option shall not be invoked for non-material issues, and only after the parties have expended good faith efforts to resolve any issues arising during the CRB. The parties agree that the customer shall owe customer for the time and materials expended.

6.   Project Scope.   Vendor will deliver the Base Software for Policy Decisions, Billing Decisions, and Reporting Decisions as it exists as of the effective date of the Master Agreement, without modification, except as described below. During the CRB, Vendor will work with Customer to leverage prior efforts and make available certain configurations previously developed where such configurations are not proprietary or otherwise restricted.

(a)   The Base Software will support the following state:

    i. New York

(b)   The Base Software will support the following lines of business:

    i.   Personal Auto

    ii.   Homeowners

    iii.   Personal Umbrella

(c)   The Base Software will support the following transactions:

    i.   For all lines of business:

- New Business Quote/Issue
- Renewal Quote/Issue
- Endorsement
- Cancel
- Reinstatement
- View and Reprint Documents
- Non-Renewal
- Out-of-sequence change endorsement processing
- Rewrites

(d)   The Base Software to be implemented as part of the Implementation Services will include the following standard customization items at no additional cost to Customer:

    i.   VIN Verification

    ii.   Interfaces for ChoicePoint CLUE (Home and Auto), ChoicePoint Current Carrier, ChoicePoint Credit Scoring, ChoicePoint MVR, ChoicePoint Data Pre-fill, and ChoicePoint NY List Service.

(e) The Base Software to be implemented as part of the Implementation Services will include a Consumer User Interface and Agent User Interface. These will be delivered as part of the base at a time deemed appropriate by the Vendor Project Manager and Customer Project Manager.

(f) Batch print administration – Policy Decisions will be integrated with Insurity's Batch Print Administrator (BPA) or with a client specific batch printing tool to support batch printing of policy documents.

7.   Excluded in Project Scope.   The following modules and/or services are not included within the scope of this Master Agreement:

- Claims

- Reinsurance
- Data conversion
- Each interface project will be defined separately and will have its own Schedule defining project scope, timelines and costs.
- Support for additional lines of business not specifically defined as part of this Software Schedule
- Software modifications, except those identified in the CRB, as mutually agreed in writing by the Parties, and as may be modified by mutual written agreement by the Parties from time to time, required to support Customer's business are not included. Any such other modifications will be considered to be enhancements and will be determined during the CRB.
- Any other Software and/or Services not specifically set forth in this Master Agreement or any other Schedule.

8.    Pricing and Payment Schedules

(a)    Base Software License Fee:

Policy Decisions, Billing Decisions, Reporting Decisions          $1,250,000

Payment of these fees will be due as follows:

$250,000 upon execution of the Master Agreement
$125,000 Billable monthly beginning May 1, 2008 and ending on December 1, 2008

(b)    Customer Specific Customizations

The Customizations listed below will be done for a fixed bid of:    $245,500

1.  Tristate Auto
    a.  Auto Processing, including UW and Workflows
    b.  Current Auto Rating
    c.  Auto Forms Development and Mapping
    d.  Batch print jobs
    e.  Batch processing jobs

2.  Tristate Home
    a.  Home Processing, including UW and Workflows
    b.  Home Schedules
    c.  Current Home Rating
    d.  Home Forms Development and Mapping
    e.  Batch print jobs

      f.  Batch processing jobs

3. Drivers Auto
      a.  Auto Processing, including UW and Workflows
      b.  Current Auto Rating
      c.  Auto Forms Development and Mapping
      d.  Batch print jobs
      e.  Batch processing jobs

4. Security - Access Segmentation

5. Security - User Permissions

6. Expire Quotes

7. Copy Quotes

8. Data purge

9. Professional Services
      a.  QA

10. VIN Verification Integration (Tristate must provide data)

11. Violation leveling

12. 50 completed and mapped letters are included in the fixed bid. Tristate will be responsible for providing the letters in MS Word format. Insurity will be responsible for the mapping. After these 50 letters Tristate will be responsible for the mapping.

13. Adverse Action Notices

14. Email quotes

Payment of these fees will be due as follows:

$47,750 payable upon CRB signoff

$47,750 payable upon delivery of customizations

$150,000 payable 30 days post production

(c) The following customizations will be done on a T & M Basis

    1.  Consumer "User Interface" for Tristate

2. Agent "User Interface" for Tristate
3. Consumer "User Interface" for Drivers
4. Agent "User Interface" for Drivers
5. Interfaces
   a. Bi-directional Claims Interface
   b. Address Verification
   b. Billing Decisions Customizations
   c. Payment Gateway
   d. ISO Customizations
   e. Document Management Integration
   f. Aggregator Integration for Rating, Quote import, Workflow, UW (Insweb, Insureme, NetQuote)
   g. General Ledger Export
   h. NY Auto ID Cards Integration
   i. Google Adwords integration
   j. Integration of distance data into Tristate rating
   k. Integration TransUnion credit scoring.
6. Conversion Renewals
   a. All active policies for home, auto, and umbrella will be converted at renewal
   b. Legacy policies will not be converted
7. TSC Claim data to Insurity ODS and Data Mart
8. Insurity data export of Policy data to TSC COBOL System
9. Batch Print modification to send batch print materials for ImageRight import
10. Coverage or Policy Suspension
11. Access Segmentation by line of business
12. Billing Set Up
    a. Premium refund file (checks issued to bank) – maybe can remove if core feature
    b. Direct pay file to bank – maybe can remove if core feature
13. Reporting
    a. Interfaces to ODS and data marts
    b. Canned Reports
    c. Reporting

Payment of these fees will be due upon delivery of each customization.

(d) Additional Customer Specific Customizations and costs, if any, will be identified

during the CRB process.

(e)     Annual Maintenance Fee

Policy Decisions, Billing Decisions, and Reporting Decisions   $252,000   (18%)

Vendor will provide Customer with 20 hours per month, for the term of this Schedule, to be used towards Professional Services. Any unused hours may be carried forward for up to six months, and at no time may the total number of available hours exceed 120. The availability of these hours will begin upon delivery of Production System and will coincide with the start of Maintenance.

Maintenance Fees will begin as follows:

The first payment of   the Annual Maintenance Fee, paid monthly, is due upon delivery of the Production System.

9.   <u>Scope of Maintenance Services.</u>   Vendor will provide the following Software Maintenance Services as part of the Annual License and Maintenance Fee:

(a)     <u>Call-in assistance</u>. Call-in assistance for Customer's trained system administrator and other trained supervisory staff will be available from 9 a.m. to 5 p.m. Eastern Standard Time, Monday through Friday. Off-hour support may be made available to Customer upon request for an additional fee.

(b)     <u>Correction of Software Errors</u>. Errors must be documented by Customer and must be re-creatable in order for Vendor to be able to correct the error. Vendor will correct errors within reasonable time frames based on the priority of the error as mutually agreed upon by the Parties.

(c)     <u>Regularly scheduled system releases</u>.   Regularly scheduled updates to the Software will be provided to Customer throughout the term of this Agreement. Such releases will include applicable Mandatory Updates, Maintenance changes, Enhancements, and/or correction of errors.

(d)     <u>Base System Enhancements.</u>   As Vendor adds additional enhancements or customizations to their Base Products, these enhancements will be made available to Customer as part of regularly scheduled releases. If Customer chooses to enhance or customize any of the Base Products, Vendor will enter into a Schedule with Customer leveraging prior efforts and making available certain enhancements or customizations previously developed for other customers where

such enhancements or customizations are not proprietary or otherwise restricted.

10.   Customer's Responsibilities.   Customer agrees to provide the following support to Vendor:

(a) During the Development Phase and before Delivery:

    i.   Begin final Client Requirements Book (CRB) within 45 calendar days from the execution of the Master Agreement.

    ii.   Assign competent project, insurance/business and technical staff to review and sign-off on the final CRB.  Insurance staff should be knowledgeable of the way Customer conducts its business.

    iii.   Customer should provide adequate resources to ensure that the CRB process is completed within seventy-five (75) calendar days from the date of execution of this Agreement. Should seventy-five (75) calendar days pass and additional Vendor time and resources are required to complete the CRB, such time will be billed to Customer on a time & material basis, provided that such time period may be extended in the event that Vendor causes a delay, prohibiting completion of the CRB.

    iv.   Provide sign-off on development artifacts within 15 business days from receipt of Vendor's request.

    v.   Using mutually agreed to guidelines; develop a test strategy, test conditions and a test plan linking test conditions to policies to be used during pre-delivery and pre-production testing.  These deliverables will be provided by the Customer to the Vendor no later than a date mutually agreed to after the CRB is signed.

    vi.   Participate in Vendor's pre-delivery testing for up to one week at Vendor's site.

    vii.   Using Vendor's guidelines develop a reasonable number of policies to be used as a testing base during pre-delivery and pre-production testing.  This test bed of policies will be representative of 90% of the Customer's business to ensure thorough and accurate pre-delivery testing by Vendor.

    viii.   Customer will share with Vendor all additional test plans and scripts prior to Delivery.

    ix.   Thoroughly test all Software prior to use in production and report all bugs to Vendor, including their priority, in accordance with the mutually agreed upon guidelines and project plan.

    x.   Customer will share with Vendor their deployment plan and will ensure Customer will assign and deploy competent staff to complete deployment –

special deployment resources such as additional training, administrative support can be provided by Vendor for an additional cost.

xi. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(b) Following Delivery and before Acceptance:

i. Provide Vendor regular (weekly) status of Customer's testing results;

ii. Customer set's production target date and communicates changes to all Vendor and Customer stakeholders;

iii. Thoroughly test all Software prior to use in production and report all bugs to Vendor, including their priority, in accordance with the mutually agreed upon guidelines and project plan;

iv. Provide appropriate documentation of errors and utilize vendor's reporting tools;

v. Where needed, Customer will provide Vendor access to Customer systems for diagnostic purposes;

vi. Customer will continue to test all delivered components unless access to such component is prevented due to specific defects preventing such testing;

vii. Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

(c) Following Acceptance:

i. Customer provides Coordinator to qualify problems prior to being reported to Vendor;

ii. Use Vendor on-line compliance adoption and issue reporting system;

iii. Where needed, Customer will provide Vendor access to Customer systems for diagnostic purposes;

iv. Adjust test bed of policies and testing scripts in conjunction with Customer initiated changes made to the Software;

v. Following guidelines, submit to Vendor test cases for Vendor's use in testing future software releases;

vi. Assure that all Customer project coordinators are fully trained in use of the Software before assuming their role(s) as primary contact to Vendor;

vii. Stay current with Service Packs no more than 3 generations behind (6 weeks);

    viii.  Move new Mandatory Updates into a test environment within thirty (30) days of receipt and move them into production no later than seventy-five (75) days following receipt.  Vendor will not support mandatory system releases later than ninety (90) days following the date a replacement release is made available to Customer;

    ix.  Participate in EGC as defined in Section 7.1 of the Master Agreement and adhere to mutually agreed upon escalation policies & procedures;

11.    <u>Conflicting Terms</u>.  In the event there are any conflicts among the terms of this Software Schedule and those in the Master Agreement, the terms of this Software Schedule shall prevail.  In the event there are any conflicts among the terms of the specifications set forth in the CRB and those in this Software Schedule, the terms of the CRB shall prevail.

In witness of the foregoing, each of the Parties hereto has duly executed this <u>Software Schedule</u> as of the day and year first above written.

**INSURITY LLC**

Signature: _Anthony F Reis_

Name: _ANTHONY REISZ_

Title: _PRESIDENT_

Date: _3/31/08_

**TRI-STATE CONSUMER INSURANCE**

Signature: _____

Name: _PENNY FERN HART_

Title: _President_

Date: _3-31-08_